**In the United States District Court**
**For the Southern District of Texas**
**Galveston Division**

| | | |
|---|---|---|
| **Jay Rivera** | § | |
| **Plaintiff,** | § | **C.A. No. 3:17-cv-111** |
| | § | |
| **v.** | § | |
| | § | **9(H) Admiralty** |
| **Kirby Corporation and** | § | |
| **Kirby Offshore Marine, LLC** | § | |
| *In personam* | § | |
| **M.V. Tarpon** | § | |
| *In Rem* | § | |

**Plaintiff Jay Rivera's**
**First Amended Complaint**

**To the Honorable Judge George C. Hanks, Jr.:**

Comes Now, Captain Jay Rivera ("Capt. Rivera" or "Plaintiff") and files this his first amended complaint against *in personam* defendants Kirby Corporation and Kirby Offshore Marine, LLC and against *in rem* defendant *M.V. Tarpon* and would respectfully show the court as follows:

**I.**
**Jurisdiction & Venue**

This is an admiralty and maritime claim within the meaning of Article III, Section 2 of the United States Constitution; 28 U.S.C. §§ 1331, 1333; and rule 9(h) of the Federal Rules of Civil Procedure. Venue is proper in this district as Defendants have availed themselves of this district by directing its vessels to the ports of Galveston County, Texas, and the injuries to Plaintiff occurred while on board the *M.V. Tarpon*

1

while the vessel was in the territorial waters offshore Texas, which are located in this judicial district.  Furthermore, Defendant Kirby Corporation's headquarters are located in this judicial district.  The Kirby Defendants have answered this suit and have appeared herein.

## II.
## Parties

1.     Plaintiff Capt. Jay Rivera is an individual Citizen of the State of Texas who currently resides at 16101 Cuttysark St Corpus Christi, TX 78418, which is within this District.

2.     *In Personam* defendant Kirby Corporation is a foreign corporation which regularly engages in business in the state of Texas and maintains its corporate headquarters in Houston, at 55 Waugh Drive, Suite 1000, Houston, Texas 77007, and may be served with process with its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620 Austin, Texas 78701-3136.   Kirby Corp. has appeared and is represented by counsel.

3.     *In Personam* defendant Kirby Offshore Marine, LLC is a foreign limited liability company which regularly engages in business in the state of Texas and maintains its corporate headquarters in Houston, at 55 Waugh Drive, Suite 1000, Houston, Texas 77007, and may be served with process with its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company

2

at 211 E. 7th Street, Suite 620 Austin, Texas 78701-3136.  Kirby Offshore Marine,

LLC has appeared and is represented by counsel.

3.      *In rem* Defendant *M.V. Tarpon* (official number 1231405) may be found

wherever she is afloat.  The operator of the *M.V. Tarpon,* Kirby Offshore Marine, LLC

has appeared on behalf of the vessel and has stipulated that it is the responsible party

for the *in rem* unseaworthiness allegations contained herein.

### III.
### Background Facts

#### A.      Captain Jay Rivera – Aransas Corpus-Christ Pilot

5.      Capt. Rivera is an Aransas-Corpus Christi Pilot and is licensed by the United

States Coast Guard as a First Class Pilot and holds a commission from the State of

Texas to conduct compulsory pilotage to vessels calling on Nueces County.  *See*

*generally* TEX. TRANSP. CODE 70.001 *et seq*.

6.      Capt. Rivera has maintained his Texas pilotage commission for twelve-years.  In

order to serve as Texas state pilot, Capt. Rivera is also required to pass and maintain

a United States Coast Guard first class pilot's license.  *See* TEX. TRANSP. CODE §

61.011(a).

7.      As part of Capt. Rivera's responsibilities as an Aransas-Corpus Christ Pilot, he

is responsible for protecting the natural resources of the state of Texas by providing

navigational guidance to the captains of the vessels who are required to use pilots

aboard their vessels.

8.      Due to the injured made the basis of this case, Capt. Rivera is now physically incompetent to act as a Pilot under his U.S. Coast Guard issued First Class Pilot Endorsement, and consequently, cannot act as a compulsory pilot in accordance with the Chapter 60 of Texas Transportation Code.

####      B.      M.V. Tarpon/DBL 76

9.      The *M.V. Tarpon*, official number 7390923, is a seagoing towing vessel which comprises an articulated tug/barge unit ("ATB") when the vessel is affixed to, or "in the notch" of, tank barge DBL 76.

10.      On August 16, 2016, Capt. Rivera was dispatched to bring the ATB from the Port Aransas sea buoy to Oil Dock #11.

11.      At approximately 4:00 p.m. boarded the ATB offshore Port Aransas from the pilot boat.  As he had done thousands of time before on different vessels, Capt. Rivera boarded the ATB by climbing up the pilot ladder and onto the deck of the barge DBL 76.   He was met by an able bodied seaman ("AB") Charles Hudgins who was apparently on his first hitch aboard the ATB.  The AB then escorted Capt. Rivera to the stern of the barge where they both climbed down a set of inset ladder rungs built into the barge's skin, and onto the deck of the *M.V. Tarpon*.

12.      Capt. Rivera was then escorted to the rear of the house of the *M.V. Tarpon*, where he was required to enter the interior of the *M.V. Tarpon* by climbing through a watertight door.   At this time, the escort went ahead of Capt. Rivera into the interior

4

of the wheelhouse, and left him behind—unescorted.  A true and correct photograph

of the entrance to the *M.V. Tarpon's* house, or "fiddly" is shown below as well as a

photograph of the bulkhead and engine room access hatch on the interior of the house.



Photograph of the *M.V. Tarpon* "fiddly"



Photograph of the bulkhead and engine room access hatch

13.     As Capt. Rivera climbed over the bulwark, making use of the exterior and interior steps, he then stepped down onto the engine room access hatch.

14.     Unbeknownst to Capt. Rivera, the edges of the engine room access hatch, which were not marked with any type of yellow tape warning of its hazard, are raised from the deck approximately two inches.  The AB also failed to warn Capt. Rivera of this hazard and was not present to prevent him from falling or to assist him over the watertight door/bulkhead.

6

15.     As Capt. Rivera stepped onto the engine room access hatch, his left foot landed on the raised edge of the engine room access hatch and his foot rolled off the raised edge causing him to fall to the deck.  Capt. Rivera immediately felt a pop in his left foot and he believed he had simply rolled his ankle.

16.     Capt. Rivera lay there in distress until the escort returned and assisted him to his feet and into the wheelhouse.   Although he was in severe pain at the time, Capt. Rivera believed he could complete the task of bringing the vessel safely into port.

17.     Upon arriving in the wheelhouse, Capt. Rivera informed the master of the *Tarpon* of his injury, and complained about the raised and unmarked deck area in the fiddly.  Capt. Rivera asked for some ice for his rapidly swelling foot.  He then made the transit from the sea buoy to Oil Dock #11 with ice on his foot, and in extreme pain.

18.     Throughout the three hour transit, Capt. Rivera began to become more and more concerned that this was something more than a simple ankle sprain.

19.     After completing the docking evolution, Capt. Rivera became concerned that he would not be able to safely disembark the vessel, and so he asked the line handlers who were assisting in mooring the vessel to help him off the *Tarpon* and to help carry him to his vehicle.  Capt. Rivera then travelled to the Bay Area Hospital emergency room where he received X-rays.

20.     Concerned that the extent of the damage could be permanent, Capt. Rivera was then seen by an orthopedic specialist, Dr. Dawn Grosser at South Texas Bone & Joint

7

who diagnosed Capt. Rivera with a fracture of the fifth metatarsal of his left foot.

21.     As a result of the injury, Capt. Rivera was required to wear an air-boot and use a bone growth stimulator. Capt. Rivera, who is required by the United States Coast Guard to maintain physical competency to act as a pilot, was rendered physically incompetent as a result of his injury aboard the *M.V. Tarpon* on August 16, 2016.

22.     Following the initial treatment, Dr. Grosser released Capt. Rivera to return to work on January 31, 2017 with the assistance of a carbon-fiber orthopedic insert. However, Capt. Rivera began to experience severe pain in his foot, and returned to consult with Dr. Grosser about his pain.

23.     Dr. Grosser conducted a bone scan on Capt. Rivera's left foot which revealed that the fifth metatarsal had not healed, and a surgery would be required to insert stabilizing hardrware.

24.     Surgery was performed on Capt. Rivera's left fifth metatarsal on September 7, 2017, and although the surgery appears to have repaired the bone, Capt. Rivera began experiencing numbness and pain in his foot which causes him distress and uncertainty with his balance.

25.     As a result of this chronic and lingering pain in his left foot, Capt. Rivera consulted with neurologist Dr. Randolph Evans on December 28, 2017.

26.     Dr. Evans opined that Capt. Rivera suffers from Complex Regional Pain Syndrome (CPRS), which upon information and belief is a permanent condition the

treatment of which will render Capt. Rivera physical incompetent to hold a U.S. Merchant Mariner Credential and to act as a state compulsory pilot in Texas.

27.     As a result of Capt. Rivera's medical condition he is now physically incompetent to act not only as a harbor pilot, but as a mariner in any capacity.

28.     Capt. Rivera is seeking damages as a result of the negligence and unseaworthiness of Kirby Defendants and the *M.V. Tarpon*.

**IV.**
**<u>Claims:</u>**

### A.     Negligence:

29.     Capt. Rivera incorporates paragraphs 1-286 as if fully set forth herein.

30.     On August 16, 2016 Kirby Offshore Marine, LLC as the operator of the *M.V. Tarpon*, was responsible for providing a safe means of ingress and egress to Capt. Rivera, and owed the duty of reasonable care under the circumstances.

31.     Before the requirement for vessels to have a ship security plan, it was a well-established maritime custom to provide escorts to pilots from the deck to the navigation bridge on arrival and from the navigation bridge to the deck on departure of the pilot.  With the requirements for vessels such as the *M.V. Tarpon* to maintain a ship security plan, the escort custom became law.  *See* 33 CFR § 101.

32.     The Kirby Defendants provided an untrained seaman to escort Capt. Rivera to the wheelhouse, and who failed to inform Capt. Rivera of the raised engine room access hatch that he would have to transition over, and ultimately left him unescorted

9

as he transitioned through the Fiddly.  Leaving Capt. Rivera unescorted was a violation of the ship's security plan and of the International Convention for Safety of Life at Sea (SOLAS).

33.    Additionally, the Kirby Defendants failed to sufficiently mark the hazard of the raised engine room access hatch cover with contrasting paint or yellow tape which is the industry standard.

34.    The Kirby Defendants, by and through the crew members aboard the *M.V. Tarpon*, neglected to warn Capt. Rivera of the dangerous and hidden nature of the raised engine room access hatch cover, and warn him of those dangers, and as a result, Capt. Rivera fell and was injured.

35.    Furthermore, the escort provided by Kirby failed to accompany Capt. Rivera through the entire boarding evolution, which was a violation of the vessel's safety management system, and shipboard security plan.

   **B.    Unseaworthiness-*Sieracki* Seaman:**

36.    Capt. Rivera incorporates paragraphs 1-35 as if fully set forth herein.

37.    At the time of Capt. Rivera's injury, he was aboard the *M.V. Tarpon* to perform pilotage services and to conn the vessel from the sea buoy to Oil Dock #11.

38.    Pilotage is a traditional maritime activity that is critical to the safe navigation of ocean going ships and requires the localized knowledge of a duly licensed pilot to safely conn the vessel past the shoals, reefs and other submerged hazards in the ship

10

channel.

39.     Compulsory pilots, such as Capt. Rivera, are not members of the crew of the vessel, but assist in the mission and safe navigation of the vessel.

40.     Due to the relationship of Capt. Rivera to the *M.V. Tarpon*, the vessel (and its owners) owed to him the duty of a seaworthy ship under the doctrine of seaworthiness. *See Seas Shipping Co., Inc. v. Sieracki*, 328 U.S. 85 (1946).

41.     The *M.V. Tarpon* was unseaworthy as that term is understood at law as the engine room access hatch cover was defectively designed, or engineered, or marked in such a way to not appraise anyone transiting it of its inherent danger, creating an unsafe condition aboard the vessel.   Furthermore, this unmarked and hazardous condition created a tripping hazard comprising an unseaworthy condition of the *M.V. Tarpon*. *See Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539 (1960).

42.     Coupled with the defective access hatch is the lack of any handrails sufficient for anyone to use to stabilize themselves upon entering the house of the *M.V. Tarpon*, and therefore compounding the defective access hatch.

       **C.     *Negligence Per Se***

43.     Plaintiff incorporates paragraphs 1-42 as if fully set forth herein.

44.     The *M.V. Tarpon* is an American flagged towing vessel which is classified by the American Bureau of Shipping (ABS).

45.     Under ABS's classification requirements, the *Tarpon* is categorized as a "Cargo

11

Ship" for purposes of the International Convention for Safety of Life at Sea (SOLAS).

46.     The United States has adopted Chapter IX of SOLAS, which covers the Safe Operation of Ships and for Pollution Prevention. *See* 33 CFR § 96.100.

47.     Among other things, the vessel failed to promulgate a proper Safety Management System (or Towing Safety Management System) (SMS) which addresses escorting pilots such as Capt. Rivera and identifying and remedying trip and fall hazards, such as the unmarked hatch cover.   The vessel also failed to provide handrails as required by 46 C.F.R. § 42.15-75(d).

48.     Escorting of pilots to and from the wheelhouse is required under SOLAS regulation twenty-three, and the failure to incorporate a protocol in Kirby Offshore Marine, LLC's SMS, and in fact the utter lack of any policy on this whatsoever is a violation of the International Ship Management Code (ISM) regulations (46 USC §§ 3202, 3203(a)), as well as SOLAS.

49.     Furthermore, the *M.V. Tarpon* also lacked handrails as required by 46 C.F.R. § 42.15-75(d) which provides for the protection of the crew and others doing the crews' worknin having a satisfactory means access to the various working parts of the *M.V. Tarpon*.

50.     As a compulsory pilot, Capt. Rivera was within the class of people intended to benefit from these regulations, namely having a safe means of walking within the ship.

51.     A trip is the type of injury a handrail and safety policies identifying trip and fall

hazards is intended to prevent.

52.    The violation of the foregoing U.S. Coast Guard regulations are all unexcused and proximately caused Capt. Rivera's injuries and therefore constitute negligence *per se*. *Kernan v. Amer. Dredging Co.*, 355 U.S. 426, 78 S. Ct. 394 (1958); *Reyes v. Vantage S.S. Co.*, 609 F.2d. 140 (5th Cir. 1980).

**Causation:**

53.    Plaintiff would show that the above described incident was caused by the aforementioned negligence and negligence *per se* of the Defendants and/or the unseaworthiness of the *M.V. Tarpon*.  Defendant owed and breached  duties to Capt. Rivera and those breaches proximately caused damages and injuries to Plaintiff.

54.    Because Kirby failed to maintain a proper and complete SMS manual, this amounts to a violation of a rule intended to prevent the accident in question, and therefore Plaintiff invokes the Rule of the *Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873).  Accordingly, Kirby must show that the violation of the escort policy and failure to have a sufficient trip and fall hazard identification procedure could not have been the cause of the injury.  *Id.*

D**.    Damages:**

55.    Capt. Rivera incorporates paragraphs 1-54 as if fully set forth herein.

56.    In the occurrence made the basis of this suit, Plaintiff Jay Rivera, sustained severe bodily injuries. Because of the nature and severity of the injuries sustained,

Plaintiff has sustained physical pain and mental anguish in the past and in reasonable probability he will continue to suffer physical pain and mental anguish in the future. At the time of the occurrence made the basis of this suit, Plaintiff was a healthy able bodied working man, who was at the apex of his profession: a harbor pilot.

57.     Plaintiff has and will suffer physical impairment and disfigurement. Because of the occurrence in question, Plaintiff has sustained very painful and disabling physical injuries that have caused him to sustain a loss of earnings and wage earning capacity and household services in the past and this condition will exist into the future.

58.     Because of the nature and severity of the injuries he sustained, Capt. Rivera has required medical treatment in the past and in reasonable probability will require other and additional medical treatment in the future. Charges for such medical treatment that have been made in the past and those which will in reasonable probability be made in the future have been and will be reasonable charges made necessary by the occurrence in question.

59.     Considering Plaintiff's loss of earning capacity as an Aransas-Corpus Christ Pilot, as well as his lost retirement and lost pension benefits due to his injuries suffered aboard the *M.V. Tarpon*, Plaintiff estimates his economic damages to be in excess of $15,000,000.00.

60.     Plaintiff would additionally say and show that he is entitled to recovery of pre-judgment and post-judgment interest in accordance with law and equity as part of his

14

damages herein and your Plaintiff here and now sues specifically for recovery of pre-judgment and post-judgment interest as provided by law.

## V.
## Conclusion

WHEREFORE, Jay Rivera, Plaintiff, prays that upon final trial and hearing hereof Plaintiff recover his damages in accordance with the evidence, that he recover costs of Court herein, that he recover interest to which he is entitled under law, and for such other and further relief, general and special, legal and equitable to which he may show himself justly entitled

Respectfully submitted.

**Johnson & Crew, PLLC**

*/s/ Paxton N. Crew*
**Paxton N. Crew**
ATTORNEY-IN-CHARGE FOR
JAY RIVERA
SDTX 859147
TBA No. 24058720
Paxton@JohnsonCrewLaw.com
303 East Main
Suite 260
League City, Texas 77573
Telephone 713-955-0909
Facsimile 409-908-4050

## **Certificate of Service**

I, Paxton N. Crew do certify that the foregoing document was filed on all counsel of record as listed on the court's docket sheet via the District Court Electronic Case Filing System (ECF) on this 19th day of January, 2018.


*/s/ Paxton N. Crew*
**Paxton N. Crew**

16