**In the United States District Court**
**For the Southern District of Texas**
**Galveston Division**

| | | |
|---|---|---|
| **Jay Rivera** | § | |
| **Plaintiff,** | § | **C.A. No. 3:17-00111** |
| | § | |
| **v.** | § | |
| | § | **9(H) Admiralty** |
| **Kirby Offshore Marine, LLC** | § | |
| *In personam* | § | |
| **M.V. Tarpon** | § | |
| *In Rem* | § | |

---

## PLAINTIFF'S AMENDED
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW, Jay Rivera, Plaintiff, and respectfully submits his Proposed Findings of Fact and Conclusions of Law in accordance with the Court's scheduling order and would respectfully ask the Court to adopt the proposed findings of fact and conclusions of law in this case:

1.     The above cause was brought on for a bench trial commencing on December 17, 2018 and ending on _____, the Honorable George C. Hanks Jr. presiding. The court, having carefully considered the testimony of all witnesses present live and by deposition, all exhibits admitted during the course of the trial, all pleadings filed in this case, the Joint Pre-Trial order, statements and arguments of counsel and the proposed findings of fact and conclusions of law submitted by Plaintiff and Defendant herby enters its Findings of Fact and Conclusions of Law.

1

## I.      Findings of Fact

2.      Plaintiff Jay Rivera was a state commissioned harbor pilot working in Corpus Christi, Texas.  He maintained a United States Coast Guard Merchant Mariner Credential (hereafter "License") and a commission from the State of Texas as a Branch Pilot, for the Port Aransas Bar, Corpus Christi Bay and Tributaries (hereafter the "Commission").

3.      As a Branch Pilot, Capt. Rivera was a member of the unincorporated association known as the Aransas-Corpus Christi Pilots (the "Association").

4.      The Articles of Agreement for the Association require that in order to be a member of the Association, a member must have a valid U.S. Coast Guard License and Commission from the State of Texas to operate as a Branch Pilot.

5.      Prior to becoming a pilot, Capt. Rivera was a licensed master mariner who sailed on U.S. Flagged chemical tankers.  In 2005, he was accepted into the Aransas Corpus Christi Pilot deputy training program, and in 2008, he was appointed as Branch Pilot for the Port Aransas Bar and Corpus Christi Bay and its Tributaries by then Texas Governor, Rick Perry.

6.      Capt. Rivera's state commission was renewed in 2011 by then Governor Perry, and in 2015 by Governor Greg Abbott.


### The Incident and Injury to Capt. Rivera

7.     On August 19, 2016, Capt. Rivera was the Aransas Corpus Christi Pilot dispatched to pilot the M.V. Tarpon and barge DBL/76 from the sea buoy to Oil Dock #1 in Corpus Christi, Texas.

8.     The *M.V. Tarpon*, official number D556953, IMO No. 7390923, is a seagoing towing vessel which comprises an articulated tug/barge unit ("ATB") when the vessel is affixed to, or "in the notch" of, tank barge DBL 76 (or other similar barges).  Because the *Tarpon* did not have a crewmember aboard who was licensed by the U.S. Coast Guard to act as a First Class Pilot for the Corpus Christi Ship Channel, it was required by its Safety Management System, and federal and local law to take a first class pilot aboard.  That Pilot was Capt. Jay Rivera.

9.     At approximately 4:00 p.m. on August 19, 2016, Capt. Rivera boarded the ATB offshore Port Aransas from the pilot boat.  As he had done thousands of times before, he boarded the vessel by climbing up the pilot ladder and onto the deck of the barge DBL 76.   There is some dispute at the point he was met by the escort  ("AB") David Hudgins, but it either transpired on the deck of the barge DBL 76 or on the deck of the *Tarpon*.   After boarding the *Tarpon*, Capt. Rivera transited to the stern of the barge where he climbed down a set of inset ladder rungs built into the barge's skin, and onto the deck of the *M.V. Tarpon*.

10.     Capt. Rivera was then escorted to the rear of the house of the *M.V. Tarpon*.  As Capt. Rivera was transiting down the port side of the house of the

*Tarpon*, he lost sight of the escort.  He then approached the rear of the house of the *Tarpon* where he was required to enter by climbing over a raised bulkhead and through a watertight door.   At this time, Capt.Rivera was unescorted.

11.     Capt. Rivera then transitioned over the watertight door and attempted to step down to the interior deck area in the machinery space of the Tarpon.

12.     As Capt. Rivera stepped down, his foot landed on the edge of a raised hatch cover that was raised approximately 1" to 1 ½" inch from the remaining part of the deck.

13.     This hatch cover was located in the main passageway utilized by everyone on board the vessel to enter and exit the main quarters on the vessel, and was unmarked with any contrasting paint or tape as is customary in the maritime industry to denote a possible walkway hazard.  This deck plate is part of an engine room access hatch that is used by the crew of the *Tarpon* to lift heavy equipment in and out of the engine room below this walkway.  It also serves as a critical component of the deck's walkway, because without it, a large hole would be present descending down into the engine room below.

14.     The Court finds that this engine room access hatch, in the condition it was in on August 19, 2016 was neither open, nor obvious, to a person unfamiliar with the vessel as was Capt. Rivera.

15.     As the edge of Capt. Rivera's left foot landed on the edge of the

4

engine room access hatch cover, his foot rolled and he experienced what he believed to be a severely sprained ankle.  Some minutes later, the escort returned to assist Capt. Rivera to his feet.  Capt. Rivera then made his way to the wheelhouse of the vessel to meet the Captain of the *Tarpon*, Jay Crossman.

16.     Capt. Rivera reported his injury to Capt. Crossman and asked for Ibuprofen and ice for his ankle.  He then took the conn of the *Tarpon* and safely navigated the vessel for the entirety of the inbound transit.

17.     Upon reaching Oil Dock #1, Capt. Rivera expressed concern that he would be unable to safely disembark by the gangway, and therefore asked the line handlers assisting in mooring the vessel to carry him off the vessel and to assist him in getting into his vehicle.

18.     Capt. Crossman did not report this injury to the U.S. Coast Guard. This was one of many record keeping violations the court finds cast doubt on the veracity of the records Kirby argues support no other accidents ever occurred aboard the *Tarpon*.  Amongst others, the Court also noted that the crew of the *Tarpon* had been cited in internal audits for failing to properly record log entries and failing to properly record and maintain records of Job Hazard Analysis.  The Court therefore finds that Kirby's and the *Tarpon's* internal record keeping is suspect.

19.     Capt. Rivera then travelled to the Bay Area Hospital emergency room

where he received X-rays.

20.     Concerned that the extent of the damage could be permanent, Capt. Rivera was then seen by an orthopedic specialist, Dr. Dawn Grosser, at South Texas Bone & Joint who diagnosed Capt. Rivera with a fracture of the fifth metatarsal of his left foot.   The Court notes the medical evidence that throughout the early treatment of Capt. Rivera's fracture, he began to experience hyperintense pain over the dorsum of his foot, with coolness and numbness and tingling throughout the entire foot.   The Court accepts the medical testimony that these were symptoms of Complex Regional Pain Syndrome that Capt. Rivera demonstrated in September 2016.

21.     As a result of the injury, Capt. Rivera was required to wear an air-boot and use a bone growth stimulator.

22.     Following the initial treatment, Dr. Grosser released Capt. Rivera to return to work on January 31, 2017 with the assistance of a carbon-fiber orthopedic insert.   However, Capt. Rivera continued to experience severe pain in his foot, and returned to consult with Dr. Grosser about his pain.

23.     Following his return to work, Capt. Rivera continued to undergo physical therapy treatments at New Stride Physical Therapy in Corpus Christi, Texas and complained of continued pain in his left foot.

24.     In July 2017, Capt. Rivera presented for his annual U.S. Coast Guard

physical, which he was able to pass.  This caused Capt. Rivera's medical certificate to remain valid until July 2019.

25.     On July 27, 2017, Dr. Grosser saw Capt. Rivera again regarding his left foot.  Diagnostic examinations revealed Capt. Rivera's fifth metatarsal in his left food had not fully healed and she attributed the ongoing pain problems to this non-union.  She recommended surgical fixation of the Capt. Rivera's left fifth metatarsal.

26.     Surgery was performed on Capt. Rivera's left fifth metatarsal on September 7, 2017, and although the surgery repaired the bone, Capt. Rivera began experiencing increased numbness and pain in his foot which causes him distress and uncertainty with his balance.   Capt. Rivera related that this pain was similar to the pain he experienced prior to surgery, but that it had increased in orders of magnitude.

27.     Dr. Grosser recommended yet another surgery to remove a callus from the nerve endings in the vicinity of the fifth left metatarsal.

28.     Wary of further complications, Capt. Rivera consulted with neurologist Dr. Randolph Evans on December 28, 2017.

29.     Dr. Evans examined Capt. Rivera and noted the hyperintense pain (allodyinia), discoloration of the foot, coolness to the touch compared to the right foot, and a loss of hair over the dorsum of the left foot.

30.     Dr. Evans opined that Capt. Rivera had all the clinical symptoms for what is known as the Budapest Criteria, which is the classic diagnosis of Complex

7

Regional Pain Syndrome (CPRS-1). Dr. Evans offered testimony that in his opinion, Plaintiff's CRPS was more likely than not directly related to his August 19, 2016. The Court accepts this testimony.

31.     Dr. Evans recommended that Capt. Rivera begin taking Gabapentin, a nerve medication, and to continue to treat with Dr. Grosser. Dr. Evans recommended that if Capt. Rivera's CRPS did not improve, to see a pain management specialist.

32.     Following Dr. Evans diagnosis, Dr. Grosser discontinued treatment of Capt. Rivera and referred him to Dr. Li-Herng Liu of the Institute of Precision Pain Management in Corpus Christi, Texas. Dr. Liu also made a clinical diagnosis of CRPS-1.

33.     Dr. Liu performed a series of nerve blocks on Capt. Rivera and discussed a spinal cord stimulator implant. Based on the risks of possible paralysis involved with the implantation procedure, Capt. Rivera declined.

34.     As required by the U.S. Coast Guard licensing requirements, on June 20, 2018, Capt. Rivera presented for his annual coast guard physical examination. The examining medical practitioner, Dr. Thomas Moloney reviewed his medical history, and notes from Dr. Grosser and Dr. Evans and recommended to the United States Coast Guard that Capt. Rivera be found medically unfit to hold his merchant mariner credential. The National Maritime Center issued a letter to Capt. Rivera in June, 2018 advising him of their finding that he not serve under the authority of his

license.

35.     On July 27, 2018 the Board of Pilot Commissioners for the Port of Corpus Christi held a public hearing to consider what action to take on Capt. Rivera's state commission in evaluating whether he was medically qualified to carry out the duties of a harbor pilot.  During that meeting the Port of Corpus Christi Pilot Board voted unanimously to recommend to the Governor that Capt. Rivera's state commission be revoked.

36.     As required under the Association Articles of Agreement, Capt. Rivera was no longer a member of the Aransas-Corpus Christi Pilots as of July 31, 2018.

37.     The Court therefore finds that Captain Rivera's injury of August 19, 2016 was the proximate cause of Capt. Rivera's loss of his License, Commission and revenue stream from conducting pilotage.

**Maritime Status**

38.     The question of Capt. Rivera's maritime status depends on a number of factual issues which the Court now determines.

39.     Capt. Rivera was commissioned by the State of Texas to act as a Branch Pilot for Port Aransas Bar and Corpus Christi Bay and Tributaries from 2008 until 2018.   A Harbor Pilot's role aboard a ship is that of a navigator in pilotage waters. This is a role that is the traditional hallmark of a Seaman.  However, the Court finds that Capt. Rivera was not employed by the Defendant, and was free to use his own

judgment in carrying out his duties as an Aransas-Corpus Christi Pilot.  Therefore, even though his duties aboard the vessel were essentially those of a seaman, because he is not an employee of the defendant, he is not a Jones Act Seaman.

40.    It is undisputed that Capt. Rivera's injury occurred on the navigable waters of the United States.

41.    Capt. Rivera's duty as an Aransas-Corpus Christi Pilot is to safeguard the waters of the State of Texas from possible collisions with other vessels thereby protecting the environment and population of the Texas coastline from maritime disasters.  The Court therefore finds that because Capt. Rivera was autonomous in his role as a Pilot, and because his occupation is commissioned by the State to serve the Public, he is a public officer.

42.    The Court also finds, and it is undisputed by the parties, that Capt. Rivera was in no way involved in the loading or unloading of the *M.V. Tarpon*, or in any other traditional longshore activities.

### Kirby's Naval Architect Expert

43.    Mr. Martyn is a naval architect and former U.S. Coast Guard marine inspector.  Mr. Martyn testified that he knew of no standards that required an elevation change of at least 1", such as the engine room access hatch presented, to be marked with dissimilar colored visual cues that would warn someone of the elevation change or nature of the hazard.  Mr. Martyn further testified that the

Kirby training video, published by Moxie Media Video "STEP BACK FOR SAFETY, Slips, Trips and Falls," offered no instruction on this, and he dismissed ASTM-1166 as a standards for marine walkways that indicated a 3/8" elevation change should be marked with a visual cue as a warning. Indeed, the Court reviewed the training video used by Kirby to train its crewmembers that Mr. Martyn testified he had reviewed and that Capt. Jay Crossman admitted that he had also reviewed.

44. After reviewing the Moxie Media training video at trial, the Court observed a hazard nearly identical to the one complained of by the Plaintiff depicting a worker rolling his ankle on an unmarked obstruction in the walkway as well as numerous examples of potential hazards and what to do to avoid someone being hurt by them. In spite of offering this training to its employees, none of the training advice was followed by the crew. Likewise, the Court considered training materials from the American Waterways Operators, of whom Kirby is a member, which also indicated that as little as 3/8" elevation change can comprise a trip and fall hazard. Mr. Fogelsanger, Kirby's corporate representative indicated that Kirby had received those training materials, and had incorporated them into its training program by way of, among other things the Moxie Media Video. Furthermore, the Court takes notice that Capt. Crossman admitted that Kirby's policy was to mark hazards when identified, and that other hazards similar to the engine room access hatch should be

11

marked.

### Pilot Compensation

45.     As a Harbor Pilot, Capt. Rivera received considerable compensation.

46.     He was paid a net distribution by the Aransas-Corpus Christi Pilots on a monthly basis.  This net distribution takes into account almost all expenses incurred by Capt. Rivera related to his function as a harbor pilot: pilot boat upkeep and expenses; pilot station upkeep; salaries and insurance premiums for employees; operation of a fleet of dock cars; 401K contributions.

47.     The Court heard testimony from Misty Mata, the accountant for both Capt. Rivera and the Aransas-Corpus Christi Pilots on how Capt. Rivera was compensated for his job as a harbor pilot, including whether the figures in his form K1 were net or gross distributions.  The Court finds Ms. Mata's testimony credible and accepts it.  Kirby offered no contrary testimony on the effect of Capt. Rivera's compensation from the pilots and therefore finds that Capt. Rivera's net distributions as expressed in his K1 for wage base calculations for the years 2013-2017 are appropriate for analysis under *Culver v. Slater Boat Co.*, 722 F.2d. 114 (5th Cir. 1983).

48.     Capt. Rivera offered Mr. Dan Cliffe as an expert economist to testify to Capt. Rivera's past and future wage loss, and loss of fringe benefits.

49.     The Court heard testimony from Capt. Rivera's economist on the

revenue stream he derived from Pilotage. It was considerable. For instance, in 2013 Capt. Rivera's K-1 partner distribution from performing pilotage was $613,349. In 2014 his distribution was $702,007. His distribution in 2015 was $722,000. In 2016, the year he was injured, his distribution was $604,923, and in 2017, it was $692,908.

50.     Capt. Rivera's economist, Mr. Dan Cliffe, testified that the average of these five years revenue streams was $667,211.

51.     Mr. Cliffe then reduced $667,211 by $20,000 for other non-reimbursable expenses related to pilotage and determined Capt. Rivera's wage base from piloting was $647,211.

52.     Mr. Cliffe also determined that Capt. Rivera's past wage loss, after taxes, was $157,810 as he had been paid full pay by the pilots up until the point the Board of Pilot Commissioners revoked his commission.

53.     Mr. Cliffe also testified that the Aransas Corpus Christi Pilot defined benefit pension plan allows for thirty-years of maximum participation, and that because of Capt. Rivera's injury, he would lose approximately 19 years of contributions. The value of those lost contributions, discounted to present value is $1,469,129.

54.     Mr. Cliffe relied on the opinion of Wallace Stanfill, Jr. in order to establish Capt. Rivera's residual earning capacity. Mr. Stanfill opined that Capt. Rivera's had demonstrable residual earning capacity of $55,000, but this was in

addition to his pilot income and was not pilot income.

55.     Opposed to this testimony is the testimony of Dr. Thomas King, who testified that he believed Capt. Rivera's residual earning capacity is between $100,000 and $300,000 per year.  The gist of Dr. King's opinion is that if Capt. Rivera now has more time to work, his consulting work would increase and he would make more money.  The methodology he utilized was to estimate that Capt. Rivera could devote ten hours a week to consulting work, and would therefore be able to earn approximately $300,000 a year.   The court finds that Dr. King's opinion is highly speculative and lacks the type of reliability that expert testimony should possess.  Dr. King offered no publications, literature, studies, or any sort of evidence beyond his bare opinion that Capt. Rivera would work more, in other words it was because he said so.   The Court does not accept Dr. King's testimony as a basis for a residual earning capacity.

56.     As for the remainder of Dr. King's opinion, he offered only one job opening—from across the entire United States—that he felt Capt. Rivera's job skills translated to.  That job only offered compensation of $65,000.  Dr. King also testified that he reviewed occupations for annual wages he located on a internet website that listed a number of professions that he felt Capt. Rivera may be qualified for.  The average salaries ranged from $50,000 to $180,000.   Dr. King did not, however, conduct a labor market survey regarding whether Capt. Rivera would actually qualify

for any of these jobs, or whether his current disability would be a barrier for his employment. As such, because he did not rule out or actually conduct any sort of investigative work regarding these other jobs and Capt. Rivera's ability to obtain them, these opinions are highly suspect and lack any sort of methodological rigor. The court does not find Dr. King's opinions to be helpful or reliable and therefore rejects them.

57. In contrast to Dr. King's speculative opinion on potential jobs, the only demonstrable evidence of residual earning capacity is that Capt. Rivera could earn $95,000 a year as a maritime consultant and expert witness. Capt. Rivera concedes that he believes $150,000 a year is acceptable. The Court accepts that amount, but does not reduce Capt. Rivera's wage base by the full $150,000 because he was already earning $95,000 as a consultant before the injury. The question of whether Capt. Rivera could earn more than $150,000 a year in another profession is also highly speculative, and the Court has no evidence to rely upon in finding a higher residual earning capacity than $55,000 which would represent new money the Plaintiff may earn in the future over and above what he was previously able to earn as a marine consultant in a part time capacity.

58. The Court finds that Capt. Rivera's future lost earnings should be reduced by $55,000 for residual earning capacity, and after projecting that amount out for the remainder of Capt. Rivera's work life, that Capt. Rivera's future lost

earnings should be reduced by the present value of $800,000, using a discount rate of 1.02 percent under the real discount rate method articulated in *Culver*.

59.     The Court relies on the following evidence to support its finding that Capt. Rivera's work-life expectancy would be beyond the DOL statistical average of age 62: (a) Capt. Rivera's physician, Dr. Thomas Moloney, testified that that he saw no reason the Capt. Rivera could not work to age 68 or beyond, considering his prior health and physical condition before his injury; (b) there is no mandatory age of retirement for harbor pilots in Corpus Christi, Texas.  The only mandatory retirement age for harbor pilots in other ports of Texas is age 68 (Orange, Jefferson County, Houston, and Freeport); and (c) many current harbor pilots in Corpus Christi are working past the age of 60, including on harbor pilot over the age of 70.  For these reasons, the Court finds that had Capt. Rivera not been injured, more likely than not, he would have worked to the age of _____.

60.     The Court therefore awards _____ as future lost earnings discounted to present value and taking into consideration the consequences of taxes on that lost income as required by *Culver II*.

61.     In addition to Capt. Rivera's wage loss, he also experienced a loss of fringe benefits consisting of pension plan contributions.  Capt. Rivera's pension plan has a maximum of thirty-years before no more contributions could be made.  Capt. Rivera had only eleven-years of participation in the pension plan, and therefore the

Court finds that Capt. Rivera would have, but for this injury, continued to participate in the pension plan for an additional 19 years.   The Court therefore awards Capt. Rivera $1,469,129 discounted to present value.

## II.     Conclusions of Law

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and jurisdiction of the United States and this Court is proper under 28 U.S.C. §1333.

2.     The primary dispute in this case involves Capt. Rivera's legal status. Prior to Capt. Rivera's loss of his license and commission, he was a harbor pilot licensed by the United States Coast Guard as a Master unlimited tonnage on any seas.  This is the highest merchant marine license a mariner can hold.  He was also commissioned as a public officer of the State of Texas as a Branch Pilot for the Port Aransas Bar and Corpus Christi Bay and its Tributaries by the Governor of Texas.

3.     Defendants argue and urge the Court to find that Capt. Rivera is a longshoreman and that his remedies are exclusively found in the Longshore and Harborworker's Compensation Act ("LHWCA" or "Longshore Act"), 33 U.S.C. §§ 901, 905(b).

4.     The Court finds, as explained below, that Capt. Rivera is neither a Jones Act Seaman nor a Longshoreman, but is a *Sieracki* seaman entitled to the

warranty of seaworthiness. Plaintiff urges the Court to find that Plaintiff is a maritime worker who falls in a gap between Longshore Act coverage and the Jones Act. The Court finds, as explained below, that Capt. Rivera's is neither a Jones Act Seaman nor a Longshoreman. To begin with, the Court has previously held that Plaintiff's Jones Act claim is barred as a matter of law based on controlling circuit precedent. *Bach v. Trident S.S. Co. Inc.*, 920 F.2d 322 (5th Cir. 1991). Capt. Rivera's role on August 19, 2016 was that of the master *pro hac vice*, and is therefore as close to being a seaman as a maritime worker can be without actually qualifying as one.

5.     Kirby argues that merely because Capt. Rivera suffered an injury while on the navigable waters of the United States, and because he was not a member of the Crew of the *Tarpon*, he is axiomatically a longshoreman. Kirby relies on a very narrow reading of the U.S. Supreme Court's decision in *Director, Office of Worker's Comp. Programs, v. Perini*, 459 U.S. 297 (1983).

6.     What Kirby fails to account for is that the U.S. Supreme Court has repeatedly cautioned that simply because an injury occurs on the navigable waters of the United States, to be a longshoreman, the party must be actively involved in the loading or unloading of a ship. *Northeast Marine Terminal Co. v. Caputo,* 432 U.S. 249, 267 (1977); *Herb's Welding, Inc. v. Gray*, 470 U.S. 414 (1985); *P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 80 (1979). In fact, the *Perini* Court itself warned

18

against this reading in stating that this analysis only applies to those individuals covered by the Longshore Act prior to the 1972 Amendments.  Because the Court finds that Capt. Rivera would not have been covered by the Longshore Act prior to the 1972 Amendments, the Court finds that the Longshore Act does not apply to him, and he therefore is able to avail himself of an unseaworthiness claim against Kirby.

7.    Guiding Fifth Circuit precedent provides that for those workers who are neither Jones Act Seamen nor Longshoremen, that the general maritime law negligence and unseaworthiness remedies are available.  *See, e.g. Aparicio v. Swan Lake*, 643 F.2d 1109, 1116 (5th Cir. Unit A, 1981) (Rubin, J.); *Green v. Vermillion Corp.* 144 F.3d 332, 338 (5th Cir. 1998); *Blancq v. Hapag-Lloyd,* 986 F.Supp. 376 (E.D.La 1997)(harbor pilot entitled to unseaworthiness remedy).

8.    Kirby's citation to *Perini* that a worker need only be injured on the navigable waters of the United States to satisfy the maritime employment test overlooks the history and evolution of the Longshore Act.   Some of the facts of the *Perini* case are instructive.  The Plaintiff in *Perini,* Raymond Churchill, was "in charge of all work performed on a cargo barge used to unload caissons and other materials from the supply barges and to set caissons in position for insertion into the embedded rock." *Perini*, 459 U.S. at 298.  Mr. Churchill's employer, Perini, argued that because Mr. Churchill was not engaged in traditional maritime

employment, he was not a longshoreman.  The Director of the Office of Worker's Compensation argued that Mr. Perini should be covered by the Longshore Act because Churchill was actually injured on the navigable waters and ". . . would have been covered under the pre-1972 [Longshore Act]."  *Id.* at 302.   The *Perini* Court held that because Mr. Churchill was injured on the navigable waters of the United States, he automatically satisfied the maritime employment test and would have been covered prior to the 1972 Longshore Act amendments.  *Id.* at 325.  ("In conclusion, we are unable to find anything in the legislative history or in the 1972 amendments themselves that indicate that Congress intended to withdraw coverage from employees injured on the navigable waters in the course of their employment as that coverage existed before the 1972 amendments.")

9.      Notably, *Perini* did not change the requirement that an employee must be engaged in a traditional longshore activity—not just injured over the water.  The *Perini* court made this clear in footnote 34:  "Our holding, of course, extends only to those persons "traditionally covered" before the 1972 amendments." *Id. at* fn.34. Pilots such as Plaintiff were <u>not</u> covered prior to 1972 by the plain language of Longshoreman's Opinion No. 22 because they were always viewed as being masters or members of the crew *pro hac vice*.

10.    Although Kirby makes much of Capt. Rivera's admission that he was not a member of the crew in his complaint, the Court has undertaken an analysis

20

of a pilot's traditional role prior to the 1972 Longshore Act amendments and finds that traditionally a pilot was considered the equivalent of the master of the vessel *pro hac vice* and therefore is excluded from Longshore Act coverage. *Evans v. United Arab Shipping Co. S.A.G.,* 4 F.3d 207, 218 (3d. Cir. 1993)(a pilot is in supreme command while he is navigating the vessel); *Camp. v. The Marcellus*, 4 F.Cas. 114, 1146 (D.Mass 1860) (pilot master *pro hac vice*); *Sideracudi v. Mapes*, 3 F. 873 (S.D.N.Y. 1880)(accord).

11.    The Court has also reviewed the opinion of the administrative body interpreting the Longshore Act prior to 1972's amendments and found that pilots, such as Capt. Rivera were excluded from Longshore Act coverage. *See* Longshoreman's Opinion No. 22. The Court has found no pre-1972 cases, and no party has offered a case that holds that a pilot was a longshoreman or would have been covered by the Longshore Act prior to 1972.

12.    Finally, the Court has reviewed the most recent Supreme Court and Fifth Circuit pronouncements on this issue following *Perini* and finds that both indicate that as a threshold matter, an injured worker must be involved in the loading, unloading or repairing or building a ship in order to be considered engaged in maritime employment under Section 2(3) of the Longshore Act.

In *Schwalb,* the Supreme Court indicated as much hearkening back to *Caputo* and *P.C. Pfeiffer*:

In *Northeast Marine Terminal Co. v. Caputo, supra,* we held that the 1972 amendments were to be liberally construed and that the LHWCA, as amended, covered all those on the situs involved in the essential or integral elements of the loading or unloading process.  But those on the situs not performing such tasks are not covered. This has been our consistent view. *P.C. Pfeiffer Co. v. Ford, supra,* held that workers performing no more than one integral part of the loading or unloading process were entitled to compensation under the Act.  We also reiterated in *Herb's Welding, Inc. v. Gray, supra,* that the maritime employment requirement as applied to land-based work other than longshoring and the other occupations named in § 902(3) is an occupational test focusing on loading and unloading. Those not involved in those functions do not have the benefit of the Act.

*Chesapeake and Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 46 (1989)(internal

citations and quotations omitted).

13.     Likewise, the Fifth Circuit, *en banc*, followed *Schwalb* in analyzing

Section 2(3) of the Longshore Act to be limited to those traditional maritime

workers who loaded or unloaded ships:

An individual located on a proper situs will qualify as a covered employee under the LHWCA only if he is also "engaged in maritime employment." 33 U.S.C. § 902(3). This statute provides that, for example, "any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker," has the status of a maritime employee. *Id.*  The Supreme Court has acknowledged that the Act also extends to cover workers other than those in the delineated occupations . . . as long as the worker is "engaged in loading, unloading, repairing, or building a vessel."

As acknowledged in *Chesapeake & Ohio Railway Co. v. Schwalb,* the maritime employment requirement as applied to land-based work other than longshoring and the other occupations named in § 902(3) is an occupational test focusing on loading and unloading. Those not involved in those functions do not have the benefit of the Act.  In the

context of the LHWCA, loading and unloading includes those tasks incident to the process of handling of cargo as it moves between sea and land transportation, because such tasks are of the sort traditionally performed by longshoremen. Thus, land-based activity occurring within the § 903 situs will be deemed maritime ... if it is an *integral* or *essential* part of loading or unloading a vessel," viewed from the position of a longshoreman or harborworker. Maritime employment does not extend to workers "beyond those actually involved in moving cargo between ship and land transportation."

*New Orleans Depot Services, Inc. v. Director, Office of Worker's Compensation Programs,* 718 F.3d 384, 395 (5th Cir. 2013) *en banc.*

14.     Accordingly, the Court finds that because Capt. Rivera was not in one of the delineated classes identified in Section 2(3) of the Act, and was also not involved in loading or unloading a vessel, he would not have been covered by the Longshore Act before, or after, the 1972 Amendments to the Longshore Act. *Perini*, 459 U.S. at 318-320.  The intent of the 1972 Amendments was not to expand coverage to anyone who was injured on the navigable waters—this was already the law prior to 1972 if the employee was engaged in a traditional stevedoring or ship repairing activity.  The intent of the 1972 Amendments was to cover employees who were in warehouses and docks facilitating loading and unloading of ships. Plaintiff would not have been covered by the Longshore Act before 1972 and therefore should not be covered by it afterward.

**Capt. Rivera was a public officer of Texas**

15.     Additionally, and as a separate basis for determining that Plaintiff is not a Longshoreman, the Court also holds that Plaintiff is a public or state officer of the State of Texas given his commission from the State of Texas to act as a Branch Pilot. The legal test under Texas law for determining when someone is a public officer is "whether any sovereign function of the government is conferred upon the individual to be exercised by him for the benefit of the public largely independent of the control of others." *Green v. Stewart,* 516 S.W.2d 133, 135-136 (Tex. 1974) *citing Aldine Ind. School. Dist. v. Standley,* 280 S.W.2d 578 (1955).  The Court has reviewed the long history in the general maritime law devoted to precisely what pilots do as well as their responsibilities to the public.  This analysis reveals the role of a pilot and how the State of Texas treats them.  It is clear that they are public officers of the state of Texas, and therefore exempt from Longshore Act coverage. 33 U.S.C. § 903(b).

16.     State regulation of pilotage has been the source of two separate decisions involving monopoly power that reached the U.S. Supreme Court.  Notably, both of these cases supported the existence of a monopoly power of state pilotage in certain ports in Texas and Louisiana because the function and role of pilots is critical and is deemed an exercise of the State's police power for the public interest.  *See Olsen v. Smith*, 195 U.S. 332 (1904)(Texas); *Kotch v. Board of Pilot Com'rs for Port of New Orleans*, 331 U.S. 864, 913 (1947)(Louisiana).  In *Olsen*, Justice White,

writing for a unanimous court and addressing whether the Pilots constituted an

illegal monopoly stated that ". . . the state has the power to regulate, and in so doing

to appoint and commission those who are to perform pilotage services, it must follow

that no monopoly or combination in a legal sense can arise from the fact that the

<u>duly authorized agents</u> of the state are alone allowed to perform the duties devolving

upon them by law." *Olsen v. Smith*, 195 U.S. at 344-45 (White, J.) (emphasis added).

Because Texas exercised its police power over pilotage, and has delegated the power

to conduct pilotage to the state pilots, they are agents of the state—or public officers.

17.     Over forty-years later, the Supreme Court analyzed the issue of Pilot

monopolies in Louisiana.  *Kotch*, 331 U.S. 864.  Justice Black, writing for the *Kotch*

Court stated eloquently the role pilots play:

> In order to avoid invisible hazards, vessels approaching and leaving
> ports must be conducted from and to open waters by persons intimately
> familiar with the local waters. The pilot's job generally requires that he
> go outside the harbor's entrance in a small boat to meet incoming ships,
> board them and direct their course from open waters to the port. The
> same service is performed for vessels leaving the port. Pilots are thus
> indispensable cogs in the transportation system of every maritime
> economy. Their work prevents traffic congestion and accidents which
> would impair navigation in and to the ports. It affects the safety of lives
> and cargo, the cost and time expended in port calls, and in some
> measure, the competitive attractiveness of particular ports. Thus, for the
> same reasons that governments of most maritime communities have
> subsidized, regulated, or have themselves operated docks and other
> harbor facilities and sought to improve the approaches to their ports,
> they have closely regulated and often operated their ports' pilotage
> system.

*Kotch*, 331 U.S. at 913.  With this historical lens guiding its perspective, the *Kotch* Court spoke to the critical import of pilots to the public good.  *Kotch*, 331 U.S. at 564 ("The object of the entire pilotage law, as we have pointed out, is to secure for the State and others interested the safest and most efficiently operated pilotage system practicable.").  These are the words of the Highest Court in our land speaking directly to the role of a pilot and the sovereign function of the states' regulating pilots.

18.     Finally, yet another case from this very court almost ninety years ago found state compulsory pilots (this time Galveston Pilots) to be public officers.  *The Griffdu*, 25 F.2d 312, 313 (S.D.Tx. 1928)("There, as here, each pilot was a public officer, appointed individually, responsible individually.") *comparing* Galveston Pilots with the Virginia Pilots in *Guy v. Donald*, 203 U.S. 403(1906).

19.     In short, pilots are bestowed with the tremendous authority of ensuring that foreign vessels safely reach and depart the docks in their state and local waters. A pilot is a prime example of someone on whom the sovereign function of the government has been conferred for the benefit of the public.  Consequently, Capt. Rivera, as a Texas Branch Pilot commissioned by the Governor of Texas to act with independently on the States of Texas' behalf, in a role that is of critical importance to the economy, environment and public welfare of Texas, satisfies the "public officer" test under Texas law.

26

20.     The Court therefore finds that because Capt. Rivera is not a Longshoreman and was doing a seaman's work as the navigator of the *Tarpon*, he is entitled to a seaman's common law remedy of unseaworthiness.  *Seas Shipping Co. v. Sieracki.*328 U.S. 85 (1946).

### ***Warranty of Seaworthiness***

21.     The Warranty of Seaworthiness is a strict liability doctrine that requires the owner of a vessel to provide a safe workplace for the members of the crew.   The character of the duty to provide a seaworthy vessel is absolute. *See Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 548–49 (1960). The duty imposes liability without fault. *See id.*  The standard is not perfection, but "reasonable fitness" for the ship's intended use. *Id.* at 549.  A plaintiff asserting a claim of unseaworthiness need not establish negligence, but bears the burden to show that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Phillips v. Western Co. of North America,* 953 F.2d 923, 928(5th Cir.1992).

22.     In 1946, the United States Supreme Court extended the warranty of seaworthiness to non-seamen who were aboard a ship performing work traditionally performed by the crew.  *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946). Traditionally, the job of loading and unloading the ship was done by the crew.  *Id.*

27

Because of modern advances in shipping and the use of localized stevedores, the owner could delegate the duty of loading and unloading the ship to a thirty party. *Id.* The *Sieracki* Court reasoned that because the warranty of seaworthiness was non-delegable, the ship owner could not escape its obligation by delegating a crewmember's task to a non-crewmember. *Id.* at 95-96. The Supreme Court extended this rationale to all those aboard the ship who were exposed to the same dangers and perils of a seaman and doing work traditionally performed by a seaman. *Pope & Talbot v. Hawn*, 346 U.S. 406, 412-13 (1953) ("Sieracki's legal protection was not based on the name 'stevedore' but on the type of work he did and its relationship to the ship and to the historic doctrine of seaworthiness.").

23.   In 1972, Congress amended the Longshore Act and eliminated the unseaworthiness remedy for those covered by the Longshore Act. *P.C. Pfeiffer Co.,* 444 U.S. at 73. But for those not covered by the Longshore Act, and who are performing work traditionally done by the vessel's crew, the *Sieracki* remedy endures. *Aparicio*, 643 F.2d 1109, 1116 (5th Cir. Unit A, 1981) (Rubin, J.); *Burks v. American River Transp.* 679 F.2d. 69, 71 (5th Cir. Unit A, 1981) (Brown, J.) (abrogated on other grounds); *See, e.g. Aparicio v. Swan Lake*, 643 F.2d 1109, 1116 (5th Cir. Unit A, 1981) (Rubin, J.); *Green v. Vermillion Corp.* 144 F.3d 332, 338 (5th Cir. 1998);  *Blancq v. Hapag-Lloyd,* 986 F.Supp. 376 (E.D.La 1997)(harbor pilot entitled to unseaworthiness remedy).

28

24.     The Court, having reviewed the evidence, and taking notice that the edge of the engine room access hatch cover was raised more than one-inch above the remaining deck surface, that the edges of the engine room access hatch were unmarked with any visual cue to warn someone of the danger, and the fact that Capt. Crossman acknowledged that the engine room access hatch was indeed a hazard— albeit one he and Kirby had not identified before the incident—lead the Court to the conclusion that the engine room access hatch, as part of the walkway in the ship, was not reasonably fit for its intended purpose as a safe walkway, and rendered the *Tarpon* unseaworthy.

### **Negligence**

25.     A general maritime law negligence claim requires the following elements: (1) the existence of a duty owed by the ship owner, (2) breach of the duty, (3) a causal connection between the breach and alleged injury, and (4) injury and damages. *Canal Barge Co., Inc. v. Torco Oil Co*., 220 F.3d 370, 376 (5th Cir. 2000). A vessel owner "owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632 (1959) (emphasis added). This standard of care was reaffirmed by the Supreme Court in *Federal Marine Terminals, Inc. v. Burnside Shipping Co*., 394 U.S. 404, 416-17 (1969) ("federal maritime law does impose on the shipowner

a duty to the stevedoring contractor of due care under the circumstances.").

### The Raised Access Hatch was a Hazard that Was Foreseeable to a Maritime Vessel Operator Such as Kirby, but was not open and obvious to Rivera

26.     Kirby argues that it had no reason to have known the engine room access hatch was a hazard and therefore no constructive or actual notice that it was a hazard until Capt. Rivera was injured by it.  The Court finds this argument unpersuasive.  The area this hatch was located in was the primary passageway for everyone on the entire ship.  Capt. Rivera was not warned of the elevation of the hatch as a potential trip and fall hazard, or ordinary walkway obstruction, by the use of a warning sign or a visual cue to draw his attention to the hazard, or by a verbal warning from the escort who abandoned him.  Instead, Kirby left Capt. Rivera, a virtual stranger, aboard the vessel to fend for himself while climbing over a raised watertight door, carrying a backpack, and visually adjusting from a bright summer afternoon to a dark interior machinery space.

27.     The Court finds that it was foreseeable that someone such as Capt. Rivera could trip over the unmarked engine room access hatch cover that was raised approximately one to one and a half inches above the rest of the walkway. The Court heard testimony from expert witnesses Capt. Reginald McKamie and David Martyn regarding Kirby's obligations in this regard.

28.     Having already found that the unmarked engine room access hatch

was not an open or obvious condition, the Court finds that Kirby had a duty to warn Capt. Rivera of the hazard the engine room access hatch presented to him, and indeed, everyone who transited the area aboard the ship.

29.    Kirby offered as a defense that it did not know the hatch presented a hazard until Capt. Rivera was injured by it.  The Court finds that this is not a feasible safety approach and violates the industry standards regarding identifying and marking slip, trip and fall hazards as well as Kirby's own safety management system.  Kirby also argues that because no one before has ever been injured by the engine room access hatch, it must not have been a hazard.  This is simply an argument that Kirby was lucky instead of proactively trying to safeguard its crew and those aboard the vessel to assist in its mission.  Looking at it another way, if Kirby had marked the engine room access hatch cover with a visual cue and/or warning before Capt. Rivera's injury, it would have discharged its duty to warn Capt. Rivera of a hazard.   Because Kirby Offshore Marine, LLC did not do this, the Court finds that this hazard was reasonably foreseeable to Kirby that it should have been marked with an industry standard visual warning cue.  The Court finds that this failure to do is a breach of the duty owed to Capt. Rivera, and this breach caused Capt. Rivera's injury.

30.     The Court having already decided that Capt. Rivera is not a longshoreman, and also not a Jones Act seaman, finds that the *Sieracki* unseaworthiness remedy is available to him.

### Analysis of Capt. Rivera's Unseaworthiness Claim

31.     Kirby has a non-delegable duty to provide a vessel that is reasonably safe, including work places, equipment, and access to and from the vessel.  Because the Court finds that the unmarked and elevated engine room access hatch comprised a hazard vis-à-vis its role as a walkway surface, indeed, Capt. Crossman admitted as much in his deposition, the Court finds that the first prong of the unseaworthiness test is met and that the engine room access hatch was not reasonably fit for its intended purpose as a walkway.   The second part is met as well as the Court further finds that the unseaworthy condition played a substantial part in bringing about and actually causing the injury and that the injury was a reasonably probable consequence of the unseaworthiness.  If the engine room access hatch had been marked appropriately, or had it set flush with the deck instead of having a 1" elevation change from the rest of the deck, the Court finds that this accident likely would not have happened.  Accordingly, the Court finds that Capt. Rivera should be awarded damages on his unseaworthiness claim against Kirby Offshore Marine, LLC.

### Negligence per se

32.     Plaintiff argues that Kirby violated regulation 23 of the violation of the Safety of Life at Sea Convention (SOLAS) and that this violation is negligence *per se*.  Plaintiff also urges the Court to find that the lack of a safe walkway surface was a violation of 46 C.F.R. § 42.15-75(d).

33.     Capt. Rivera's argument regarding Regulation 23 is that he should have been provided an escort to assist him to the wheelhouse of the Tarpon. SOLAS Regulation 23 is an international regulation regarding boarding and disembarking pilots from ocean going ships, and is primarily concerned with the use of Jacob's ladders and how those ladders are affixed to the superstructure of the vessel.  Capt. Rivera argues that within Regulation 23 is a requirement that an officer of the vessel meet him upon boarding and escort him to the wheelhouse and then accompany him upon disembarking as well.  By having an escort, the pilot can ensure he reaches the wheelhouse as quickly and safely as possible so navigational command can be asserted to ensure the safety of the transit.

34.     Capt. Rivera argues that inherent in this obligation, is that had an escort been provided, the escort could have (and should have) warned him of the unmarked, and raised engine room access hatch cover, and that by leaving him, he was unable to ascertain the risk of the unmarked engine room access hatch.  Capt. Rivera has offered evidence that the *M.V. Tarpon* previously sailed on foreign articles, which would have required it to be in compliance with SOLAS.

35.     Kirby argues that the *Tarpon* was not required to comply with SOLAS, and that it therefore had no obligation to escort Capt. Rivera at all.  Kirby ignores the definition of "escorting" under 33 CFR § 101.105 which states:

> Escorting means ensuring that the escorted individual is continuously accompanied while within a secure area in a manner sufficient to observe whether the escorted individual is engaged in activities other than those for which escorted access was granted. This may be accomplished via having a side-by-side companion or monitoring, depending upon where the escorted individual will be granted access. Individuals without TWICs[1] may not enter restricted areas without having an individual who holds a TWIC as a side-by-side companion, except as provided in §§ 104.267, 105.257, and 106.262 of this subchapter.

In this case, Kirby violated 33 CFR § 101.105 by failing to have a side-by-side companion for Capt. Rivera or by monitoring. It matters not that this regulation was not concerned with safety, but with ship security.  As the Supreme Court indicated in *Kernan v. American Dredging Co*., the failure to follow any Coast Guard regulation which is a cause of an injury establishes negligence p*er se. Kernan v. American Dredging Co*., 355 U.S. 426 (1958). Here, the Court finds that the failure to enforce the ship security plan and provide a side-by-side companion for Capt. Rivera was a cause of his injury.  As Capt. Rivera correctly pointed out during his testimony, an escort could have offered him assistance in climbing over

---

[1] TWICS are "Transportation Worker Identification Cards" and are required to be carried by all workers with unrestricted access to secure areas by the Maritime Transportation Security Act of 2002. 33 U.S.C. § 101 *et seq.*

the watertight door and finding his way.  The escort also could have warned Capt. Rivera that the engine room access hatch cover was not flush with the rest of the deck.  These were things that could have and should have been done, and if the escort policy had been followed—either under SOLAS Regulation 23 or 33 CFR § 101, Capt. Rivera likely would not have been injured.  The Court therefore rules that these violations constitute negligence as a matter of law.

### Kirby did not provide a safe and satisfactory means of passage about the vessel

36.     As an alternative basis, Capt. Rivera argues the passageway itself was unsatisfactory for providing safe and accessible passage for himself and the crew. Capt. Rivera cites to 46 C.F.R. § 42.15-75(d) states that, "Satisfactory means (in the form of guard rails, life lines, gangways or underdeck passages, etc.) shall be provided for the protection of the crew in getting to and from their quarters, the machinery space and all other parts used in the necessary work of the vessel."  The U.S. Supreme Court and the Fifth Circuit have both held that the violation of a U.S. Coast Guard regulation, regardless of type, was grounds for negligence as a matter of law so long as the violation caused the injury. *Reyes v. Vantage S.S. Co.*, 609 F.2d. 140, 143 (5th Cir. 1980).

37.     Although Capt. Rivera is not a member of the crew of the *Tarpon*, it is undisputed that he was on board the vessel because the vessel was legally incapable of coming into the Port of Corpus Christi, Texas without him.  Capt.

Crossman was likewise unqualified to perform the transit from the sea buoy to Oil Dock #11 in Corpus Christi, Texas, and it was only with the assistance of a harbor pilot, such as plaintiff, that the *Tarpon* could complete its voyage. It follows then, that if this regulation applies to safe passages for crewmembers, it should also apply to pilots who supplement the crew in performing the last leg of an ocean voyage. Their safety is no less important to that of a crewmember whom the Coast Guard has deemed fit to enact regulations regarding safe passageways. The Court therefore finds that 46 CFR § 42.15-75(d) encompasses individuals such as Capt. Rivera. The Court having found that the walkway and passageway are unsatisfactory and the violation is unexcused, finds that this violation constitutes negligence as a matter of law.

### Negligence

38.    Finally, even though the Court has found that the violations of 46 CFR § 42.15-75(d) and Regulation 23 of SOLAS are a basis for negligence *per se*, the Court also finds that Kirby's failure to remedy the hazard inherent in elevated engine room access hatch cover was negligence. Two months before this incident Kirby's crew conducted a slip, trip and fall safety meeting aboard the *Tarpon*. Furthermore, the training video Kirby offers to its entire fleet of crewmembers illustrated the exact scenario that Capt. Rivera was injured on. The Court finds that there is no reasonable or plausible excuse for why Kirby did not mark this

36

hazard.  Capt. Crossman testified that he had been the master of the *Tarpon* for 9 years, and not once in that entire time had he identified the raised edge of the hatch cover as a trip hazard—in spite of Kirby's training videos and industry standards.

39.    Furthermore, Capt. Crossman testified that he was the vessel security office and was required to be familiar with the Maritime Transportation Security Act of 2003 and knew that a security escort was required to stay side-by-side Capt. Rivera until he reached the galley.

40. The Court therefore finds, in addition to the other violations of safety regulations and industry standards, that Kirby breached its duty to Capt. Rivera of acting reasonably under the circumstances and identifying and warning him of the hidden hazard lurking in the engine room access hatch cover.

41.    The Court finds that this breach was a proximate cause of Capt. Rivera's broken left foot, and that the development of CRPS-1 in his left foot was also caused by the injury he experienced on August 19, 2016 aboard the *Tarpon*.

### III.    Conclusion

42.    To the extent that any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such.  To the extent that any Conclusion of law constitutes a Finding of Fact, the Court hereby adopts it as such.

43.    For the reasons set forth in the Court's Findings of Fact and Conclusions of Law, pursuant to Rule 58 of the Fed. R. Civ. P., judgment is hereby

rendered in favor of Jay Rivera on his claims of general maritime law negligence and is awarded damages in the amount of $_____.     The   Court awards prejudgment and postjudgment interest at the legal rate. Plaintiff is awarded court costs.

The Court allocates liability as follows:

a.  Negligence on the part of Kirby Offshore Marine, LLC:_____%

b.  Unseaworthiness on the part of the M.V. Tarpon:_____%

c.  Negligence on the part of Jay Rivera:_____%

The Court allocates damages as follows:

d.  Past loss of earning capacity: _____

e.  Future loss of earning capacity:_____

f.  Loss of future defined benefit contributions:_____

g.  Impairment and disfigurement in the past:_____

h.  Impairment and disfigurement in the future:_____

i.  Pain and suffering in the past: _____

j.  Pain and suffering in the future:_____

k.  Loss of society and enjoyment of life in the past:_____

l.  Loss of society and enjoyment of life in the future:_____

All claims not presented are hereby denied.

THIS IS A FINAL JUDGMENT.

38

Respectfully submitted

**The Crew Law Firm, P.C.**

By: /s/ *Paxton Crew*                    
Paxton Crew
Attorney in Charge for Plaintiff
Jay Rivera
Texas State Bar No. 24058720
Fed. I.D. No.  859147
Paxton@thecrewlawfirm.com
303 East Main Street
League City, Texas 77573
main: 713-955-0909
fax: 409-204-0050
**Counsel for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all known counsel of record in accordance with the Federal Rules of Civil Procedure on this 27th day of December, 2018 on all counsel of record via the U.S. District Court for the Southern District of Texas Electronic Case Filing System.

*Paxton N. Crew*
**Paxton N. Crew**