1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                    GALVESTON DIVISION

3    JAY RIVERA,                    )
                    Plaintiff,     )
4                                   )
     VS.                            )
5                                   )
                                    ) CIVIL ACTION
6    KIRBY OFFSHORE MARINE,         )
     LLC,                           ) NO.: 3:17-cv-111
7                   In Personam     )
                                    ) 9(H) Admiralty
8    M. V. TARPON,                  )
                                    )
9                   In Rem          )

10   ----------------------------------

11        ORAL AND VIDEOTAPED DEPOSITION OF

12                 DR. DAWN GROSSER

13                  JUNE 8, 2018

14   ----------------------------------

15        ORAL AND VIDEOTAPED DEPOSITION OF DR. DAWN GROSSER,

16   produced as a witness at the instance of the Plaintiff,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on JUNE 8, 2018, from 2:49 p.m. to 5:25

19   p.m., before LEAH MALONE, CSR in and for the State of

20   Texas, reported by machine shorthand, at the offices of

21   South Texas Bone & Joint, 601 Texan Trail, Suite 300,

22   Corpus Christi, Texas 78411, pursuant to the Federal

23   Rules of Civil Procedure and the provisions stated on

24   the record or attached hereto.

25

```
 1              A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        MR. PAXTON CREW
          The Crew Law Firm, P.C.
 5        303 East Main, Suite 260
          League City, Texas 77573
 6        713-955-0909

 7   FOR THE DEFENDANTS, KIRBY OFFSHORE MARINE, LLC and M. V.
     TARPON:
 8
          MR. JOHN SPILLER
 9        Clark Hill Strasburger
          909 Fannin Street, Suite 2300
10        Houston, Texas 77010
          713-951-5631
11

12   ALSO PRESENT:

13        Mr. Art Garcia, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX

 2                                           PAGE

 3   Appearances                             2

 4   DR. DAWN GROSSER

 5        Examination by Mr. Crew            4

 6        Examination by Mr. Spiller         57

 7        Re-Examination by Mr. Crew         110

 8   Reporter's Certificate                  124

 9                        EXHIBITS

10   NO.       DESCRIPTION                   PAGE

11   Exhibit 1 Initial Evaluation            19
     Exhibit 2 Sept 19, 2016 Letter          21
12   Exhibit 3 Oct 17, 2016 Letter           25
     Exhibit 4 Dec 7, 2016 Letter            28
13   Exhibit 5 8/22/2016 CT Scan Findings    29
     Exhibit 6 Jan 11, 2017 Letter           32
14   Exhibit 7 Jan 30, 2017 Letter           33
     Exhibit 8 July 26, 2017 Letter          34
15   Exhibit 9 7/27/2017 CT Scan Findings    37
     Exhibit 10 Imaging Order                38
16   Exhibit 11 8/1/17 MRI Findings          39
     Exhibit 12 Aug 14, 2017 Letter          41
17   Exhibit 13 Aug 14, 2017 New System Letter  42
     Exhibit 14 Surgical Notes               44
18   Exhibit 15 2/5/18 CT Scan Findings      47
     Exhibit 16 March 2, 2018 Letter         48
19   Exhibit 17 12/28/17 Neurology Letter    50
     Exhibit 18 6/4/18 Neurology Letter      53
20   Exhibit 19 Jan 11, 2017 Letter          63
     Exhibit 20 New Stride Ankle Evaluation/Care Plan  67
21   Exhibit 21 Jan 30, 2017 Letter          73
     Exhibit 22 1/30/17 Release to Duty      74
22   Exhibit 23 7/5/17 Nueces Occupational Medicine
                Clinic Evaluation            85
23   Exhibit 24 7/26/17 Letter               89

24   Exhibit 25 7/26/17 Pain Assessment      97
     Exhibit 26 8/23/16 Foot & Ankle History 98
25
```

Page 4

1       THE VIDEOGRAPHER: Okay, today is June 8th,
2  2018. This is the deposition of Dr. Dawn Grosser in the
3  matter of Jay Rivera versus Kirby Corporation. We're on
4  the record at 2:49. Will counsel please state their
5  appearance after which the court reporter will swear in
6  the witness?
7       MR. CREW: Paxton Crew for the plaintiff
8  Jay Rivera.
9       MR. SPILLER: John Spiller for defendant
10  Kirby Offshore Marine.
11       DR. DAWN GROSSER,
12  having been first duly sworn, testified as follows:
13       EXAMINATION
14  BY MR. CREW:
15       Q. Hi, Dr. Grosser. Could you please tell us your
16  name?
17       A. Dawn Grosser.
18       Q. Okay. And where do you live right now?
19       A. Corpus Christi, Texas.
20       Q. And you're -- I know you're a medical doctor.
21  Could you please tell us about your education?
22       A. I went to medical school or you want me to
23  start...
24       Q. Or just start with your under grad?
25       A. Okay, under grad at Baylor and then I was

Page 5

1  pre-med major and went to medical school at Yale. And
2  then stayed on for residency in orthopedics and did a
3  year fellowship in Mayo Clinic in Scottsdale for foot
4  and ankle.
5       Q. And, Dr. Grosser, I know you may have been in a
6  deposition before, but there's a couple of things I just
7  need to go over that may help things go over a little
8  smoother, be a little more efficient.
9       This nice young lady sitting to your left
10  is a court reporter. She takes down everything you say.
11  And if we don't -- if we talk over each other, it often
12  makes it difficult for her to take down what you say and
13  what I'm asking you, what Mr. Spiller might be asking
14  you as well.
15       A. Okay.
16       Q. So if we could try not to talk over each other,
17  that would be great. I'll try to ask you questions that
18  are fair questions that you understand. And if you
19  don't understand my question, would you please tell me
20  that you don't understand it?
21       A. Yes.
22       Q. Okay. And this is obviously being videotaped
23  here. And you understand that you're here today to
24  testify about a lawsuit that Mr. Jay Rivera, one of your
25  patients, is involved with against Kirby Offshore

Page 6

1  Marine; is that correct?
2       A. That's correct.
3       Q. Okay. Now, Dr. Grosser you understand that
4  you're appearing here voluntarily today, correct?
5       A. Yes, I am.
6       Q. And I have not subpoenaed you for your
7  appearance?
8       A. No, you have not.
9       Q. And I have paid you for your time in this case;
10  is that correct?
11       A. Yes, you have.
12       Q. Okay. Now, is that payment for your time --
13  does that represent the amount of time that you've taken
14  away from your clinical practice here today to -- in
15  order to prepare for and provide your testimony in this
16  case?
17       A. Yes, it does.
18       Q. Okay. And is that the same rate that you
19  charge everyone for a deposition?
20       A. Yes, it is.
21       Q. Okay. And do you know what your hourly rate
22  for providing deposition testimony is?
23       A. It's whatever the office says it is.
24       Q. Okay. So for whatever the amount that you've
25  been paid in this case is what everyone has to pay?

Page 7

1       A. Right. Yes, right.
2       Q. Unless they're subpoenaed? Okay, if you --
3       A. I don't --
4       Q. No, that's okay. If you don't mind letting me
5  finish my question --
6       A. Sure.
7       Q. -- it'd be better --
8       A. Okay.
9       Q. -- going forward. Are you licensed to practice
10  medicine in the State of Texas?
11       A. Yes, I am.
12       Q. How long have you been licensed to practice
13  medicine?
14       A. 12 -- since 2006.
15       Q. Okay. And is that -- obviously your license is
16  on file with the Texas board of medicine?
17       A. Yes, it is.
18       Q. What type of practice are you primarily engaged
19  in?
20       A. Foot and ankle orthopedic surgery.
21       Q. And is that practice located here in Corpus
22  Christi?
23       A. Yes, it is.
24       Q. Okay. And right now we're in the South Texas
25  Bone and Joint Clinic. Is that your primary office?

Page 8

1    A.  Yes.
2    Q.  Do you practice in any other -- with hospitals
3  or other facilities?
4    A.  I work out of Doctor's Regional Hospital in
5  Corpus Christi outpatient surgery center.
6    Q.  Okay.  I asked you a little bit about your
7  education earlier and you said that you went to Baylor
8  pre-med and then you went on to maintain your medical
9  degree from Yale.  And then -- and then I believe you
10  said you had an internship or a --
11    A.  Fellowship.
12    Q.  Fellowship.  And can you tell us about what
13  that fellowship was?
14    A.  It's -- it's a year fellowship to specialize in
15  foot and ankle specifically in orthopedics.
16    Q.  And where did you take that fellowship?
17    A.  That was in Scottsdale Mayo Clinic.
18    Q.  At the Mayo Clinic in Scottsdale?
19    A.  Yes.
20    Q.  And that was a one-year?
21    A.  Yes.
22    Q.  And what year did that take place?
23    A.  2005 through 2006.
24    Q.  So following your fellowship at the Mayo
25  Clinic, what did you do next?

Page 9

1    A.  Came here to start my first job.
2    Q.  And who was that with?
3    A.  Well, Orthopedic Associates of Corpus Christi
4  is what we used to be called, but it's been the same
5  group for the last 12 years.
6    Q.  So -- and you've been with Orthopedic
7  Associates of Corpus Christi or South Texas Bone and
8  Joint since that time?
9    A.  Yes.
10    Q.  Can you tell us when you had the first
11  opportunity to treat Jay Rivera?
12    A.  The first visit was August 23rd, 2016.
13    Q.  Okay.  Had you ever treated Jay Rivera before
14  August 20th, 2016?
15    A.  No.
16    Q.  Okay.  When Mr. -- when Captain Rivera first
17  presented to you in August 2016, did he provide a
18  history to you?
19    A.  Yes, he did.
20    Q.  Okay.  Can you tell us what a history is used
21  for?
22    A.  A history is to tell us the story of what
23  happened.
24    Q.  Okay.
25    A.  In the patient.

Page 10

1    Q.  Why is that important to you as a treating
2  physician?
3    A.  In part you understand the mechanism of injury
4  particularly with orthopedics, how something might have
5  happened and why.
6    Q.  Do you recall what the history was that you
7  took from Captain Rivera?
8    A.  Yes.
9    Q.  Can you tell us what that was?
10    A.  When he was getting on the boat, he stepped on
11  a loose board and he twisted his foot and ankle.  And he
12  fell -- his body weight fell on top of his ankle and
13  foot.
14    Q.  Okay.  Now -- and that's what you recall?
15    A.  That's what I recall.
16    Q.  Okay.  So -- and you know you're not certain
17  exactly what it was that he stepped on?
18    A.  Well, no.  No, I thought it was -- the ground
19  was -- something was going on with the ground.
20    Q.  And have you ever worked -- you've never worked
21  a ship before?
22    A.  Nope.
23    Q.  So I'm not going to ask you any questions about
24  technical terms for ships.
25    A.  Yup.

Page 11

1    Q.  I just like to focus on your experience and
2  education, training as a -- as an orthopedic surgeon.
3  So in any event his history included a step on an uneven
4  surface?
5    A.  Right.
6        MR. SPILLER:  Objection, form.
7    Q.  (By Mr. Crew)  Dr. Grosser, can you tell us
8  what trauma is?
9    A.  Trauma is an injury to the body in some way.
10    Q.  And in Captain Rivera's history, did it include
11  a description of the trauma that he experienced?
12    A.  The pain?  Is that what you're referring to?
13    Q.  Pain or the physical injuries.
14    A.  Yes, he had -- he was -- after this happened he
15  couldn't walk on his foot very well.  So he's limping
16  and he was in a lot of pain.
17    Q.  And so following his providing a history, did
18  you conduct an initial examination on Captain Rivera?
19    A.  Yes.
20    Q.  Okay.  What did that initial examination
21  consist of?
22    A.  It consist of palpating the foot, examining the
23  sensation, strength, swelling, ecchymoses, which is
24  bruising.  Skin, just the overall way a person
25  ambulates.

Page 12

1   Q. Were these -- were those some of your initial
2 observations?
3   A. Yes.
4   Q. Okay. What was your initial diagnosis of
5 Captain Rivera's injury?
6   A. Fifth metatarsal fracture.
7   Q. Okay. And now, were you -- was that based off
8 of diagnostic tests or just your initial examination?
9   A. We had x-rays and an MRI.
10   Q. Okay.
11   A. Before I saw him.
12   Q. Now, in regards to the x-rays and the MRI, do
13 you recall whether or not the fractures showed up on the
14 MRI or the x-rays or if there was any problem finding --
15   A. No.
16   Q. If you don't mind, let me finish my question.
17   A. Okay.
18   Q. Sometimes I'm a little long-winded. I'm trying
19 to put it in the best terms I can to -- if you let me
20 finish my question, I might ask something that'll change
21 your -- and I don't want -- I don't want you to get
22 confused. Can you tell us what a subjective complaint
23 is?
24   A. It's when the patient has a complaint about
25 pain or what they're feeling.

Page 13

1   Q. And can you tell us how that differs from an
2 objective finding?
3   A. An objective finding is what the person
4 examining might see or notice.
5   Q. Would it be fair to say that oftentimes you use
6 subjective complaints to try to hone in and diagnose
7 what the actual injury is?
8   A. Yes.
9   Q. And so once you've done that and you've used
10 diagnostic tools, you could come up with an objective
11 finding, correct?
12   A. Yes.
13   Q. Okay. So what were -- were your initial -- I'm
14 sorry, what were your objective findings after your
15 initial examination of Captain Rivera apart from the
16 fifth metatarsal fracture?
17   A. He had a significant sensitivity along the
18 outside of his foot and up into the ankle.
19   Q. And so it -- did you initially relate that pain
20 to the fifth metatarsal fracture?
21   A. Yes.
22   Q. Okay. So what did -- what did you -- what was
23 your treatment plan for Captain Rivera following the
24 initial diagnosis of fifth metatarsal fracture?
25   A. Treatment plan was to immobilize with the boot

Page 14

1 and then we call a phase in the early stages non-weight
2 bearing. So he was not to walk on this. Using
3 assistive device, crutches or other forms of assistive
4 devices to stay off of the foot. And to elevate, ice,
5 things that are pretty routine.
6   Q. Okay. And can you tell us what conservative
7 care means?
8   A. Non-surgical.
9   Q. And so would this -- would this plan that
10 you -- that you prescribed for Captain Rivera be
11 characterized as conservative?
12   A. Yes.
13   Q. Okay. So following this diagnosis did you have
14 any concerns on this particular injury and its healing
15 to a full union?
16   A. No, it was non-displaced.
17   Q. Okay. So can you tell us what a non-displaced
18 fracture is?
19   A. It's when the bone breaks but doesn't shift.
20 And so it stays in its original position.
21   Q. Okay. And so can you tell us on most cases in
22 your experience a non-displaced fracture should heal, do
23 you know if there's a percentage of in your experience
24 of non-unions for this type of injury?
25   A. Less than five percent.

Page 15

1   Q. Okay. But it has happened in your experience?
2   A. Uh-huh.
3   Q. And have you read about it happening in the
4 literature?
5   A. Uh-huh.
6   Q. Okay. If you don't mind, could you say yes or
7 no?
8   A. Yes.
9   Q. I'm sorry, I didn't go over that, but what's
10 going to happen is we're going to have a record and --
11 just like you take medical notes. And if she says
12 uh-huh, it's not going to be clear to the judge what you
13 said.
14     So -- so at some point -- and I'm going to
15 go briefly with -- obviously with concern for your time
16 here today through your medical records a while. But at
17 some point following your initial appointment assessment
18 for Captain Rivera, did you release him back to full
19 duty as a harbor pilot?
20   A. He was released on January 30th, 2017, six
21 months after the original injury.
22   Q. Okay. And so following his original injury,
23 did Captain Rivera present to you again, have any
24 complaints about his -- his left foot?
25   A. Yes.

**Page 16**

1  Q.  Okay.  And what were his complaints when he
2  presented to you again?
3  A.  He did have point tenderness over the fracture.
4  He had pain that radiated up into the outside of his
5  ankle.  He did have discoloration of the foot.  And we
6  call it hypersensitivity to -- to touch.
7  Q.  And so at that point did you discuss with
8  Captain Rivera non-conservative treatment plans?
9  A.  Initially in the first six months?
10  Q.  Following his return with complaints.
11  A.  Following his return, yes.  After when he came
12  back which was around the 11th month out from -- from
13  his injury, I did discuss other options with him because
14  he continued to have pain.
15  Q.  Okay.  And so before you discussed those other
16  options, you wanted to rule out other things.  So you
17  ordered more diagnostic testing; is that right?
18  A.  Yes yes.
19  Q.  Can you tell us what that diagnostic testing
20  consisted of?
21  A.  Yes, we had a repeat CT scan that was in July
22  of 2017 that showed no obvious fracture line.  And we
23  did a repeat MRI which did show that there was a D-mode
24  within the bone, which means there is -- there is
25  activity within the bone.  And the radiologist that read

**Page 17**

1  it at the time suggested there was about 80 percent
2  healing of that fracture.
3  Q.  And so following the MRI results that were
4  taken in this case, what was your diagnosis for --
5  A.  Partial non-union.
6  Q.  Okay.  And can you tell us what a partial
7  non-union means?
8  A.  It means some of the bone and the fracture
9  healed, but not complete healing.
10  Q.  And so what was your -- your plan following
11  that diagnosis of a partial non-union?
12  A.  I discussed with him at that point whether or
13  not he wanted to proceed surgically with a bone graft
14  and internal fixation.
15  Q.  Could you tell us what a bone graft is?
16  A.  It's taking usually the person's own bone from
17  another area that's a fresh autologous bone and putting
18  it in a site that is lower to heal to try to stimulate
19  the remaining bone to heal.
20  Q.  And -- and fixation means using hardware?
21  A.  That's right.
22  Q.  Do you -- and you did perform surgery on
23  Captain Rivera in this case?
24  A.  I did.
25  Q.  And what technique did you use on Captain

**Page 18**

1  Rivera if you recall?
2  A.  Technique, what does that mean?
3  Q.  Surgical technique.  Did you use -- did you
4  conduct a bone graft?
5  A.  Yes.
6  Q.  Okay.  Where did you relocate the bone from?
7  A.  From the calcaneus.
8  Q.  Okay.  And so -- and then you also inserted a
9  screw; is that correct?
10  A.  Yes.
11  Q.  All right.  So following the surgery in this
12  case, Captain Rivera -- did he appear -- did his
13  condition appear to improve to you objectively?
14  A.  No.
15  Q.  Okay.  Can you tell us what your -- what your
16  findings were concerning his improvement following the
17  surgery?
18  A.  His improvement?  I mean around five weeks we
19  started progressing to weight bearing, but he started
20  having more pain that radiated up along the same area
21  laterally on his ankle.
22  Q.  And so at some point did -- do you recall --
23  and I tell you what, what might be easier at this point
24  is if I switch from just asking you generalities if I
25  start going into some medical records --

**Page 19**

1  A.  Yeah.
2  Q.  -- because I've covered kind of the general --
3  the general basics on how you got to the point of the
4  surgery.  But what I think might be helpful is to
5  actually show you the medical records in this case.
6  So, Dr. Grosser, what I'd like to do first
7  is I would like to turn to show you some notes so we can
8  get these.  What I'm going to do is I'm going to mark
9  this as Grosser exhibit number 1.  Hand that to you.
10  And, Dr. Grosser, have you seen that document before?
11  A.  Yes.
12  (Exhibit No. 1 marked.)
13  Q.  (By Mr. Crew)  Can you tell us what that
14  document is?
15  A.  It's the initial evaluation when Jay first saw
16  me August 23rd, 2016.
17  Q.  And we talked about the patient history.  And
18  this -- this initial evaluation form marked as Exhibit
19  Number 1, does it contain Captain Rivera's history?
20  A.  Yes, it does.
21  Q.  Okay.  And so -- and is that contained in the
22  section where it says history of present illness?
23  A.  Yes, it is.
24  Q.  If you will turn your attention to the part
25  that says social history?  It says he works as a harbor

Page 20

1  pilot. Do you understand what a harbor pilot does?
2      A. I do.
3      Q. Can you tell us what that is to your
4  understanding?
5      A. They have to essentially leap from their boat
6  onto a bigger ship and climb up a rope ladder in the
7  middle of the waves and the wind and the movement. And
8  climb onto the bigger ship that they are piloting into
9  the harbor.
10     Q. Okay. And do you understand whether that
11 happens within the confines of the harbor or whether it
12 happens offshore?
13     A. I thought it was offshore, but I don't know if
14 that's correct.
15     Q. What I'd like to ask you about is on the second
16 page it's actually got a number on the bottom. It says
17 page 8. And I think those numbers were placed on there
18 by your office when they produced these documents to us.
19     A. Okay.
20     Q. At the very bottom it says assessment plan. It
21 says he was advised at this point on fracture care and
22 fracture healing. He's a 39-year-old male with a left
23 fifth metatarsal fracture, non-weight bearing and
24 non-operative.
25         It is something, however, that requires

Page 21

1  time to heal. And as a hardware pilot, that demands
2  quite a bit of activity. This is something where
3  standing on a boat or climbing a rope ladder on the side
4  of a boat is a dangerous proposition for probably about
5  three months.
6      A. Yeah.
7      Q. I was going to ask you -- let me ask you this:
8  Hardware, was that probably a dictation error or
9  something was harbor?
10     A. Yes, harbor.
11     Q. But -- so would it be fair to say that in terms
12 of Captain Rivera's initial examination and history, he
13 explained to you what -- what his activity involved so
14 that you could place limitations on him?
15     A. Correct.
16     Q. Do you recall if you placed limitations on
17 Captain Rivera at this time?
18     A. Yes.
19     Q. What were those?
20     A. Those were non-weight bearing. He had to be
21 immobilized. He had to be able to sit and elevate his
22 foot.
23         (Exhibit No. 2 marked.)
24     Q. (By Mr. Crew) Okay. And so at the very bottom
25 it looks like you scheduled him for a follow-up in about

Page 22

1  a month. What I'd like to do next is this will be
2  exhibit 2. Oh, there you go. I need to give you the
3  exhibit before I ask you about it. So on -- it appears
4  he came back almost a month later on September 19th,
5  2016. Now, have you seen what this document that I've
6  handed you is exhibit number 2 before?
7      A. Yes.
8      Q. And so what I'd like to draw your attention to
9  is the first paragraph. It says this is of his fifth
10 metatarsal fracture. He reports at this point that he's
11 starting to feel symptoms that are hyperintense pain and
12 sometimes shooting sensations along the dorsum of his
13 foot.
14         He has hypersensitivity to touch,
15 discoloration which is not uncommon after trauma in the
16 foot and ankle. But it is a purple discoloration, but
17 it does seem to go away with elevation. He is concerned
18 because this is not just where the fracture is. Some of
19 the swelling has improved, but the pain overall seems to
20 be getting a little worse in other areas.
21         Okay. So do you understand what RSD or
22 CRPS is?
23     A. From an orthopedic perspective, yes.
24     Q. Okay. Can you tell us what RSD stands for?
25     A. A regional sympathetic dystrophy.

Page 23

1      Q. And it's now more commonly known as CRPS,
2  right?
3      A. Yes.
4      Q. Can you tell us what CRPS stands for?
5      A. Chronic regional pain syndrome.
6      Q. So in September 19th, 2016 with the symptoms
7  that you -- that you objectively found, did -- are those
8  symptoms commonly associated with RSD or CRPS?
9      A. Yes.
10     Q. Okay. Now, in your practice as an orthopedic
11 surgeon dealing with ankle and foot injuries, are these
12 symptoms also commonly seen in non-RSD or CRPS cases?
13     A. Yes.
14     Q. Okay. Can you tell us how you as an orthopedic
15 surgeon would be able to distinguish between the two at
16 this point in Captain Rivera's treatment?
17     A. I don't think you can.
18     Q. Okay. Can you tell us why?
19     A. Because at a month out many people still have a
20 lot of pain. They have swelling. Everyone after foot
21 and ankle trauma if they put their foot down is
22 discolored. It turns purplish. And it usually starts
23 to resolve though over time. But it could take six to
24 eight months before that purplish discoloration and the
25 swelling gets better.

Page 24

1    Q.  In terms of from a lay person's point of view
2 in terms of fractures there's a wide range of severity
3 of fractures, right?  In terms of impacting your
4 impairment.  How would you characterize a fifth
5 metatarsal fraction -- fracture as impairing someone's
6 physical ability?
7    A.  If it heals properly, usually it does not
8 impair their physical ability.
9    Q.  And if a fifth metatarsal fracture does not
10 heal properly, how would it impair someone's physical
11 capabilities?
12    A.  It would be difficult for them to be able to do
13 running activities, jumping activities, climbing.
14 That's an area in the foot that takes a lot of pressure
15 when you're climbing up a ladder or a rope in this case.
16    Q.  And so you understand what he means by a rope
17 ladder to be wooden rungs suspended by two vertical
18 ropes, correct?
19    A.  Yes.
20    Q.  And so stepping on a wooden rung and putting
21 weight on that foot, would that impact a non-union fifth
22 metatarsal fracture?
23    A.  All the body pressure would go on that leg.
24 And on that specific spot in the mid-foot would push
25 off.

Page 25

1       (Exhibit No. 3 marked.)
2    Q.  (By Mr. Crew)  What I'd like to do is turn next
3 to -- this is an October 17, 2016 report.  And we've got
4 we're going to mark that as exhibit -- exhibit 3.
5 Sorry, I lost my mike.  Dr. Grosser, have you seen this
6 report before?
7    A.  Yes.
8    Q.  Okay.  And just for purposes of clarity, these
9 -- these notes that are -- that we've been talking
10 about, were these notes that you entered into some
11 computer system that's maintained here at South Texas
12 Bone and Joint?
13    A.  This is the -- Wynonna Floyd, the nurse --
14 nurse that saw the patients.
15    Q.  So when it says at the bottom Dawn
16 Grosser, M.D., Wynonna Floyd, LVN --
17    A.  Yes.
18    Q.  -- I notice at the bottom it's got your
19 signature and also Wynonna Floyd.  Can you tell us about
20 how Wynonna Floyd populated this -- this report with the
21 text that's in the document?
22    A.  It's a dictation.  Like a standard dictation.
23    Q.  But these are your words that were
24 dictated in?
25    A.  Yes, she and I -- yes, okay.

Page 26

1    Q.  That's what I was getting at.
2    A.  Okay.
3    Q.  Were these Ms. Floyd's words or your words that
4 were dictated and transcribed in?
5    A.  These are Wynonna Floyd's words.
6    Q.  Okay.  So let me make sure -- I'm not sure I
7 understand your answer.  Did you dictate the words that
8 are in exhibit number 3 and Wynonna Floyd typed them or
9 transcribed them in?
10    A.  No.
11    Q.  Okay.  These are all done --
12    A.  These are hers.
13    Q.  Okay.  So what I'm going to do instead of
14 asking you whether these are your words or hers is in
15 reviewing these notes, these are notes that are kept in
16 the ordinary course of your business here at South Texas
17 Bone and Joint?
18    A.  Indeed, yes.
19    Q.  And is this something -- is this something in
20 your file that you would rely on in evaluating Captain
21 Rivera's physical condition?
22    A.  Yes.
23    Q.  Okay.  So the -- the question that I have is in
24 the third paragraph in the text where it says Mr. Rivera
25 is a harbor pilot and this requires him standing on a

Page 27

1 boat and climbing rope ladders at the side of boats and
2 ships.  It is a dangerous proposition and he should
3 probably look at three or four months recovery time
4 before he can get return to full duty as a harbor pilot?
5    A.  Yes.
6    Q.  Is that an opinion that Ms. Floyd
7 reached, or is that an opinion you reached and Ms. Floyd
8 entered as part of the notes in your consultation with
9 Captain Rivera?
10    A.  I reached that opinion.
11    Q.  Okay.
12    A.  And she -- she put it in.
13    Q.  Okay.  That's all I wanted -- and you still
14 agree that that was a --
15    A.  Absolutely.
16    Q.  -- proper position at the time?  Okay.  I'd
17 like --
18    A.  I see the patient's x-rays and I go over
19 everything.  She just sometimes will go in and talk to
20 them and...
21    Q.  Sure.  I just want to make sure for purposes of
22 who said what that it doesn't get confused because we
23 lawyers have different rules that we have to follow
24 and --
25    A.  Okay.

Page 28

1     (Exhibit No. 4 marked.)
2     Q. (By Mr. Crew) -- put before the court. What
3   I'm going to do next is mark -- mark exhibit 4. And
4   I'll -- oh, I marked it wrong. Let me see if I can peel
5   this off. Here you go.
6         So, Dr. Grosser, we have on exhibit number
7   4 is your notes from December 7th, 2016. And so at the
8   bottom I note that there's no notation from Ms. Floyd on
9   there. So these were your notes, correct?
10    A. Yes.
11    Q. So on the second paragraph it indicates on exam
12  today he's still quite sensitive over the fifth
13  metatarsal and he doesn't feel comfortable trying to
14  wean out of the boot. In your experience is having this
15  discomfort and pain in the region of the fracture
16  ordinary or unordinary this far out from the time of his
17  injury?
18    A. At three and a half months, majority of people
19  would be able to wean out of the boot by now.
20    Q. Okay. And so one of the things that you talked
21  about with Captain Rivera at the time was carbon fiber
22  inserts. And do you know whether or not Captain Rivera
23  got and started to use those carbon fiber inserts?
24    A. Yes, he did.
25    Q. So the -- in the third paragraph it notes that

Page 29

1   you also ordered a CT scan. And it says even though
2   x-rays show some interval callus, I'm concerned about
3   this low rate of healing.
4         When you said earlier that typically three
5   and a half months there should not be pain, was this a
6   diagnostic exam that you felt would enable you to
7   determine the cause of the lingering pain?
8     A. Yes.
9     Q. Okay. Can you tell us what an interval callus
10  is?
11    A. It means when we compare an x-ray from the
12  prior visits that is maybe four to six weeks earlier, we
13  should see some increased density within the fracture
14  line.
15    Q. And so at the very bottom of that paragraph, it
16  says he may have injured more than one area. Both of
17  them though should heal non-operatively. So based on
18  your examinations and the diagnostics, did you find any
19  other area of his lower left extremity that he had
20  injured apart from the fifth metatarsal?
21    A. No.
22        (Exhibit No. 5 marked.)
23    Q. (By Mr. Crew) I'll show you next is -- we'll
24  mark this as Rivera 5. Dr. Grosser, have you seen this
25  document or documents like it before?

Page 30

1     A. Yes.
2     Q. Who generates this document?
3     A. This is a report from the radiologist of
4   Radiology and Imaging.
5     Q. Okay. And so who generated this report?
6     A. Cade McDowell.
7     Q. Okay. And do you know whether Cade McDowell is
8   a doctor or not?
9     A. He is. He is an M.D.
10    Q. And do you know what his area of specialty is?
11    A. Musculoskeletal radiology.
12    Q. And so as a radiologist, would you rely upon
13  his diagnostic reports from a radiological exam in your
14  practice?
15    A. Yes.
16    Q. And so at the top -- well, actually, underneath
17  the masthead or the Radiology and Imaging address
18  section it says name Jay -- Rivera, Jay, sorry. Date of
19  exam 12/13/16 and physician Dawn Grosser, M.D. Is this
20  data that indicates you ordered this particular imaging?
21    A. Yes.
22    Q. Can you tell us what this exam was?
23    A. It was a CAT scan of his left ankle -- or
24  excuse me, his left lower extremity.
25    Q. And so in the findings section can you tell us

Page 31

1   what the findings were?
2     A. What Dr. McDowell found was about 75 percent of
3   the fracture appeared to be healed.
4     Q. And so this is December 2016. And would is --
5   that a sufficient amount of healing for someone to
6   perhaps go on to work hardening?
7     A. Yes.
8     Q. Can you tell us what work hardening is?
9     A. They're usually with physical therapy trying to
10  progress the patient to their level of activity,
11  whatever their work, you know, requires. And it's
12  usually done five days a week.
13    Q. And would that -- and do you understand -- do
14  you know where Captain Rivera was going in conducting
15  physical therapy?
16    A. New Stride I believe.
17    Q. Okay. So in terms of weaning out of the boot
18  and putting a carbon fiber insert into his -- the sole
19  of his shoe and physical therapy, these were all
20  conservative methods of treatment to hopefully get
21  Captain Rivera back to work?
22    A. Yes.
23    Q. In your experience treating Captain Rivera, did
24  you -- did you ever feel that he was being non-compliant
25  or not giving full effort towards a full recovery?

Page 32

1    A. No.
2       (Exhibit No. 6 marked.)
3    Q. (By Mr. Crew) What I want to ask you about
4  next is -- we're going to mark this as exhibit 6. Dr.
5  Grosser, have you seen this document before?
6    A. Yes.
7    Q. Okay. And these appear to be your notes from a
8  January 11th, 2017 examination of Captain Rivera?
9    A. Yes.
10   Q. So as you understand it, this is about two
11 weeks out before you releasing him to full duty; is that
12 correct?
13   A. Yes.
14   Q. So the second paragraph says his exam today
15 shows some mild tenderness over the fifth metatarsal,
16 but better than before and some tenderness over the
17 anterior ankle ligaments and even more dorsally. It's
18 not just this area that has been affected. It certainly
19 can affect the area around it. And that's why he feels
20 pain in other places, not just the metatarsal.
21   A. Uh-huh.
22   Q. And then it says radiographs. On x-ray today
23 the fifth metatarsal is healing very well compared to
24 before. Again, his CT scan that was done demonstrates
25 about 75 percent to 80 percent healing.

Page 33

1       And you went on to say so at this point I
2  certainly wouldn't say he's completely healed, but he's
3  made very good progress on the x-ray. We may take one
4  more x-ray just to confirm the continued progress, but
5  no further radiation is required.
6       He will follow up with us in about a month
7  and likely be released to full duty. He was given a
8  prescription for physical therapy. Okay, so at this
9  point did you have any reason to believe that the fifth
10 metatarsal was a non-union?
11   A. No.
12      (Exhibit No. 7 marked.)
13   Q. (By Mr. Crew) And so what we're going to do
14 next is I'm going to show you what we're going to mark
15 as exhibit number 7. So this is -- again, have you seen
16 this document before?
17   A. Yes.
18   Q. And, Dr. Grosser, this appears to be your
19 January 30th, 2017 notes from your consultation with
20 Captain Rivera. It notes he feels that he is ready to
21 get back to work on the boat as a pilot. So at this
22 point you examined an x-ray. Do you know whether or not
23 those x-rays were taken in the office here when he
24 visited on January -- January 30th, 2017?
25   A. Yes.

Page 34

1    Q. Okay. And so at that point was there any
2  reason for Captain Rivera to -- to think that the pain
3  that he was experience would not resolve over time?
4    A. I don't believe so.
5    Q. Okay. And any time that you consulted with
6  Captain Rivera, did he ever not express concerns about
7  the pain in his foot?
8    A. No, he was always concerned some.
9    Q. Okay. And he always expressed to you that he
10 was experiencing pain?
11   A. Yes, but I think he wanted to get back.
12   Q. Okay. And would you characterize Captain
13 Rivera's attitude and your impressions of him as someone
14 who was trying to do everything they could to get back
15 to work, or trying to avoid going back to work?
16   A. He was trying to do everything he could to get
17 back.
18      (Exhibit No. 8 marked.)
19   Q. (By Mr. Crew) So what I would like to do next
20 is turn your attention to -- what I'm going to do is I'm
21 going to combine these two documents. Well, actually,
22 I'll just turn to this one first. We're going to call
23 this exhibit number 8.
24      MR. CREW: Oh, this is hers. I'll get you
25 yours. Here you go, John.

Page 35

1    Q. (By Mr. Crew) First of all, this is a document
2  that was also in your file, but it wasn't -- it has a
3  different number at the bottom that was produced
4  separately.
5    A. Okay.
6    Q. Have you seen this document before?
7    A. I -- yes.
8    Q. Okay.
9    A. I think I have.
10   Q. What I want to ask you about is this is a
11 different kind of document than the ones we've been
12 talking about?
13   A. I got you, yes.
14   Q. Okay. Do you know and can you explain the
15 difference between --
16   A. Yes, I can. This is our new computer system.
17 Is that what you're referring to? So these are what we
18 used to have until I think it was April. And then we
19 switched to a new computer system. And now we generate
20 the computer system we use now for the electronic
21 medical records generates this.
22   Q. Okay. And so I'm going to -- I know that I
23 think -- yeah, okay. So that's what I was curious about
24 because for instance in the middle part of that screen
25 there's a signature. Do you recognize that signature?

Page 36

1     A.  Yes, that is mine.
2     Q.  So what I'd like to do is -- so these appear to
3  be your notes and summary based on your electronic
4  system from a July 26, 2017 visit with Captain Rivera.
5  So at the bottom it has an assessment of plan.
6         And it says the assessment note is at this
7  point we're evaluating this further with another CT scan
8  and will compare it to prior CT scan which originally
9  showed quite a bit of healing callus starting to form at
10  that point.  He continues with his activity and will
11  follow up with me after the CT.  So -- and then it looks
12  like it was ordered a CT foot without contrast?
13     A.  Yes.
14     Q.  CT left foot with contrast avow fifth
15  metatarsal FX healing?
16     A.  Yes.
17     Q.  What does FX stand for?
18     A.  Fracture.
19     Q.  And then there's a significant number of
20  records following that.  But do you recall whether or
21  not Captain Rivera informed you that he had recently set
22  for his annual physical examination with a Dr. Moloney
23  here in town?
24     A.  That's vaguely familiar.
25     Q.  Okay.  And so do you know who Dr. Moloncy is?

Page 37

1     A.  Yes.
2     Q.  Can you tell us who he is?
3     A.  He does I thought FCE's for workers for
4  work-related injuries.
5     Q.  Okay.  What is -- what is an FCE?
6     A.  Function capacity exam.
7     Q.  And so if he does Coast Guard physicals, that
8  wouldn't be surprising to you; would it?
9     A.  No.
10     Q.  So have you ever provided any of your notes or
11  opinions on an individual to Dr. Moloney for his
12  purposes in evaluating whether or not they're suitable
13  for either a functional capacity evaluation or a
14  physical examination for a very physical job?
15     A.  Yes.
16     Q.  Okay.  So do you recall whether -- what Captain
17  Rivera's complaints were to you when he presented on
18  July 26th, 2017?
19     A.  He was continuing to have pain in the fracture
20  and then still higher up into the ankle.
21         (Exhibit No. 9 marked.)
22     Q.  (By Mr. Crew)  So what I'd like to do next is
23  show you what we'll mark as exhibit number 9.  Dr.
24  Grosser, this is another record from Radiology and
25  Imaging of South Texas for Captain Rivera, and this

Page 38

1  examination date was July 27th, 2017.  Have you seen
2  this before?
3     A.  Yes.
4     Q.  Okay.  At the bottom it says sign physician
5  William Weathers, M.D.  Do you know who Mr. -- or Dr.
6  Weathers is?
7     A.  Yes.
8     Q.  Can you tell us what his area of expertise is?
9     A.  He's a musculoskeletal radiologist.
10     Q.  And again, he's also someone you would rely on
11  in diagnostic examinations of your patients to reach a
12  diagnosis or prognosis, correct?
13     A.  Yes, sir.
14     Q.  So this appears to be a CT of his left foot
15  without contrast.  And the indication says fifth
16  metatarsal fracture, but can you tell us what the
17  discussion says?
18     A.  Complete healing.
19     Q.  Okay.  So based on the CT examination -- this
20  CT scan, there appears to be no fracture at this time?
21     A.  Right.
22     Q.  So following the CT scan you went further and
23  ordered an MRI of the left foot; is that correct?
24     A.  That's correct.
25         (Exhibit No. 10 marked.)

Page 39

1     Q.  (By Mr. Crew)  So what I'll do next is show you
2  the order.  We'll mark this as exhibit 10.  And, Dr.
3  Grosser, have you seen this document before?
4     A.  Yes.
5     Q.  Okay.  At the top I remember at the very
6  beginning of our deposition you mentioned Orthopedic
7  Associates of Corpus Christi.  And so in -- and you
8  indicated that that was the name of South Texas Bone and
9  Joint.  Is that -- that's the same entity basically?
10     A.  It's the same entity.
11     Q.  Okay.  So is this an order that you generated
12  in this office?
13     A.  Yes.
14     Q.  Okay.  And that's your signature at the bottom,
15  correct?
16     A.  Yes.
17     Q.  Okay.  And -- and so you ordered an MRI in this
18  case of Captain Rivera's left foot?
19     A.  Yes.
20         (Exhibit No. 11 marked.)
21     Q.  (By Mr. Crew)  Okay.  What I'd like to do next
22  is I'd like to show you what we'll mark as exhibit 11.
23  Dr. Grosser, have you seen this this report before?
24     A.  Yes.
25     Q.  Okay.  This appears to be an August 1st, 2017

Page 40

1 report from Radiology and Imaging of South Texas. Can
2 you tell us what the findings were?
3     A. This showed edema in the bone where the
4 fracture was. And the radiologist who was the same
5 radiologist who read the CT scan suggested that it was
6 approximately 80 percent healing.
7     Q. Okay. So at this point did you offer Captain
8 Rivera any medical options for treating this non-union
9 -- I'm sorry, I tell you what, let me go back.
10 Following this diagnostic examination, did you have a
11 new diagnosis of Captain Rivera's injury to his fifth
12 left metatarsal?
13     A. Yes.
14     Q. What was that finding?
15     A. A non-partial non-union.
16     Q. Okay. Can you -- so would it be fair to say
17 that a partial non-union is one that has a high
18 percentage of healing but not complete?
19     A. Correct.
20     Q. Okay. Dr. Grosser, in your experience as an
21 orthopedic surgeon, would a patient who has a non-union
22 and who is working on it -- would you expect that
23 patient to be experiencing pain symptoms with a
24 non-union of the type that Captain Rivera had?
25     A. Yes.

Page 41

1     Q. Okay. Can do you have any idea on how severe
2 those pain symptoms might be?
3     A. That's hard to gauge. Depends on their
4 activity level and their pain tolerance.
5     Q. Every patient is different, right?
6     A. Yes.
7     Q. And some people have very high tolerances of
8 pain, some people low tolerances?
9     A. Right.
10     Q. So on -- what we're going to do next is I'm
11 going to show you what's marked as exhibit number 12.
12     MR. CREW: Here you go, John.
13     (Exhibit No. 12 marked.)
14     Q. (By Mr. Crew) Dr. Grosser, this is a -- have
15 you seen this document before?
16     A. Yes.
17     Q. Okay. And this -- this appears to be an August
18 14th, 2017 summary of your visit with Captain Rivera
19 following your diagnostic -- your diagnostics of the MRI
20 and the CT scan. Can you indicate to us in this report
21 that's in here whether any -- what your -- your plan --
22 your assessment and plan was?
23     A. Yeah, hold on. Let me look through my records
24 as well if that's okay. Assessment and plan is a
25 partial non-union.

Page 42

1     Q. Okay.
2     A. And if that partial non-union is causing enough
3 pain to limit activity, then the options at that point
4 are surgically to go in and do a bone graft and screw to
5 stabilize the remaining non-union site.
6     Q. One of the -- when I was asking you about the
7 difference in the note system earlier --
8     A. Yes.
9     Q. -- and these summaries, what I -- and this is I
10 think what led to some of my confusion when I was
11 preparing these documents.
12     A. Right.
13     (Exhibit No. 13 marked.)
14     Q. (By Mr. Crew) What I want to do next is show
15 you what I'm going to mark as exhibit number 13, which
16 appear to be some other type of notes from your August
17 14th, 2017.
18     A. This is what I was looking for.
19     Q. Okay. So --
20     A. Yes.
21     Q. Can you tell us the difference in terms of the
22 document -- documents at your office here between the
23 patient's summary and the document that I've just handed
24 you labeled exhibit 13?
25     A. Well, they have -- this should be what comes up

Page 43

1 on the first screen: Chief complaint, CT follow-up,
2 left metatarsal fracture. Should give you the
3 medications, the problems, and then the HPI. And then I
4 have my physical exam and my assessment plan. And then
5 in the system we have all these other things.
6     Q. Okay.
7     A. That we all have to sit here and sort through.
8     Q. Yeah, and I apologize. This is taking a little
9 longer, but I just needed to understand you so I could
10 explain it to the court.
11     A. It's complicated I know.
12     Q. So in August 14th, 2017, your assessment -- can
13 you tell us what your assessment plan was?
14     A. Well, at that point I reviewed the MRI -- the
15 follow-up MRI and CT scan with him, which showed the
16 partial non-union. There was no soft tissue or tendon
17 involvement on the -- on the MRI. And we talked about
18 continuing to, you know, conservatively treat this
19 versus surgically.
20     Q. Okay. And so on the next page it's labeled
21 page 21 at the bottom, it said -- or it says, sorry, at
22 the top strongly considering an open reduction internal
23 fixation, but partial non-union fifth metatarsal
24 fracture left foot.
25     A. Yes.

Page 44

1    Q. And so you say open reduction internal
2  fixation. That is a surgical procedure to insert a
3  piece of hardware or screw into that fifth metatarsal?
4    A. Yes.
5    Q. What is the purpose of inserting a screw into a
6  non-union fracture?
7    A. It stabilizes the two parts of the bone.
8    Q. In non-unions in your experience as an
9  orthopedic surgeon, fixate -- does fixating the
10  non-union relieve the pain symptoms?
11    A. The fixation stabilizes the two pieces of bone
12  so that the bone can finish the healing process and that
13  alleviates the pain symptoms.
14      (Exhibit No. 14 marked.)
15    Q. (By Mr. Crew) That's what I was asking.
16  That's why you're the doctor and I'm a lawyer. What I'd
17  like to do next is turn to exhibit number 14. Let's
18  see, are these your -- I want this document, but it's
19  not --
20      MR. CREW: Are we on 15?
21      THE REPORTER: 14.
22    Q. (By Mr. Crew) 14. I'm going to need some more
23  stickers. Dr. Grosser, have you seen this particular
24  document before?
25    A. Yes.

Page 45

1    Q. Okay. Can you tell us what it is?
2    A. This is an operative report on 9/7/2017 for Jay
3  Rivera's surgery.
4    Q. Okay. And where was that surgery conducted?
5    A. It was at Corpus Christi outpatient surgery
6  center.
7    Q. And can you tell us what the -- and does this
8  document contain the procedures that you performed on
9  that day?
10    A. Yes, it does.
11    Q. And so can you tell us for the record what
12  those procedures were?
13    A. Procedure was open reduction internal fixation
14  of partial non-union of his left fifth metatarsal
15  fracture. He also had autologous bone graft, which
16  means his own bone graft from his calcaneous. And then
17  inoperative telescopic interpretation, which means
18  x-ray -- live x-ray in the operating room.
19    Q. And so following the surgery what -- what --
20  what did you prescribe Captain Rivera to do to
21  facilitate him getting back to being able to return to
22  work? Sorry if that was a confusing question. If it
23  is, I'll rephrase it.
24    A. Okay.
25    Q. What was your prescription for Captain Rivera

Page 46

1  post-op?
2    A. Pain wise for pain medicine?
3    Q. For just recovery. Is that -- I'm sorry.
4    A. I think we gave him hydrocodone initially.
5    Q. Okay, so I know he was allergic to hydrocodone?
6    A. Tramadol. Sorry, Tramadol.
7    Q. So, for instance, for purposes of any medical
8  devices, he was placed in a short leg cast, right?
9    A. Yes.
10    Q. Okay, and so you understand that he was using
11  some sort of -- he was having to use either a wheelchair
12  or some other device to assist him in mobility, right?
13    A. That's correct.
14    Q. Do you know how long he -- Captain Rivera was
15  in the cast?
16    A. Usually -- well, we did two weeks in the cast.
17    Q. Okay. And so following the two weeks in -- was
18  he restricted in any way following the two-week cast
19  time?
20    A. Yes, two weeks in the cast, then we switched to
21  the boot again.
22    Q. And so at some point he was switched to a tall
23  walking boot?
24    A. Yes.
25    Q. Can you tell us what a tall walking boot is?

Page 47

1    A. It's -- it's like a cast, but it's removable.
2  And so it has Velcro, but it behaves like a cast. It
3  immobilizes the foot to the ankle.
4    Q. And it has kind of a slope or a curved heel?
5    A. A rocker bottom.
6    Q. And that alleviates the need for the ankle to
7  twist, correct?
8    A. Correct. He was given that on 9/21.
9      (Exhibit No. 15 marked.)
10    Q. (By Mr. Crew) Okay. What I'm going to do next
11  is I'm going to go forward to -- what I'm going to do
12  next is I'm going to show you what we've marked -- what
13  I'm going to mark as exhibit number 15. Dr. Grosser,
14  have you seen this report before?
15    A. Yes, I have.
16    Q. Okay. Can you tell us why this report was
17  ordered?
18    A. Because of his continued pain.
19    Q. Okay. So at this point -- and the date of this
20  examination was February 5th, 2018; is that right?
21    A. That's correct.
22    Q. So that's roughly seven months?
23    A. This was his five-month follow-up.
24    Q. Five-month follow-up, okay. So five-month
25  follow-up, would you expect to -- Captain Rivera to

Page 48

1  still have continued pain in his left foot following the
2  fixation procedure you conducted?
3      A. No.
4      Q. So what -- what diagnostics did you order at
5  that time?
6      A. At that time we did a CT scan again.
7      Q. Okay.
8      A. To look at bone healing.
9      Q. Okay. And so -- and what did those diagnostics
10  find?
11      A. This was by the same doctor who had read his
12  prior.
13      Q. And that's Dr. Weathers, correct?
14      A. Weathers, yes. And he found greater than 90
15  percent -- percent bone bridging across the fracture
16  site.
17      Q. So at this point in Captain Rivera's treatment,
18  would the ordinary course of treatment have been to
19  remove the hardware?
20      A. Not really, no.
21      Q. Is this a piece of hardware that could be left
22  in permanently?
23      A. Yes.
24          (Exhibit No. 16 marked.)
25      Q. (By Mr. Crew) Okay. What I'm going to do next

Page 49

1  is, Dr. Grosser, I'm going to show you what I'm going to
2  mark as exhibit number 16. Dr. Grosser, have you have
3  you seen this document before?
4      A. Yes.
5      Q. Okay. And who wrote this document?
6      A. I did.
7      Q. Okay. And that's your signature at the bottom?
8      A. It is.
9      Q. Okay. So the -- this is a March 2nd, 2018 --
10  it looks like a report that you wrote that says to whom
11  it may concern, I have been treating Mr. Jay Rivera for
12  a fifth metatarsal fracture that has now healed. But he
13  has developed a complication that can occur after
14  trauma.
15          It affects the nerve system. And he is
16  currently undergoing treatment for that with a pain
17  management specialist. I'm no longer recommending any
18  further surgery orthopedically for the neurologic
19  condition, but will continue to follow him. He is
20  unable to work in the same capacity as a harbor pilot at
21  this time. Sedentary duty is the only possibility with
22  his current symptoms.
23          For any further questions, I'll be happy to
24  discuss this. Please feel free to call and contact me
25  at your phone number. So at some point did you receive

Page 50

1  medical documents from a neurologist that was treating
2  Captain Rivera?
3      A. I did.
4      Q. Do you recall who those documents were from?
5      A. Dr. Randolph Evans.
6      Q. And did you -- what did Dr. Evans conclude that
7  Captain Rivera was suffering from?
8      A. He saw him in December of 2017 and said he had
9  CRPS.
10          (Exhibit No. 17 marked.)
11      Q. (By Mr. Crew) Okay. What I'd like to do is
12  I'll show you this, what we're going to mark as exhibit
13  17. Have you seen this particular document before, Dr.
14  Grosser?
15      A. Yes, I have.
16      Q. Okay. Is this -- does this appear to be a true
17  and correct copy of the notes from Dr. Randolph Evans
18  dated December 28th, 2017 that you're referring to
19  earlier?
20      A. Yes.
21      Q. Okay. And in terms of the history that Dr.
22  Evans relates, does that history appear to accurately
23  represent the history of Captain Rivera's injury in this
24  case correctly?
25      A. Yes.

Page 51

1      Q. Okay. And so in terms of Captain -- I'm sorry,
2  in terms of Dr. Evans' assessment, can you tell us what
3  that was? And for -- just to point your attention to
4  it, it's on the second page.
5      A. His assessment was complex regional pain
6  syndrome left lower limb.
7      Q. Are you familiar with Dr. Evans?
8      A. I spoke to him on the phone.
9      Q. Okay. And did you do any investigation into
10  Dr. Evans' background or qualifications?
11      A. He's -- he's the head of neurology at Baylor.
12      Q. Okay. And so you have no reason to disagree
13  with Dr. Evans' assessment and diagnosis of Captain
14  Rivera's CRPS?
15      A. No.
16      Q. Okay. Going back your March 2nd, 2018 report,
17  it says that I no longer recommending any further
18  surgery orthopedically for the neurologic condition, but
19  will continue to follow him. Do you understand or do
20  you know if there are any risks which may be associated
21  with surgical intervention in Captain Rivera's left
22  foot?
23      A. With a diagnosis of CRPS and that being the
24  symptoms that he's showing, if you -- if he has further
25  trauma to that area or surgical trauma, it can flare up

Page 52

1 CRPS symptoms.
2 Q. Okay.
3 A. Has a possibility of doing that.
4 Q. So in terms of the -- your opinion in the March
5 2nd, 2018 letter, your opinion was that he is unable to
6 work in the same capacity as a harbor pilot at this
7 time. So as we sit here today and based on the
8 documents and medical records that you've reviewed in
9 this case, are you in a position to say whether or not
10 more likely than not Captain Rivera can return to work
11 as a harbor pilot?
12 MR. SPILLER: Objection, calls for
13 speculation, incomplete foundation.
14 Q. (By Mr. Crew) You can answer.
15 A. Oh, okay. If the symptoms continue, he will
16 not be able to do that.
17 Q. And who would you look to for in terms of
18 making a determination on whether or not Captain Rivera
19 can return to work?
20 A. Meaning which physician would be following him
21 or...
22 Q. Any sort of -- any sort of objective findings,
23 physicians' notes, or anything in that nature? Which --
24 what sort of -- what sort of documentation would you
25 need to reach an opinion that Captain Rivera could

Page 53

1 return to work as a harbor pilot?
2 A. You'd want to make sure he could accomplish the
3 physical activity that was required.
4 Q. Okay.
5 A. Through physical -- you know, through the
6 physical therapist or I guess the Moloney.
7 Q. Would it be fair to say that you would leave
8 that decision up to Doctors Moloney and Dr. Evans?
9 A. Yes.
10 (Exhibit No. 18 marked.)
11 Q. (By Mr. Crew) Okay. I'm going to show you
12 what we're going to mark next as exhibit number 18. Dr.
13 Grosser, have you seen the document that I've just
14 handed you marked exhibit number 18 before?
15 A. Yes.
16 Q. Okay. And have you had a chance -- did you
17 read it before this deposition, or are you just now
18 seeing it for the first time today?
19 A. I've read it before.
20 Q. Okay. Did Dr. Evans' office send you this
21 report?
22 A. Yes.
23 Q. Okay. Can you tell us what Dr. Evans had to
24 say about Captain Rivera's current condition?
25 A. Can I read?

Page 54

1 Q. Sure.
2 A. In his assessment which is the most concise, it
3 has chronic allodynia, chronic pain, swelling in the
4 left foot is cooler with decreased hair than the right
5 consistent with the criteria for complex regional pain
6 syndrome.
7 This pain continues in spite of using
8 medications Gabapentin, which is used for neurologic
9 pain, Tramadol, and he's had -- he had two sympathetic
10 lumbar blocks.
11 Q. Can you tell us what his -- what Dr. Evans'
12 plan was?
13 A. He started a different medication called
14 Cymbalta. And he said it's more likely than not he will
15 not be able to pass the Coast Guard physical to return
16 as a mariner within the next year.
17 Q. And so I asked you the question earlier if you
18 had an opinion on whether more likely than not Captain
19 Rivera would be able to pass a Coast Guard physical
20 based on the documents that you reviewed in this case
21 and do you have an opinion on that now?
22 MR. SPILLER: Objection, calls for
23 speculation, incomplete factual foundation.
24 Q. (By Mr. Crew) Do you?
25 A. More likely than not he will not be able to go

Page 55

1 back.
2 Q. And Dr. Grosser, I'm not asking you to guess.
3 I'm asking you based on the documents that you're
4 looking at right here today.
5 A. Right.
6 Q. Okay. And you're not speculating on that; that
7 would be your opinion right now?
8 A. Yes.
9 Q. Okay. Dr. Grosser, do you feel that you're
10 qualified as an orthopedic surgeon to reach an opinion
11 on someone's -- a mariner's in this case physical
12 capabilities to perform their job as a harbor pilot?
13 A. For a musculoskeletal problem.
14 Q. And so in so far as the musculoskeletal problem
15 for Captain Rivera is concerned, do you have an opinion
16 on whether or not Captain Rivera can return to work
17 based on -- only on the musculoskeletal problems that he
18 has now?
19 A. Which means fracture healing?
20 Q. Yes.
21 A. His fracture from what I have in front of me is
22 95 percent healed. With most patients when a fracture's
23 95 percent healed, they can usually get back to a higher
24 level of activity.
25 Q. And so in your opinion is Captain Rivera's

Page 56

1  current condition a musculoskeletal or a neurological
2  condition?
3      A.  It's a neurologic condition now.
4      Q.  Okay.  I think, Doctor, we've received -- we
5  have some medical billing records.  And I know that's a
6  separate part of your office, but do you have an opinion
7  from a medical practitioner's standpoint on whether the
8  medical care that you've provided Captain Rivera was all
9  reasonably necessary and related to his injury on August
10  2016 that he's complaining of?
11      MR. SPILLER:  Objection, calls for
12  speculation, incomplete factual foundation.
13      A.  I believe so, yes.
14      Q.  (By Mr. Crew)  I'm asking for the treatment
15  that you provided Rivera since August 20th, 2016?
16      A.  Yes.
17      Q.  Okay.  Dr. Grosser, I think that's all the
18  questions I have for you.  I pass the witness.
19      MR. SPILLER:  How much time do we have left
20  on the DVD?
21      THE VIDEOGRAPHER:  On this one here we have
22  20 minutes.
23      MR. SPILLER:  Why don't we go ahead and
24  change that and then we'll...
25      THE VIDEOGRAPHER:  Okay, we're now off the

Page 57

1  record.  Time is 4:02.
2      (Break from 4:02 to 4:09.)
3      THE VIDEOGRAPHER:  We are now back on the
4  record.  Time is 4:09.
5          EXAMINATION
6  BY MR. SPILLER:
7      Q.  Dr. Grosser, we met for the first time just an
8  hour earlier.  My name is John Spiller.  I represent the
9  defendant in this case.  We have not met or spoken on
10  the phone before today, correct?
11      A.  No, correct.
12      Q.  What I'd like to do is start back
13  chronologically with your initial visit with Captain
14  Rivera.  You have the exhibits in front of you.  Exhibit
15  1 was the initial note that you did on your initial
16  evaluation of Dr. -- or of Captain Rivera.  So when
17  Captain Rivera came to you, your initial diagnosis was
18  he had a simple non-displaced fracture of the fifth
19  metatarsal, correct?
20      A.  Yes.
21      Q.  And because of the fact that it was
22  non-displaced, that it was simple, you saw him as a
23  non-operative candidate?  That is, he was not a
24  candidate to have surgery to repair the fracture,
25  correct?

Page 58

1      A.  If it stays like this and heals, yes.
2      Q.  There was a mention that it was not a Jones
3  fracture?
4      A.  Right.
5      Q.  As I appreciate it, Jones fractures are more
6  complicated and bring up a lot more other issues?
7      A.  They are less likely to heal than an evulsion
8  fracture, and that's what he had sustained that was
9  non-displaced.
10      Q.  With patients who have a fifth metatarsal
11  fracture non-displaced simple like Captain Rivera, your
12  experience is -- is that I believe 95 percent of your
13  patients heal and they never have follow-up with you,
14  they just go on with their lives?
15      A.  Usually, yes.
16      Q.  And on a rare occasion patients with this kind
17  of fracture may have a non-union, correct?
18      A.  Yes.
19      Q.  And this type of fracture, the one that he
20  initially presented with, it's rare to treat it
21  surgically, correct?
22      A.  It's uncommon.
23      Q.  Now, when treating Captain Rivera or patients
24  of any kind, what you're looking to do is treat the
25  condition and get them in a position where if they're in

Page 59

1  the workforce they can eventually return to work,
2  correct?
3      A.  Yes.
4      Q.  And depending on the nature of what the
5  patient's work is, they may be able to get back to the
6  workforce sooner?  For example, if you have someone like
7  myself who has a desk job, I can probably get back to
8  work with a broken metatarsal faster than someone who is
9  like Captain Rivera who has to climb rope ladders?
10      A.  Yes.
11      Q.  So with your understanding of Captain Rivera's
12  occupation and the types of activities he had to engage
13  in, you are not going to turn him loose to return to
14  work until you were absolutely sure that he could
15  tolerate it and do it safely, correct?
16      A.  Yes.
17      Q.  And part of that process would be you would
18  look at objective signs, correct?
19      A.  Yes.
20      Q.  And that would be things like radiological
21  studies and the like?
22      A.  Yes.
23      Q.  And then you would like at subjective signs?
24  That is, what Captain Rivera himself is telling you
25  about his condition, correct?

Page 60

1    A. Yes.
2    Q. And as I appreciate it, from the time that you
3 first saw Captain Rivera on August 23rd of 2016 until
4 you discharged him full duty to return to work on
5 January 30, 2017, he had a pretty much unbroken progress
6 and healing of his fracture, correct?
7    A. He had progress on an x-ray and symptomatically
8 he was I would say not as -- as progressive as other
9 patients might be because he continued to have pain.
10    Q. He continued to have pain and it took longer,
11 but --
12    A. Yes.
13    Q. -- his pain got progressively less until you
14 finally discharged him to return to work?
15    A. Yes.
16    Q. And we'll talk about the progress he made in
17 just a second.
18    A. Okay.
19    Q. The -- as I appreciate it, one of the benefits
20 of actually returning to work is it can actually help in
21 the healing process?
22    A. Depending on the kind of work, but yes, yeah.
23    Q. And in December of 2016 you had a CT scan
24 performed to check on the progress of how his fracture
25 site was healing, correct?

Page 61

1    A. Correct.
2    Q. And why do you use a CT scan as opposed to,
3 say, an MRI?
4    A. A CT scan is going to show bone healing and
5 bone connection better, but sometimes a CT scan doesn't
6 show subtle changes that an MRI might show.
7    Q. In December of 2016 when you -- when you
8 commissioned the CT scan -- I guess that's exhibit
9 number 5 in your pile there?
10    A. CT scan on 12/14.
11    Q. Or 12/13 I guess?
12    A. Oh, sorry, that's right. I follow up with him
13 on 12/14, yup.
14    Q. So if we look at exhibit number 5?
15    A. Got it.
16    Q. While he is slow to heal, he is showing
17 progress in healing and at that point he's about 75
18 percent healed?
19    A. Correct.
20    Q. And at that point on December 13, 2016 he's
21 still complaining of pain, correct?
22    A. Correct.
23    Q. You would expect someone with 75 percent
24 healing to still have aspects of pain, correct?
25    A. Correct.

Page 62

1    Q. It is only when you get to 95 percent or
2 thereabouts that you're going to be pain-free?
3    A. You -- we would expect that.
4    Q. So at that point with 75 percent healing, you
5 did not feel that Captain Rivera was capable of
6 returning to work as a harbor pilot, correct?
7    A. Right, correct.
8    Q. And part of that was he still wasn't completely
9 healed?
10    A. Yes.
11    Q. And second, he was still having pain
12 complaints?
13    A. Correct.
14    Q. So you continue following Captain Rivera and
15 then in January -- January 11 of 2017 you follow up with
16 Captain Rivera and he's continuing to progress? That
17 is, he's doing better, correct?
18    A. Yes.
19    Q. If we look at exhibit 6, he is -- he's making
20 progress. He -- you said at that point he was not
21 completely healed, but he's making very good progress,
22 correct?
23    A. Yes.
24    Q. And so the plan was that you were going to
25 continue to follow him. And if he continued to progress

Page 63

1 in the same fashion, you were going to release him to
2 return to work?
3    A. Correct.
4    Q. And then I believe -- and I just -- I want to
5 make sure I understand what these are. In addition to
6 your reports, you also have interview notes I guess that
7 are in your file?
8    A. Yes.
9        (Exhibit No. 19 marked.)
10    Q. (By Mr. Spiller) And I just want to find
11 out -- I'm going to mark exhibit number 19.
12    A. Okay, thank you.
13    Q. Do you recognize exhibit number 19?
14    A. Yes.
15    Q. What is exhibit 19?
16    A. Exhibit 19 is the note that before we got a new
17 system, our -- the person who interviewed the patient
18 would write the -- what the patient said.
19    Q. In this case it says interviewer's initials as
20 E.A.C. Who would that be?
21    A. That's Emelda Cantu. She's an M.A. who works
22 with me.
23    Q. So she's a medical assistant who would come in,
24 interview Captain Rivera, and based on what he tells her
25 she puts down in these notes?

Page 64

1    A. Correct.
2    Q. And then you take these notes and you use them
3  in your assessment of Captain Rivera's condition?
4    A. Yes. These are subjective, yes.
5    Q. And the notes -- these are notes that you keep
6  in your file on Captain Rivera, correct?
7    A. Yes, correct.
8    Q. So on January 11 of 2017 -- so at this point we
9  are about four and a half months out from his injury,
10  correct? If you look at --
11    A. Yes, is that what I said?
12    Q. Well, if you look at exhibit number 19?
13    A. Yes, he is. Yes, what she said, right.
14    Q. So there's a notation FWB. That's full weight
15  bearing?
16    A. Correct.
17    Q. What's the significance of full weight bearing
18  and regular shoes?
19    A. That he's not requiring -- he's not using
20  crutches when he comes into the office and he's not
21  using his medical boot -- the tall walking boot. He's
22  in regular shoes.
23    Q. Would that be another further sign of progress?
24    A. Yes.
25    Q. And then there's some notes at the bottom doing

Page 65

1  better, but still has some soreness if he tries to do
2  steps or pushing off?
3    A. That's correct.
4    Q. And it also says he has carbon fiber insert as
5  well. What is the carbon fiber insert?
6    A. It is a -- it's about a millimeter stiffener.
7  And it looks like an orthotic, but it's put underneath
8  an orthotic. And it makes a shoe that might otherwise
9  be flexible stiffer. So that when he tries to push off,
10  the shoe won't bend and it'll protect the area of the
11  fracture.
12    Q. In January -- so in January 11, 2016, Captain
13  Rivera is -- he's close, but he's not quite there where
14  you felt comfortable returning him to work?
15    A. 2017.
16    Q. 2017, thank you.
17    A. Yes.
18    Q. So again if -- what you're looking for is
19  continuing progress?
20    A. Right.
21    Q. And if he has set backs or he's doing badly,
22  you're not going to return him to work to meet an
23  artificial deadline, correct?
24    A. Correct.
25    Q. For example, if you have a patient who doesn't

Page 66

1  complain of pain and -- but he's in obvious discomfort
2  and the x-rays are showing non-union, are you going to
3  discharge a patient like that to a heavy labor job or
4  one where he's facing, say, the perils of the sea?
5    A. No.
6    Q. So you're using both what the patient tells you
7  as well as objective signs as well?
8    A. Yes.
9    Q. And you're looking at the totality of the
10  circumstances before you say this person is fit to
11  return to work?
12    A. Yes.
13    Q. And with some patients, you will give them
14  discharges to return to work, but place restrictions on
15  their activities?
16    A. Yes.
17    Q. If you feel like they can do some kind of work
18  but their condition is such that there are limitations,
19  you can give them a restrictive duty discharge and you
20  write in the limitations?
21    A. Yes.
22    Q. One of the things that you did with Captain
23  Rivera in January you began ordering I think you
24  called it work hardening, but it was a physical therapy
25  of sorts?

Page 67

1    A. Right.
2    Q. And that was with an entity called New Stride
3  Physical Therapy?
4    A. Yes.
5    Q. As I appreciate it, New Stride Physical
6  Therapy, is it in this building or is it in a --
7    A. No.
8    Q. Not in this building?
9    A. Yeah.
10    Q. But when they do a report on your patients,
11  they send you a copy of the report?
12    A. Yes.
13    Q. And with New Stride, if they do a report on a
14  patient, you will actually review these reports and sign
15  off on them?
16    A. Yes.
17    Q. And the purpose of that is that you are using
18  this as further evidence or part of the totality of the
19  circumstances to determine is this person making
20  progress?
21    A. Yes.
22    (Exhibit No. 20 marked.)
23    Q. (By Mr. Spiller) I'm going to show you what's
24  been marked as exhibit number 20. And based on the file
25  we got from your office, there were only three reports

Page 68

from New Stride. I'll show you what's been marked as exhibit number 20.

A. Okay.

Q. Exhibit 20 is a collection of three reports. Is that -- does this appear to be all the reports that --

A. Yes.

Q. -- you receive from New Stride?

A. Yes.

Q. Regarding Jay Rivera?

A. Yes.

Q. So if -- I've got them in reverse chronological order --

A. Okay.

Q. -- because I believe that's how they appeared in your report. The first report if you'll look at the last page, it is dated 1/23/2017?

A. Yes.

Q. Okay. So this would have been two weeks after your last visit from Captain Rivera where he's showing progress, correct?

A. Yes.

Q. And at the top of the page there's a -- you see history chief complaint, and then to the right of that it says palpation? At the top of the page?

Page 69

A. Yeah.

Q. So for palpation, what is palpation in this context?

A. When they touch that area.

Q. Do they take the shoe off and actually lay hands on the foot?

A. They -- they should.

Q. So your understanding of what the PT -- the New Stride Physical Therapy person does is with palpation they'll actually take the shoe off and lay hands on the foot and see how the patient responds?

A. That would be my assumption.

Q. In this instance on January 23rd, 2017, palpation there was reports of cuboid pain and peroneal pain?

A. Yup.

Q. So the peroneal pain is -- would be kind of along the -- up and down the side of the foot?

A. Right.

Q. And there's like a peroneal longus and a peroneal brevis that are -- run up and down the ankle side of the foot?

A. Yes.

Q. So when you see peroneal pain, that's kind of on the side -- on the ankle side of the foot?

Page 70

A. Well, the peroneus brevis attaches to the fifth metatarsal.

Q. Okay.

A. So it's all in line with that area.

Q. And then cuboid pain, what would that be?

A. That's the bone right next to the fifth metatarsal.

Q. Is that the one that kind of -- it's like a little bulb that...

A. Yeah, well...

Q. So he -- Captain Rivera on January 23rd, 2017 was having some pain when you put hands on his foot?

A. Yes.

Q. And you squeezed it. There's a section that says pain intensity. It's about mid-way down in the left column. Do you see that?

A. Yes.

Q. And the pain intensity is rated a three out of ten?

A. Yes.

Q. And it's checked as being intermittent?

A. Yes.

Q. And would you interpret that to mean that he has some what you would consider to be mild to moderate pains and he has it occasionally?

Page 71

A. Yes.

Q. And this would be taken from what Captain Rivera tells the physical therapist?

A. Subjective, yes.

Q. There's not like a little pain meter you can stick your foot in, correct?

A. Right.

Q. So under weight bearing, it shows that he's full weight bearing at that time, correct?

A. Yes.

Q. And then as far as range of motion, there's a comparison of the right foot which is uninjured with the left foot, correct?

A. Yes.

Q. And if look at the comparison side-by-side, they're virtually identical?

A. They're very close.

Q. There's some slight -- there's a five percent reduction for the left on inversion, and there's a five percent reduction on the left for flexion of the plantar. But other than that, the left foot's almost the same as the right foot as far as flexion, correct?

A. Correct.

Q. So you then see a week later approximately -- you then see Captain Rivera for a follow-up appointment

Page 72

1 and assessment of whether he's ready to return to work,
2 correct?
3    A. Yes.
4    Q. And that's exhibit 7. And exhibit 7 is your
5 January 30, 2017 note?
6    A. Yes.
7    Q. You said that Captain Rivera communicated to
8 you that he made progress with physical therapy,
9 correct?
10    A. Yes.
11    Q. He's been doing more on his feet, correct?
12    A. Yes.
13    Q. He's now gotten out of the New Balance running
14 shoes and into stiffer soled dress shoes, correct?
15    A. Correct.
16    Q. And that's a good sign because if he can
17 tolerate stiff shoes, it shows that his foot is healing
18 or if not healed, correct?
19    A. Yes.
20    Q. And Captain Rivera tells you he's ready to get
21 back to work as a harbor pilot?
22    A. Yes.
23    Q. And you understand that Captain Rivera is --
24 understands what his job responsibilities and physical
25 demands are of his job, correct?

Page 73

1    A. Correct.
2    Q. Probably more so than anyone else?
3    A. Yes.
4    Q. And when he spoke to you, he didn't exhibit any
5 reluctance that my foot is holding me back or I can't do
6 my job safely?
7    A. He wanted to get back.
8    Q. And at that time again when he does his visit
9 with you on January 30th, 2017, he also -- there's going
10 to be interview notes that accompany that, correct?
11    A. Yes.
12      (Exhibit No. 21 marked.)
13    Q. (By Mr. Spiller) And I'm going to show you
14 what's been marked as exhibit 21. These are going to be
15 interview notes of January 30, 2017, so the same day
16 that you saw --
17    A. Yes.
18    Q. -- Captain Rivera. The interviewer is J. Q.
19 Who is that?
20    A. Jennifer Quevera. She's the other M.A..
21    Q. So she would have interviewed Captain Rivera
22 individually and taken notes?
23    A. Yes.
24    Q. And then you -- the notes that are contained
25 here in exhibit 21, you would then take those notes into

Page 74

1 consideration --
2    A. Yes.
3    Q. -- when assessing Captain Rivera?
4    A. Yes.
5    Q. What he says -- Captain Rivera told her that
6 he's full weight bearing in regular shoes, correct?
7    A. Yes.
8    Q. He's been going to therapy, correct?
9    A. Yes.
10    Q. And that in his words he feels good?
11    A. Yes.
12    Q. So as of January 30, 2017 he's not
13 communicating any issues with pain, correct?
14      MR. CREW: Objection, misstates evidence,
15 misstates facts in evidence.
16    A. He is feeling good, yes.
17    Q. (By Mr. Spiller) Did he say I have pain?
18    A. Not that I recall him saying.
19      (Exhibit No. 22 marked.)
20    Q. (By Mr. Spiller) And in fact what you did on
21 that day is -- I'll show you what's been marked as
22 exhibit number 22. Do you recognize exhibit number 22?
23    A. Yes.
24    Q. What is exhibit 22?
25    A. It is our release to duty note that our office

Page 75

1 gives.
2    Q. You signed that, correct?
3    A. Yes.
4    Q. And he was released to full duty effective
5 February 1st, 2017, correct?
6    A. Correct.
7    Q. There's a section about specific restriction on
8 light duty, and there's a section if he had restrictions
9 or limitations you would put those in?
10    A. Yes.
11    Q. Did you put any limitations or restrictions on
12 his activities?
13    A. Did not.
14    Q. So as of January 30, 2017, would you agree with
15 me that the objective signs that you had your at your
16 disposal showed that Captain Rivera's fracture of his
17 fifth metatarsal was healed?
18    A. Yes.
19    Q. And then would you also agree with me that the
20 subjective signs that you had which can only really come
21 from Captain Rivera also showed that his right fifth
22 metatarsal -- or excuse me, let me --
23    A. Left.
24    Q. Let me try that again. So as far as the
25 subjective symptoms, the subjective evidence that you

**Page 76**

1  had available to you from Captain Rivera was that the
2  fifth metatarsal of the left foot was healed, correct?
3  A. Well, he felt good and he felt like he wanted
4  to go back to work.
5  Q. And Captain Rivera did not communicate to you
6  any pain or limitation in his left foot as of January
7  30, 2017, correct?
8  MR. CREW: Objection, misstates evidence,
9  misstates facts in evidence.
10  A. Not any specifics at that time when he was
11  ready to get back.
12  Q. (By Mr. Spiller) Sure. And if he had -- he
13  said look, Doc, I feel good although I have some bad
14  days where my foot hurts, but I'd really like to go out
15  and get back to work, that's something you would have
16  noted in your reports, correct?
17  A. Probably, yes. But a lot of times many people
18  work with pain, right?
19  Q. I understand that.
20  A. Especially harbor pilots.
21  Q. And we'll talk about that in a second.
22  A. Okay.
23  Q. But as far as what's in your notes, you see,
24  what, hundreds of patients in a given year?
25  A. Yeah.

**Page 77**

1  Q. And so unless it's written down in your notes,
2  you're not going to have a specific memory?
3  A. You're right.
4  Q. So as of whatever you remember from January 30,
5  2017, it's going to be confined to what's in your note?
6  A. Yes.
7  Q. So you don't have a specific memory of Captain
8  Rivera telling you I'm 80 percent, but I want to give it
9  a go? Your notes are he is -- he's --
10  A. He's feeling good and he would like to return.
11  Q. Yeah.
12  A. Yes.
13  Q. And you understand there's a difference between
14  I feel good and I still have pain?
15  A. Yes.
16  Q. They're kind of opposites, correct?
17  A. Yes, and he described his pain as you mentioned
18  three out of ten with the -- with the therapist.
19  Q. Right, and that was a week earlier, correct?
20  A. Yes.
21  Q. So if we look at the subjective signs of the
22  progress from January 11, 2017 to January 30, 2017, he
23  was having pain in January 11 of 2017 and he was talking
24  to the physical therapist about having intermittent
25  pain?

**Page 78**

1  A. Right.
2  Q. And as of January 30, 2017 he's improved to the
3  point you discharge him without restrictions, correct?
4  A. That's correct.
5  Q. Now, when you discharge Captain Rivera, you say
6  in your note that he is to follow up with you what's
7  called PRN?
8  A. Yes.
9  Q. And that's a -- kind of a medical term for
10  as-needed?
11  A. Correct.
12  Q. You communicated to Captain Rivera if he has
13  problems, if his foot acts up, that he should come back
14  into the office?
15  A. That's correct.
16  Q. And why is it important that if a patient has
17  continuing problems that they get back to see you as
18  soon as possible?
19  A. Because we want to make sure that the -- it has
20  completely healed or that there isn't some other issue.
21  Q. And if someone has problems and they don't
22  report it, can that introduce new complications into
23  their condition?
24  A. Yes.
25  Q. Now, the -- in looking at the records that you

**Page 79**

1  reviewed with Mr. Crew, it looks as though from January
2  30 of 2017 to July 27 of 2017 you did not see Captain
3  Rivera at all, correct?
4  A. January 30th to July 16th, that's correct.
5  2017.
6  Q. Yes.
7  A. Yes.
8  Q. Okay. Just so it's clear, so you discharged
9  him to go to work January 30, 2017 and then
10  approximately six months passes before he sees you
11  again, correct?
12  A. Correct.
13  Q. And in that interim time period he didn't call
14  or check in with you or anything like that?
15  A. Not that I'm aware of.
16  Q. If he did, that would be something that would
17  be in your file, correct?
18  A. It should be.
19  Q. If you will turn back to the physical therapy
20  notes? Do you have those?
21  A. I do.
22  Q. Exhibit 20. So he -- if we look at page 2 of
23  the physical therapy notes, it's the one that has the
24  number 138 at the bottom?
25  A. Yes.

Page 80

1    Q. So the next physical therapy report you have on
2 Captain Rivera after the January 23rd, 2017 report is
3 dated March 2nd, 2017, correct?
4    A. Right, right, right.
5    Q. So at this point Captain Rivera has been back
6 to work for about a month?
7    A. Correct.
8    Q. And if you look at the top of the page on
9 palpation, what is the note from the physical therapist?
10    A. He denies pain with palpation.
11    Q. So that's a good sign, correct?
12    A. That's a good sign.
13    Q. It shows that no pain in the foot, correct?
14    A. Correct.
15       MR. CREW: Objection, misstates evidence,
16 misstates what the document says.
17    A. Well, palpation in that area of the foot
18 wherever they palpated.
19    Q. (By Mr. Spiller) Sure. And then if we look at
20 pain intensity, are you there? What does Rivera rate
21 his pain at the time?
22    A. He subjectively described zero out of the ten.
23    Q. And you can check a box constant or
24 intermittent?
25    A. Correct.

Page 81

1    Q. So basically he has zero pain all the time is
2 what he's reporting?
3       MR. CREW: Objection, misstates what the
4 document says. The document speaks for itself.
5    Q. (By Mr. Spiller) Well, Dr. Grosser, your
6 signature is at the bottom of this document, so you
7 signed this document at some point. When you're
8 reviewing this document and it says pain intensity zero
9 out of ten and neither constant or intermittent is
10 checked, how do you interpret that?
11    A. That the patient is doing very well and that
12 there's minimal pain. No pain.
13    Q. And then under weight bearing again it shows
14 that he's full weight bearing, correct?
15    A. Correct.
16    Q. So compared to January 23rd, 2017 Captain
17 Rivera's continuing to do better, correct?
18    A. That's what this would imply, yes.
19    Q. He no longer has pain on palpation, correct?
20    A. Correct.
21    Q. And instead of a three out of ten
22 intermittently, he has no pain at no time?
23    A. Correct.
24       MR. CREW: Objection, misstates facts in
25 evidence, misrepresents what the document says.

Page 82

1    Q. (By Mr. Spiller) So the last physical therapy
2 note that you have from New Stride Physical Therapy is
3 dated April 17 of 2017, correct?
4    A. Yes.
5    Q. Under palpation, what is the notation from the
6 physical therapist?
7    A. It says denies pain with palpation.
8    Q. Again, the foot is squeezed in the area that
9 was injured and there's --
10    A. That would be the assumption. There's nothing
11 specific that they say.
12    Q. What about pain intensity? What is the rating
13 of the pain intensity?
14    A. Zero out of ten.
15    Q. So -- and again, he's also full weight bearing,
16 correct?
17    A. Correct.
18    Q. So as of April 17, 2017 -- so this is going to
19 be two and a half months following his discharge to
20 return to work, correct?
21    A. Correct.
22    Q. He continues to report no pain on palpation,
23 correct?
24    A. Yes.
25    Q. And he continues to report to the physical

Page 83

1 therapist that he's not experiencing any pain, correct?
2       MR. CREW: Objection, misstates facts in
3 evidence. The document speaks for itself.
4    A. Yes.
5    Q. (By Mr. Spiller) And, Dr. Grosser, as someone
6 who reviews this note in assessing Captain Rivera's
7 condition, what is your interpretation when you review
8 the reports of the pain intensity and the denial of pain
9 on palpation?
10    A. That this -- he has gotten better when it comes
11 to pain. The range of motion is still different and the
12 strength is a little off, but with pain it makes it
13 appear that he is pain-free.
14    Q. And in fact, at this time he's not able to
15 attend physical therapy sessions because his work
16 schedule's so busy?
17    A. Yes.
18    Q. So you understood he's working full-time?
19    A. Yes.
20    Q. And then he tries to squeeze in these physical
21 therapy appointments when he can, correct?
22    A. Yes.
23    Q. And you'd agree with me that if he was not
24 fully healed by two and a half months out, there would
25 be some signs pain-wise at least that he is not healed,

## Page 84

1  correct?
2      A. I would think, yes. He would have continued
3  pain if it's not healed.
4      Q. In your experience treating folks --
5      A. Yes.
6      Q. -- if you send them out too soon and it turns
7  out they weren't healed, in your experience do you find
8  that they start exhibiting pain on exertion and whatnot
9  pretty much right away?
10     A. Yes.
11     Q. And if they have a physically-demanding job,
12 there's really nowhere to hide pain in the foot if
13 you're on your feet a lot, correct?
14     A. Correct.
15     Q. So if you have an individual who is not fully
16 healed discharged to work at a physically-demanding job
17 where he's on his feet a lot, you would expect reports
18 of pain and reports of limitation within a month or so
19 of the return to work, correct?
20     A. Most likely.
21     Q. Now, you mentioned earlier that you're
22 generally aware of a Dr. Moloney in the Corpus Christi
23 area, correct?
24     A. Yes.
25     Q. And I didn't see in your file any mentions of

## Page 85

1  Dr. Moloney in your records.
2      A. Yeah.
3      Q. So your expectation is you've probably never
4  had any discussions or --
5      A. No.
6      Q. -- conferences with Dr. Moloney as it relates
7  to Captain Rivera, correct?
8      A. Correct.
9      Q. As far as what Dr. Moloney has found or seen as
10 it relates to Captain Rivera, you have no idea, correct?
11     A. Correct.
12     Q. But as someone who's following Captain Rivera's
13 condition, that's something you would consider though in
14 assessing his overall condition, correct?
15     A. Correct.
16     Q. If he failed a merchant mariner physical
17 examination, that's probably something you would want to
18 know about, correct?
19     A. Yes.
20     Q. In this case have you ever seen the merchant
21 mariner exam that Captain Rivera did in the summer of
22 2017?
23     A. Summer, no, I did not.
24         (Exhibit No. 23 marked.)
25     Q. (By Mr. Spiller) Okay. I'm going to show you

## Page 86

1  what's been marked as exhibit number 23.
2      A. Okay.
3      Q. So on the -- there's a number of pages on here,
4  and I'm going to turn your attention to -- it's near the
5  back. There's a number 105 at the bottom?
6      A. Yup.
7      Q. Do you see that?
8      A. Yes.
9      Q. It says fracture left fifth metatarsal 8/16,
10 had good recovery, non-tender; do you see that?
11     A. Yes.
12     Q. So the fracture left fifth metatarsal 8/16,
13 that was the fracture that you were treating, correct?
14     A. Correct.
15     Q. And Captain Rivera reports to Dr. Moloney that
16 he's had a good recovery, correct?
17     A. That's what it appears, yes.
18     Q. And in fact, he reports -- Dr. Moloney reports
19 that the foot is non-tender, correct?
20     A. Correct.
21     Q. Now, that would be -- this -- if we turn to the
22 first page of exhibit number 23, this examination was
23 conducted on July 5th of 2017. So that would be five
24 months after you had discharged Captain Rivera to return
25 to work, correct?

## Page 87

1      A. Correct.
2      Q. So looking at Dr. Moloney's assessment, five
3  months post return to work Captain Rivera is continuing
4  to report he's had good recovery and his foot is
5  non-tender, correct?
6      A. On July 5th, yes, 2017, yes.
7      Q. And that's consistent with all the reports that
8  are contained in the March and the April 2017 physical
9  therapy records, correct?
10     A. Yes, correct.
11     Q. And as of July 5th, 2017 Captain Rivera has not
12 asked for a follow-up appointment or to come in to see
13 you because he's had foot pain, correct?
14     A. Correct.
15     Q. So five months post return to work based on all
16 the information you've seen, Captain Rivera's doing well
17 and by all appearances is healed, correct?
18     A. Correct.
19     Q. There's no objective or subjective signs that
20 he is not healed since he returned to work, correct?
21         MR. CREW: Objective (sic), misstates
22 evidence, misstates facts of evidence, misstates
23 contents of documents in evidence.
24     Q. (By Mr. Spiller) You can answer.
25     A. Okay. From what I have, I would assume he was

Page 88

1  doing pretty well.
2      Q.  Okay.  And from all you've seen today that
3  we've shown you -- and we've showed you a lot of
4  documents -- do you see anything between the time you
5  discharged him to return to work on January 30, 2017 to
6  the time period of July 5th, 2017 that's an objective
7  sign that Captain Rivera has a non-union in his foot?
8      A.  No.
9      Q.  From the discharge to return to work on January
10  30, 2017 until July 5th, 2017, is there any subjective
11  signs he has a non-union in his foot?
12      A.  No.
13      Q.  So what we do know is that at this point July
14  5th of 2017 he is nearly -- he's almost 11 months post
15  initial injury, correct?
16      A.  Correct.
17      Q.  And based on your experience treating folks
18  with this type of simple non-displaced fracture, you
19  would expect by that time period that they are pain-free
20  and fully functional?
21      A.  Yes.
22      Q.  And what you said is something like 95 percent
23  of your patients who have this type of injury you
24  never -- they never have to follow up with you and they
25  don't experience non-unions, correct?

Page 89

1      A.  Correct.
2      Q.  Now, at some point Captain Rivera makes an
3  appointment to follow up with you in late July of 2017,
4  correct?
5      A.  I'm sorry, let me...
6      Q.  Let me see if I can find --
7      A.  Yes, hold on, yes.
8      Q.  I think it's exhibit 8?
9      A.  Yes, he does.  Sorry, 7/16.  July 16th, 2017.
10      Q.  And so it was on July 16 of 2017 that he asked
11  for an appointment, correct?
12      A.  That's correct.
13      Q.  And then you got him into the office on
14  January -- July 26th, 2017, correct?
15      A.  Yes.
16      Q.  I'm going to show you...
17      A.  It's already an exhibit here.
18          (Exhibit No. 24 marked.)
19      Q.  (By Mr. Spiller)  It is, but it's -- I think
20  'cause of the nature of your new medical records thing I
21  think it was -- didn't contain certain parts, so I'm
22  going to show you what's been marked as exhibit number
23  24.  Do you recognize exhibit 24?
24      A.  Yes.
25      Q.  Is exhibit 24 I guess your office note for your

Page 90

1  visit with Captain Rivera on July 26 of 2017?
2      A.  Correct, yes.
3      Q.  Okay.  So if you will turn to the last -- the
4  last page, there's a section that says physical exam.
5  Are you with me there?
6      A.  Yes.
7      Q.  So your statement is patient continues to have
8  pain over the fifth metatarsal that is limiting.  You
9  say at this point in time it should no longer be an
10  issue, correct?
11      A.  Correct.
12      Q.  And so that's what we were talking about
13  earlier.  Typically by 11 months out pain has gone away,
14  correct?
15      A.  Typically, yes.
16      Q.  And the statement -- so what Captain Rivera
17  reported to you is that he continues to have pain over
18  the fifth metatarsal that is limited, correct?
19      A.  Correct.
20      Q.  But from what we've seen from the records that
21  you've reviewed, there was no reports of pain that was
22  limiting prior to July 5th of 2017, correct?
23          MR. CREW:  Objection, misstates facts in
24  evidence, misstates the documents that have been
25  presented to Dr. Grosser today.

Page 91

1      A.  From what we have from what they reported the
2  therapist and Dr. Moloney, yes, there's not pain.
3      Q.  (By Mr. Spiller)  So it would also -- it would
4  be fair to perhaps conclude that something happened
5  after July 5th, 2017 and his foot condition changed,
6  correct?
7      A.  It may have.
8      Q.  And in fact, you can't rule that out, correct?
9      A.  Correct.
10      Q.  You mentioned earlier that when you examined
11  him in July of 2017 that he had discoloration of his
12  foot?
13      A.  Yes.
14      Q.  Discoloration is a sign of an injury?
15      A.  Yes.
16      Q.  You mentioned earlier that there was an MRI
17  that was conducted in late July of 2017 as well,
18  correct?
19      A.  Yes.
20      Q.  That shows bone edema?
21      A.  Yes.
22      Q.  And that's another objective sign of injury?
23      A.  Yes.
24      Q.  So as we sit here today, you cannot rule out
25  that Captain Rivera suffered some sort of injury to that

Page 92

1  same site that has caused a new injury to his foot,
2  correct?
3       MR. CREW:  Objection, improper predicate,
4  misstates facts in evidence.
5       A.  Correct.
6       Q.  (By Mr. Spiller)  And if we looked at his work
7  records -- and I can show them to you if you want -- he
8  didn't do any work from July 9 of 2017 to the date July
9  16, 2017 when he called you for an appointment.  I want
10 you just assume that with me.
11      A.  Okay.
12      Q.  If that's the case, there's no indication that
13 something at work caused him to have new foot pain,
14 correct?
15      A.  What was he doing at work?
16      Q.  Well, I'm sorry?
17      A.  I mean if he's sitting -- you said he didn't do
18 any work during that time, correct?  So what does that
19 mean?
20      Q.  What that means is Captain Rivera is a harbor
21 pilot.
22      A.  Right.
23      Q.  And he testified that he works -- he'll have
24 weeks on and weeks off.  So there'll be weeks at a time
25 where he doesn't work because of the nature of his

Page 93

1  schedule.
2       A.  So that he never got back to being on the -- as
3  a harbor pilot during that time?
4       Q.  He -- and my apologies for not framing it
5  directly.  If he didn't work for the week before he
6  calls you to set up an appointment, it's fair to say
7  that there was nothing at work that at least you can see
8  or that he reported that caused the re-aggravation or
9  the re-injury of his foot?
10      A.  Right.
11      Q.  All Captain Rivera told you is that he was just
12 continuing to have foot pain, correct?
13      A.  Yes.
14      Q.  He didn't say when it started, correct?
15      A.  No.
16      Q.  He didn't say, for example, that I've been
17 continuing to have foot pain since July 5th of 2017,
18 correct?
19      A.  Correct.
20      Q.  'Cause at this point you're more interested in
21 treating the pain symptoms as opposed to figuring out,
22 you know, what's the --
23      A.  Right.
24      Q.  -- the chain of events that caused it?
25      A.  Correct.

Page 94

1       Q.  You weren't there to determine whether this was
2  part of his original injury or if this was a new injury,
3  correct?
4       A.  It was in the same area and it was the same
5  pain.
6       Q.  And I understand that, but...
7       A.  It was in a new, you know...
8       Q.  A new injury is he has discoloration and he has
9  bone edema is suggestive of new injuries to his foot,
10 correct?
11      A.  Well, it can be suggestive of the old injury
12 not completely finish healing.
13      Q.  And if the old injury had not completely
14 healed, would he have been able to work full-time
15 without reports of pain for five and a half months?
16      MR. CREW:  Objection, misstates facts in
17 evidence, misstates prior testimony.
18      A.  If he was jumping off and on boats, I think it
19 would be hard to do.  I treat a lot of harbor pilots and
20 they're jumping off and on boats with things they
21 shouldn't be jumping off and on boats with, so...
22      Q.  (By Mr. Spiller)  But if he has not healed and
23 he's got bone edema and he's got non-union, he's going
24 to be -- at a minimum if you squeeze his foot, it's
25 going to be tender, true?

Page 95

1       MR. CREW:  Objection.
2       A.  You might expect there would be some
3  discomfort, sure.
4       Q.  (By Mr. Spiller)  So all we can go off of is
5  what Captain Rivera reports to the medical professionals
6  such as yourself or Dr. Moloney, correct?
7       A.  Yes.
8       Q.  And we have to assume he's being honest, for
9  example, when he reports to Dr. Moloney for a Coast
10 Guard medical certificate that he has made a good
11 recovery and his foot is non-tender, that that is indeed
12 the case, true?
13      A.  Yes.  However, you know, when people want to
14 get back to work, they sometimes will say I'm fine when
15 they're not.
16      Q.  Okay.
17      A.  So that's always an assumption I have to to
18 have.
19      Q.  But you don't have any evidence here that
20 Captain Rivera was lying about his condition or lying
21 about his foot being non-tender?
22      A.  No, but he was always ready to get back.
23      Q.  And he would be ready to get back if his foot
24 felt fine, correct?
25      A.  Absolutely.

Page 96

Q. Now, if he was concealing, if he was experiencing foot pain let's say from the get-go, you discharge him to return to work and he was having foot pain all the time while he worked and he didn't report that to you, he was doing damage to his foot, correct?

A. Usually when people hurt as bad as it can hurt, they won't put all the pressure on that foot. So really it's more likely that you might hurt another area, the opposite leg, because you would compensate if it hurt.

Q. So you would -- but if you -- if your foot hurts and you work on it constantly for, say, five months and you don't get any treatment at all, that can --

A. That can maintain something that hasn't healed to continue not healing potentially.

Q. And what you instruct your patients to do is if they are experiencing pain or discomfort, they are to come back to you right away?

A. Yes.

Q. And the reason that you do that is if you catch them early enough, you can minimize the issue and it doesn't go any further, correct?

A. We would take them out of work.

Q. And you would wait until it was definitely healed before you sent them back, correct?

Page 97

A. As definite as anyone can feel about that.

Q. And because Captain Rivera didn't report to you that he needed to see you or anything for five months or so, it's fair to assume that he was functional and working without pain, correct?

MR. CREW: Objection, improper hypothetical, misstates facts in evidence.

A. He was trying to work, yes, and I would assume without pain.

Q. (By Mr. Spiller) Now, the -- he did a pain diagram in July of 2017 when he saw you, correct? Do you recall him doing a pain diagram?

A. Are you talking about post-operatively?

Q. No, when he saw you on --

A. Oh, sorry, July.

Q. -- July 26, 2017.

A. Yeah, okay.

(Exhibit No. 25 marked.)

Q. (By Mr. Spiller) And I'll show you what's been marked as exhibit 25.

A. Okay.

Q. Is exhibit 25 -- this is a pain diagram that Captain Rivera would have done?

A. Sure.

Q. And these circles -- these were circles that

Page 98

Captain Rivera would have made?

A. Yes.

Q. And the circles that he has, he's showing some different areas of pain that were not on his original pain diagram that he filled out for you when you saw him back in August, correct? Like the top of his foot?

A. August.

Q. August of 2016.

A. Do you have that other one?

Q. Let me...

A. I can look, too.

(Exhibit No. 26 marked.)

Q. (By Mr. Spiller) I have it, Dr. Grosser. Let's see here. Dr. Grosser, I'm going to show you what's been marked as exhibit number 26.

A. Okay, all right.

Q. So exhibit 26, what is exhibit 26?

A. Exhibit 26 is that first visit, initial visit August 23rd, 2016.

Q. This would -- it's a new patient form?

A. That's right, which is different.

Q. There's a hand -- there's a bunch of handwriting on there. That would come from Captain Rivera, correct?

A. Yes, that's his handwriting.

Page 99

Q. There's some -- there's a location and duration of main problem and there's a circle there that that would have been what he circled, correct?

A. Correct.

Q. And here if we look at the -- if we compare exhibit 26 to the pain diagram that he did on July 26, 2017, on his left foot he's showing pain in a different area compared to what he complained about on August 23rd of 2016, correct?

A. No. It's the same area.

Q. He's showing, for example --

A. Lateral foot.

Q. If we look at the left foot, there's a section that's higher up from the edge of the foot?

A. It's just not the same image though. And so if you look at his original image, I don't know how specific we could be with this, but he's circling the area from his fifth toe back to his fifth metatarsal to the cuboid and then even a little bit in the dorsum of the foot into the ankle.

Q. He's also got some pain on the top of his right foot as well?

A. Sure, that's right.

Q. So --

A. Unless he misunderstood it, but yes.

Page 100

1  Q. With regard to the CT scan that you had
2  conducted on July 27, 2017, that showed complete healing
3  of the left foot, correct?
4  A. Correct.
5  Q. There were no residual fracture lines seen,
6  correct?
7  A. Correct.
8  Q. And as you talked about earlier, CT scans are
9  the best for identifying fractures, correct?
10 A. Fractures and, yeah, bone density.
11 Q. Now, the -- you talked about in question --
12 questions from Mr. Crew there was some -- he had pains
13 in other areas of his left foot that you kind of -- you
14 thought was kind of referred or is in general location?
15 A. Right.
16 Q. There's all sorts of nerves and whatnot that
17 run through the foot, correct?
18 A. Yes.
19 Q. And muscles and ligaments and tendons and
20 things like that, correct?
21 A. Yes.
22 Q. And there are nerves that -- if a nerve is
23 causing pain, there's ways to test that with a
24 short-acting anesthetic that you can isolate nerve pain,
25 for example, correct?

Page 101

1  A. Are you referring -- are you referring to an
2  injection like a nerve block or Tinel's sign?
3  Q. Just a simple -- not like a steroid injection,
4  but like a quick nerve block of like Marcaine or
5  something like that?
6  A. -- and you could see if all the pain went away
7  that -- yeah.
8  Q. And in this case you did not do that with
9  Captain Rivera, correct?
10 A. No.
11 Q. What you did is ultimately you did surgery with
12 plates and screws, correct?
13 A. Yes.
14 Q. And with surgery with plates and screws like
15 you used with Captain Rivera, if there's complete
16 healing, there's not any pain that is being generated by
17 the plates and screws themselves, correct?
18 A. Majority of patients do not have to have their
19 hardware removed. That's not to say that can't cause an
20 irritation, but...
21 Q. For example, it can cause irritation if there's
22 loosening or if the hardware breaks and dislodges,
23 correct?
24 A. Yes, some people do have issues with the metal
25 itself.

Page 102

1  Q. But as far as in this instance, the last CT
2  scan that you performed on Captain Rivera showed that
3  the hardware was not loosened, that it was in good
4  position, and that there was -- what did you say? 95
5  percent healing of the fracture?
6  A. Yes, on the last CT scan, I'm trying to just
7  get back to that again. But yes, it was 95 percent
8  healing.
9  Q. As far as any pain complaints that Captain
10 Rivera now, you've seen no sign that any of those
11 pain complaints are the result of the plates or the
12 screws, correct?
13 A. It's very hard to know that.
14 Q. Have you seen any objective signs that the
15 plates and screws are causing him any pain?
16 A. There's no loosening on a CT scan, so that's a
17 good sign. And the x-rays look the same as they always
18 have in regard to where the screw is. And the fracture
19 appears healed.
20 Q. Now, you've had plenty of folks who have had
21 foot surgeries who have used plates and screws. And
22 those folks have been able to go back to heavy duty jobs
23 where they're on their feet a lot, correct?
24 A. Yes.
25 Q. The fact that someone has plates and screws in

Page 103

1  their foot does not automatically disqualify them from
2  returning to a high physical demand job, correct?
3  A. Correct.
4  Q. There's professional athletes who probably have
5  put the most stress on their feet who are operating at
6  high levels with plates and screws in their feet,
7  correct?
8  A. Yes. But if I may say, a lot of athletes that
9  have this kind of fifth metatarsal fracture even though
10 it's not a Jones fracture, it's still the same bone that
11 supports the inversion/eversion of the foot. And that
12 is a very hard area to get back in. It takes some of
13 these athletes out of their game. So they don't get
14 back to their level of activity after a fifth metatarsal
15 fracture.
16 Q. But as far as -- and these are people who are
17 doing physical activity at the far range of human
18 capacity, correct?
19 A. Yes, I think he is, too.
20 Q. But as far as there's nothing about the fact
21 that he has plates and screws in his foot that you
22 believe would disqualify him from serving as a harbor
23 pilot, correct?
24 A. Again, some people can have a reaction to the
25 metal to the hardware. And you take it out and their

Page 104

1  pain goes away. Because of where it is, all of his
2  pressure will go on that fifth metatarsal region where
3  that screw is. So even though it's not loosening, it is
4  something foreign that is there that wasn't there
5  before.
6      Q. Do you believe his complaints of continuing
7  foot pain are the result of plates and screws in his
8  foot?
9      A. I do not.
10     Q. You said earlier in your -- you were asked
11 about the last time that you saw Captain Rivera was on
12 March 2nd of 2018, correct?
13     A. I thought I saw him February. Did I see him in
14 March? I thought it was February 5th, 2018. Correct me
15 if I'm wrong.
16     Q. Okay. So the last time you would have seen --
17     A. That was a note that I wrote --
18     Q. Okay.
19     A. -- without seeing him.
20     Q. Who asked you to write that note?
21     A. I thought -- I thought it was I talked to Jay
22 and I talked to the neurologist. And so we needed a
23 note to explain what his symptoms were and what his
24 limitations were at this point.
25     Q. Okay. So you were writing your March 2nd, 2018

Page 105

1  note was based on what Captain Rivera was experiencing
2  back in the middle of February of 2018?
3      A. Yes.
4      Q. And if I understand the tenor of your note is
5  he's not a future orthopedic surgical candidate,
6  correct?
7      A. We try to avoid it.
8      Q. And that what you're saying is he's not capable
9  of being a harbor pilot at this time, correct?
10     A. Correct.
11     Q. You're not making a prediction as to his
12 ability to return to work in the future, correct?
13     A. Correct.
14     Q. You are not saying more likely than not he will
15 never be able to return to work as a harbor pilot?
16     A. Correct.
17     Q. And you don't have any current appointments set
18 with Captain Rivera, correct?
19     A. Correct.
20     Q. He has not asked to come in and see you,
21 correct?
22     A. Not during this.
23     Q. Amongst the notes that -- your EMR records,
24 there's a notation of treatment for elbow pain. Do you
25 know what that was about?

Page 106

1      A. I believe he saw Dr. Thomas for lateral
2  epicondylitis, which is tennis elbow in a more familiar
3  term.
4      Q. Okay. And as far as the tennis elbow, that was
5  something that Dr. Thomas treated?
6      A. Correct.
7      Q. And those records would also be contained I
8  guess in the South Texas Bone and Joint file?
9      A. Yes, correct.
10     Q. And I guess in -- in terms of your treatment of
11 Captain Rivera I guess you would have seen those --
12 those records?
13     A. I saw the diagnosis and that he had been
14 treated.
15     Q. Okay. And as far as the nature of the
16 treatment or the duration or anything like that, were
17 you familiar with the treatment of that condition?
18     A. No.
19     Q. You mentioned earlier that you -- you do not
20 treat complex regional pain syndrome, correct?
21     A. Correct.
22     Q. If you suspect that a patient has it, you refer
23 that patient out to a specialist, correct?
24     A. I usually try to do an evaluation like a bone
25 scan to give us more documentation before I send them to

Page 107

1  a pain management or neurology.
2      Q. Okay. And in this case you didn't do a bone
3  scan, correct?
4      A. I did do a bone scan.
5      Q. Was that the CT scan?
6      A. Nope, it was -- it was a bone scan.
7  Three-phase bone scan with contrast on 12/14/2017.
8      Q. And what did the bone scan show?
9      A. It showed some -- some evidence that there was
10 still increased activity at the fracture site. So the
11 bone -- the fracture was still healing. It did not have
12 a classic appearance of CRPS.
13         And I -- again, I'm not an expert here, but
14 when I discuss this with the neurologist Dr. Evans, he
15 said it doesn't have to be positive, that it is commonly
16 un -- you know, negative.
17     Q. Okay. So the bone scan you performed showed it
18 was not consistent with CRPS from your perspective?
19     A. From my perspective, yes. It was consistent
20 with a fracture still healing.
21     Q. And you -- because you don't treat patients
22 with CRPS, you don't know what the rate of prognosis --
23 let me start that again. As far as the treatment and
24 the prognosis in the future for people who have CRPS,
25 you don't know the rates of recovery or anything like

Page 108

1 that, correct?
2    A. No. Dr. Evans suggested that in one of his
3 notes, but...
4    Q. And as far as the degrees of complex regional
5 pain syndrome, you understand that there's degrees of it
6 as well?
7    A. Oh, yes.
8    Q. In fact, there are folks who have complex
9 regional pain syndrome so painful they can't even put a
10 shoe on?
11    A. Correct.
12    Q. Those would be considered the most severe forms
13 of CRPS, correct?
14    A. Correct.
15    Q. And Captain Rivera has always been wearing
16 shoes even after he got out of his little stroller and
17 he's wearing shoes at least when you last saw him,
18 correct?
19    A. Yes, correct.
20    Q. So he doesn't -- at least from your experience
21 doesn't have time most significant or serious form of
22 C -- complex regional pain syndrome, correct?
23       MR. CREW: Objection, lack of foundation.
24    A. Yeah, I don't usually follow them
25 out, so...

Page 109

1    Q. (By Mr. Spiller) As far as Rivera's prognosis
2 in the future and ability to return to work, you have no
3 opinions on that, correct?
4    A. No, I just generally know it's usually a
5 difficult diagnosis.
6    Q. And you -- and you don't feel comfortable or
7 qualified to at least make that kind of prognosis based
8 on what you know right now, correct?
9    A. Correct.
10    Q. And you we were talking earlier about the --
11 your time for depositions. And what is -- how much do
12 you charge an hour for depositions?
13    A. I -- whatever the office, which is all of my
14 partners, have established. Whatever they charge, I
15 don't know. It's 2000.
16    Q. Okay.
17    A. Something.
18    Q. 2000 an hour?
19    A. I think so.
20    Q. Okay.
21    A. I don't set that price.
22    Q. Sure. Dr. Grosser, I expect Mr. Crew may have
23 some follow-up questions. In the interest of your time,
24 I will pass the witness. I may have some follow-up.
25    A. Sure.

Page 110

1       RE-EXAMINATION
2 BY MR. CREW:
3    Q. Dr. Grosser, I'm sorry, I want to keep this
4 brief. I know you were asked a lot of questions about
5 the New Stride Physical Therapy documents.
6    A. Yes.
7    Q. And I was objecting to those. That's stuff
8 between us lawyers.
9    A. Okay.
10    Q. But at least in terms of just on an ordinary,
11 you know, human relations level, do you like it when
12 people put words in your mouth or try to trick you?
13    A. No.
14       MR. SPILLER: Objection.
15       MR. CREW: What's your basis?
16       MR. SPILLER: It misstates the question or
17 misstates my prior question.
18       MR. CREW: I didn't misstate -- I didn't
19 ask -- I didn't state what your question was. I asked
20 if she doesn't like it when people try to trick her.
21       MR. SPILLER: Well, objection, misstates
22 the record.
23    Q. (By Mr. Crew) One of the things that I know
24 Mr. Spiller said repeatedly when he was asking you about
25 these New Stride Physical Therapy reports is he focused

Page 111

1 on this pain intensity level zero out of ten.
2    A. Yes.
3    Q. And then he went to on ask you there's nothing
4 in this document that indicates Captain Rivera was in
5 pain, right? You remember him asking you that?
6    A. Yes.
7    Q. Okay, and so then I made a number of objections
8 about it misstates what the document says. So what I
9 would like to do is draw your attention to the --
10 underneath the big box which is goals?
11    A. You're on 139?
12    Q. On 139.
13    A. Yes.
14    Q. Yes, Doctor. It says STG time frame two weeks,
15 LTG time frame four weeks. And underneath that it says
16 decrease pain spasm. And it says from severe to
17 minimum. It says from three out of ten to zero out of
18 ten. You see that?
19    A. Yes.
20    Q. Would that be a subjective complaint that
21 Captain Rivera was putting in this report?
22       MR. SPILLER: Objection, misstates the
23 record.
24    A. Well, yes, if you look down here I mean -- so
25 please ask that again?

**Page 112**

1   Q. (By Mr. Crew)  Sure.  Where -- I was just
2   trying to point you to the direction of where it says --
3   A. Yes, sir.
4   Q. I tell you what, let me start off from a better
5   part.  You see the part where it says goals on the
6   left-hand side?
7   A. Yes.
8   Q. And it says STG, short-term goals?
9   A. Yes.
10  Q. LTG for long-term goals?
11  A. Yes.
12  Q. So it says LTG, improve gait.  And then the
13  underlying area, can you see what that --
14  A. Yeah, community distances without pain.
15  Q. Okay.  So would that be a goal that Captain
16  Rivera told the physical therapist about what he was
17  experiencing and hoped to resolve?
18  A. Yes.
19  Q. Okay.  Do you -- do you understand people might
20  have -- there's a difference between pain on palpation
21  and ongoing chronic pain, right?
22  A. Correct.
23  Q. So just because someone doesn't present
24  a symptom of pain on palpation does not mean that
25  they're not having pain throughout their lives, correct?

**Page 113**

1   A. Palpation is about one pound of pressure.  And
2   if you're walking and doing other things, that changes
3   forces on it.
4   Q. One of the things -- and this was -- I want to
5   go to 139 and that's the January 23rd, 2017 report.
6   There's an observation on the left-hand side that says
7   mesomorphic without calf atrophy noted.  You see that?
8   A. Yup.
9   Q. Okay, what does that mean?
10  A. That that -- at this point he does not have
11  calf atrophy.
12  Q. Okay.
13  A. Compared to the other side.
14  Q. Okay.  And so -- and then we go down and it
15  says gait.  Unable to break and push off.  Has rigged
16  orthotic in shoe.  And then on the opposite side, it
17  says girth, figure eight, no edema noted.  You see that?
18  A. Yes.
19  Q. Okay.  And underneath that it says functional
20  assessment tool.  Lower extremity functional skill.  Do
21  you know what that is?
22  A. No.
23  Q. Okay.  Would that be something a physical
24  therapist would need to opine on?
25  A. Yes.

**Page 114**

1   Q. Okay.  But underneath that it has problem list.
2   Abnormal gait, decreased strength, inflammation edema?
3   A. Yup.
4   Q. And he checked palpation tenderness --
5   A. Correct.
6   Q. -- decreased functional abilities, and joint
7   dysfunction.  Do you see that?
8   A. Yes.
9   Q. And I want to go a little bit further.  It says
10  functional limitations.  Unable to gait at normal speed,
11  unable to squat or toe break during descending stairs.
12  And it says patient's goal:  Walk without pain.  You see
13  that?
14  A. Yes.
15  Q. Okay.  So when Mr. Spiller was asking you
16  questions about this document and asking you there's
17  nothing objectively or subjectively in this report that
18  would indicate Captain Rivera is still experiencing
19  pain, that wasn't true; was it?
20      MR. SPILLER:  Objection, misstates the
21  record.
22  A. No, that wasn't true.  This is the one though
23  where he was having three out of ten pain, correct?
24  Q. (By Mr. Crew)  That's correct.  On the pain
25  intensity.

**Page 115**

1   A. So he was having pain there.
2   Q. Sure.  So what I want to do next is go to the
3   one that's Bates labeled at the bottom 138.  And this
4   was when he presented on March 2nd, 2017.
5   A. Correct.
6   Q. Again, Mr. Spiller asks you questions about
7   denies palpation pain with palpation and also the issues about
8   pain intensity.
9   A. Correct.
10  Q. Okay.  It says zero out of ten here?
11  A. Yes.
12  Q. Okay.  So up there in the history of chief
13  complaint, it says he core pleaded 12 physical
14  therapy -- completed 12 physical therapy sessions making
15  return of motion and strength goals, but the rigor of
16  work has prevented eliminating L.E. edema.  Do you see
17  that?
18  A. Yes.
19  Q. This is an objective finding about his physical
20  condition that he's still experiencing edema in his left
21  foot?
22  A. Correct.
23  Q. Okay.  So again under the gait entry, it says
24  demonstrates diminished push off.  Do you see that?
25  A. Yes, correct.

Page 116

1    Q.  Okay.  And then if you see on the opposite side
2  where it says girth figure eight -- and this particular
3  record it says ongoing swelling that accumulates while
4  at work and in between physical therapy sessions.  Okay,
5  so on his first visit it notes no edema noted.  But here
6  we have an objective, you know -- or at least a
7  subjective complaint that there is ongoing swelling?
8    A.  Yes.
9    Q.  Okay.  And so although you don't -- I'm not
10  asking you to opine on what the functional assessment
11  tool lower extremity functional scale means, in January
12  23rd his functional assessment was 43 out of 80.  Do you
13  see that?
14    A.  Yes.
15    Q.  And so on March it had improved to 50 out of
16  80.  Do you see that?
17    A.  Yes.
18    Q.  He's still exhibits abnormal gait, decreased
19  strength, inflammation edema, decreased functional
20  abilities.  And it says other, and underneath that it
21  says ongoing edema.  You see that?
22    A.  Yes.
23    Q.  Okay.  And then when we go down to functional
24  limitations, unable to gait a mile without great
25  difficulty.  It says patient's goal:  Walk community

Page 117

1  distances without pain.  So when Mr. Spiller asked you
2  some questions about this document and that there was
3  nothing in here that indicated that Captain Rivera was
4  having subjective complaints about pain, that wasn't
5  correct; was it?
6      MR. SPILLER:  Objection, misstates the
7  record.  The record speaks for itself.
8    A.  No, it wasn't.
9    Q.  (By Mr. Crew)  And again, we'll go down to the
10  goals section.  Again, his long-term goal is to improve
11  gait community distances without pain.  And on the
12  right-hand side it says with community gait from three
13  out of ten to zero out of ten.  Would that appear to
14  indicate to you that while Captain Rivera is walking,
15  he's experiencing pain on a three out of ten level?
16    A.  Yes.
17    Q.  Okay.  And then finally, I'd like to turn to
18  what's been Bates marked 137.  And this is when he
19  appeared on April 17th, 2017.  So Mr. Spiller asked you
20  about the palpation, denies pain without palpation, and
21  the pain intensity.
22    A.  Right.
23    Q.  But what he didn't ask you about were these
24  following symptoms that I would like to ask you about.
25    A.  Okay.

Page 118

1    Q.  Gait, demonstrates diminished push off.  You
2  see that?
3    A.  Yes.
4    Q.  And then on the -- on the right-hand column
5  under his functional assessment tool, it says lower
6  extremity functional scale 39 out of 80.  Do you see
7  that?  Would that indicate to you based on his last
8  visit in March whether he is improved or regressed?
9    A.  He's regressed.
10      MR. SPILLER:  Objection to the compound
11  question.
12    Q.  (By Mr. Crew)  And underneath that, the problem
13  is Captain Rivera still exhibits abnormal gait,
14  decreased strength, inflammation edema, decreased
15  functional abilities, and ongoing edema.  Do you see
16  that?
17    A.  Yes.
18    Q.  Okay.  And then again under functional
19  limitations, Captain Rivera's reported he's unable to
20  gait a mile without great difficulty.  And his goal is
21  to walk community distances without pain.  And then on
22  the short-term goals on the section at the bottom, again
23  his long-term goal is to gait community distances
24  without pain.
25    A.  Yes.

Page 119

1    Q.  And across from that with community gait he's
2  still experiencing on a scale of three out of ten in
3  walking.  Do you see that?
4    A.  Yes.
5    Q.  Okay.  So when Mr. Spiller asked you that
6  nothing in this document seemed to indicate that Captain
7  Rivera was making pain complaints, that isn't true; is
8  it?
9    A.  That is not true.
10      MR. SPILLER:  Objection, misstates the
11  record.
12    Q.  (By Mr. Crew)  Okay.  And so let me ask you
13  another way.  Having looked at these documents with --
14  in their totality, is there anything in these New Stride
15  Physical Therapy reports that would indicate that
16  Captain Rivera is having ongoing pain complaints with
17  regard to the foot that was -- is the basis of the
18  injury in this case?
19    A.  Yes.
20    Q.  Okay.  And Mr. Spiller asked you a number of
21  questions about you ruling out whether or not this was a
22  new injury that may have occurred.  If this -- if there
23  had been a new injury that occurred in July, would you
24  have seen a different fracture line or a pronounced
25  fracture when you conducted the CT scan and MRI?

Page 120

1    A. You would have seen something, yes.

2    Q. Did you find any of those results?

3    A. No.

4    Q. Okay. In your opinion are the -- did the

5  complaints Captain Rivera was making in July 2017

6  related to the original injury that he first presented

7  to you in August of 2016?

8    A. Yes.

9    Q. Okay. So Mr. Spiller asked you a number of

10  questions about Captain Rivera's physical form that he

11  filled out with Dr. Moloney. So I know you mentioned

12  that you worked with a number of pilots in this case.

13    A. Yes.

14    Q. Do you think that from a doctor's position that

15  Captain Rivera misled Dr. Moloney in any way when he --

16  he wrote or represented to Dr. Moloney that the fifth

17  metatarsal was non-tender?

18        MR. SPILLER: Objection, calls for

19  speculation.

20    A. I can't speak for that with me. You know, he's

21  always been, you know, very upfront. But at the same

22  time, as many of the harbor pilots arc, they want to get

23  back to work. They want to be, you know, back at their

24  job.

25    Q. (By Mr. Crew) Sure. And oftentimes has it

Page 121

1  been your experience when someone has a very strong

2  desire to return to work, they will hope for the best?

3    A. Always.

4    Q. Okay. And so that would be consistent with

5  someone presenting for a physical and trying their best

6  to --

7    A. Yes.

8    Q. -- hope the pain away?

9    A. Yes.

10    Q. And at least your records show that prior to

11  Captain Rivera appearing for the physical with Dr.

12  Moloney, he had made an appointment with your office to

13  talk to you about the pain that he was still feeling?

14    A. Yes.

15        MR. SPILLER: Objection, form. Misstates

16  the record.

17    Q. (By Mr. Crew) Mr. Spiller asked you a number

18  of questions about whether or not you have an opinion on

19  whether Captain Rivera can return to work. I'd like to

20  ask you some questions about your medical license. If

21  you don't have a medical license, you're not legally

22  allowed to practice medicine in the State of Texas,

23  correct?

24    A. Correct.

25    Q. If you were rendered mentally incapable of

Page 122

1  making sound decisions, do you know whether or not you

2  would be allowed to practice medicine in the State of

3  Texas?

4    A. I would not be.

5    Q. Okay. And so in so far as whatever the legal

6  framework is for Captain Rivera's license, you're not --

7  you don't have an opinion on that; do you?

8    A. No.

9    Q. Okay. Your -- your opinion is only limited to

10  the records that you've seen and your examinations of

11  Captain Rivera with regard to this injury to his fifth

12  metatarsal?

13    A. Correct.

14    Q. Okay. Let me ask you this: With regard to

15  your experience as an orthopedic surgeon, have you

16  experienced situations where a patient can develop CRPS

17  following an injury to their fifth metatarsal?

18    A. Yes.

19    Q. And more likely than not in your medical

20  opinion you believe that Captain Rivera's CRPS is

21  related to his injury in August 19, 2016 that he

22  originally presented to you and complained about?

23    A. Yes.

24        MR. SPILLER: Objection, calls for

25  speculation, lack of foundation.

Page 123

1    Q. Was that a yes?

2    A. Yes.

3    Q. Thank you, Doctor. No further questions.

4        MR. SPILLER: Pass the witness. We are

5  done.

6        THE VIDEOGRAPHER: We are off thc record.

7  Time is 5:25.

Page 124

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
 2              GALVESTON DIVISION

 3   JAY RIVERA,
            PLAINTIFF,   )
 4                       )
     VS.                 )
 5                       )
     KIRBY OFFSHORE MARINE,   ) CIVIL ACTION
 6   LLC,
            IN PERSONAM  ) NO.: 3:17-cv-111
 7                       )
     M. V. TARPON,       )
 8           IN REM.     )

 9

10         REPORTER'S CERTIFICATION

11        DEPOSITION OF DR. DAWN GROSSER

12              JUNE 8, 2018

13

14        I, LEAH MALONE, Certified Shorthand Reporter in and

15   for the State of Texas, hereby certify to the following:

16        That the witness, DR. DAWN GROSSER, was duly sworn

17   by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20        I further certify that pursuant to FCRP Rule

21   30(f)(1) that the signature of the deponent:

22        _____ was requested by the deponent or a party

23   before the completion of the deposition and was to be

24   returned within 30 days from date of receipt of the

25   transcript.  If returned, the attached Changes and
```

Page 125

```
 1   Signatures Page contains any changes and the reasons

 2   therefor;

 3        __X__ was not requested by the deponent or a party

 4   before the completion of the deposition.

 5

 6

 7

 8        I further certify that I am neither counsel for,

 9   related to, nor employed by any of the parties or

10   attorneys in the action in which this proceeding was

11   taken, and further that I am not financially or

12   otherwise interested in the outcome of the action.

13        Certified to by me this 21st day of June, 2018.

14

15

16

17        LEAH MALONE, Texas CSR No. 8839
          Expiration Date: 12/31/19
18

19

20

21

22

23

24

25
```