UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

JAY RIVERA,                          §
                                     §
    Plaintiff,                       §
                                     §
VS.                                  §     C.A. NO. 3:17-00111
                                     §        9(H) Admiralty
KIRBY CORPORATION AND                §
KIRBY OFFSHORE MARINE, LLC           §
    In personam                      §
                                     §
M.V. TARPON                          §
    In Rem                           §

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
   VIDEOTAPED ORAL DEPOSITION OF DAVID S. BASKIN, M.D.
               DECEMBER 5, 2018
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    VIDEOTAPED ORAL DEPOSITION OF DAVID S. BASKIN, M.D.,

produced as a witness at the instance of DEFENDANTS, and

duly sworn, was taken in the above-styled and numbered

cause on the 5th day of December, 2018, from 5:25 p.m.

to 7:21 p.m., before LORI A. BELVIN, CSR, and Notary

Public in and for the State of Texas, reported by

videographic and stenographic means, at the offices of

David S. Baskin, M.D., 6445 Main Street, 24th Floor,

Houston, Texas, 77030, pursuant to the Federal Rules of

Civil Procedure, except that the signature of the

witness was requested to be waived by the witness.

             -  -  -  -  -

1             A P P E A R A N C E S:

2

  COUNSEL FOR THE PLAINTIFF, JAY RIVERA:
3
       Mr. Paxton N. Crew
4      THE CREW LAW FIRM
       303 East Main, Suite 260
5      League City, Texas  77573
           Email:  paxton@thecrewlawfirm.com
6

7

8 COUNSEL FOR DEFENDANTS, KIRBY CORPORATION, ET AL.:

9      Mr. Bijan R. Siahatgar
       STRASBURGER & PRICE, L.L.P.
10     909 Fannin Street, Suite 2300
       Houston, Texas  77010-1036
11         Telephone:  (713) 951.5600
           Facsimile:  (713) 951.5660
12         Email:  john.spiller@clarkhillstrasburger.com
           Email:  becky.delancy@clarkhillstrasburger.com
13         Email:  bijan.siahatgar@clarkhillstrasburger.com

14

15 ALSO PRESENT:

16     Mr. Brent Moore, Videographer

17     Ms. Lori A. Belvin, Texas CSR No. 2572

18

19

20

21

22

23

24

25

INDEX

1

2                                                    PAGE

3   Stipulations.................................    1

4   Appearances..................................    2

5   WITNESS:  DAVID S. BASKIN, M.D.

6       Examination by MR. SIAHATGAR...............    4

7       Examination by MR. CREW....................   46

8       Further Examination by MR. SIAHATGAR........   95

9       Further Examination by MR. CREW............   98

10   -- SIGNATURE OF THE WITNESS REQUESTED TO BE WAIVED --

11   Reporter's Certificate Page...................  101

12

EXHIBITS

14   NO.              DESCRIPTION              PAGE REFERRED

15   BASKIN

16   1 - Curriculum Vitae of David S. Baskin, M.D.,
        FACS, FAANS..............................   10
17
18   2 - Expert Report prepared by David S. Baskin,
        M.D., FACS, FAANS dated March 2, 2018......   11

19   3 - United States Coast Guard Medical Review
        Letter to Jay Rivera dated June 29, 2018...   64
20      (Bates-labeled RIVERA000959)

21   4 - Merchant Mariner Credential Medical
        Evaluation Report of Jay Rivera............   70
22      (Bates-labeled RIVERA000964-000976)

23

24

25

1                    P R O C E E D I N G S

2                    (The time is 5:25 p.m.)

3                        (Exhibits 1 & 2 premarked.)

4              THE VIDEOGRAPHER:  Today's date is.

5   December 5th, 2018.  The time is 5:25 p.m. and we are

6   now on the record.

7                    (Witness sworn under oath by the reporter.)

8              THE REPORTER:  On the record.

9                        *   *   *

10                 DAVID S. BASKIN, M.D.,

11  having been first duly sworn, testified as follows:

12                       *   *   *

13                  E X A M I N A T I O N

14  BY MR. SIAHATGAR:

15      Q.  Dr. Baskin, would you, please, introduce

16  yourself to the Court?

17      A.  Sure.  My name is David Baskin.  I'm a

18  neurological surgeon.

19      Q.  And where do you currently work?  What's the

20  address of where you work?

21      A.  6445 Main Street, Outpatient Center, Floor 24,

22  here in Houston.

23      Q.  And how are you employed?

24      A.  Well, I'm employed by Houston Methodist

25  Hospital.  I'm a professor of neurosurgery at Methodist

1   and also at Cornell Medical College, which Methodist is

2   affiliated with.  I'm the Vice Chairman of the

3   department.  I'm the Director of the Neurosurgery

4   Residency Training Program here; and I am, also, the

5   Director of the Brain Tumor Center here at Houston

6   Methodist.

7       Q.  How many years have you been practicing

8   medicine?

9       A.  Well, 34-and-a-half after my residency, a

10  little over 40 if you count my residency.

11      Q.  And how many of those years have been in the

12  field of neurosurgery?

13      A.  Well, all of them except my first year of

14  internship was in general surgery.

15      Q.  Are you licensed to practice medicine in the

16  State of Texas?

17      A.  Yes.

18      Q.  Is your license on file with the proper

19  authorities?

20      A.  Yes.

21      Q.  Can you give us a little bit of an educational

22  background beginning with your undergraduate education?

23      A.  Sure.  I went to a small college in

24  Pennsylvania called Swarthmore College, where I

25  graduated in high honors.  I went to Mount Sinai School

1 of Medicine in New York City, where I actually graduated

2 first in my class. I did an internship at the

3 University of California in San Francisco. And, then, I

4 did my neurosurgical residency training, also, at the

5 University of California in San Francisco.

6 During that period of time, I did two

7 research fellowships, one with a guy named C.H. Lee, who

8 discovered the brain's own morphine-like compounds

9 called "endorphins." And I, also, did a research

10 project at the University of Capetown in South Africa,

11 looking at drugs that could reverse paralysis and stroke

12 and spinal cord injury.

13 When I finished that, I came here in 1984

14 where I started as Chief of Neurosurgery at the Houston

15 VA Hospital and assistant professor at Baylor College of

16 Medicine. I worked my way up into the ranks to full

17 professor at Baylor. Then, in 2005, Baylor and

18 Methodist had a divorce; and, so, I stayed at Methodist

19 where my practice was and became a professor of

20 neurosurgery at Cornell Medical College in New York,

21 which we're affiliated with, a professor here.

22 And I'm, also, a research professor at the

23 University of Houston in two different departments, the

24 School of Pharmacy and the Department of Biomedical

25 Engineering. So I guess that's about -- that's the

short version.

Q. And I appreciate that. Can you explain to the Court very briefly what neurosurgery is?

A. Well, neurosurgery is the specialty where the doctors take care of people who have problems wherever there's nerves, so mainly the brain and spine; but there are nerves that travel throughout the body and so we -- anywhere there's nerves, that's us. We're surgeons, so we see and evaluate patients with nerve problems; but we're always looking to see if there's something that we can do with a surgical procedure that might help.

Q. Are you board certified?

A. Yes.

Q. What does it mean to be board certified?

A. Well, it's a quality assurance practice and it changes from year to year. But, in my case, an internship in general -- well, you have to -- well, first of all, medical school. So after two years of medical school, I took two 8-hour exams, two days of exams, two more years of medical school, two more 8-hour exams, a year of internship, another 8-hour written exam, and then a year of general surgery and five years of neurosurgery in my case.

After that, I took a written exam, a full day exam, as part of the board certification process;

1  and, then, I practiced for two years.  I had to keep

2  track of every case that I saw, whether I operated or

3  not, what the outcomes were; and, then, I had to have an

4  ethics review.  The local peers have to submit

5  information about me.

6           And, then, I went and had an oral

7  examination by the American Board of Neurosurgery, where

8  you sit in a room for three hours or so and people ask

9  you a lot of questions about the nervous system.  And if

10 you pass all that, then, you're -- they call you "board

11 certified."

12      Q.  Very good.  Jay Rivera, who is the Plaintiff in

13 the lawsuit that we're here for today, is claiming that

14 he has nerve injuries to his foot and/or complex

15 regional pain syndrome.  Is that injury or that type of

16 injury, the complex regional pain syndrome, CP- -- CRPS

17 within your specialty?

18      A.  Yes.

19      Q.  Have you treated -- have you treat patients

20 with similar complaints?

21      A.  Yes.

22      Q.  On a few or many occasions?

23      A.  Many occasions.

24      Q.  Are you the member of any societies in

25 neurosurgery?

A.   Yes, many.

Q.   All right.  And I know that you mentioned earlier that you've done teaching?

A.   I still do.  So I teach college students.  I teach medical students.  And I teach residents, who I'm actually the Director of the residency program, so I'm in charge of all these young men and women training to be neurosurgeons.  And, then, I teach postgraduate courses, ranging from primary care physicians to neurosurgeons.  In fact, I generally teach some courses at our annual meeting in neurosurgery.

Q.   And do you, also, do some board work, in terms of medical board reviews?

A.   Well, I am an examiner for the American Board of Neurological Surgery, so it's sort of come full circle.  Now, when someone comes to be board certified, I'm somebody who asks the questions.

Q.   All right.  And, I take it, you're on the staff of several hospitals here in the area as well?

A.   Yes.

Q.   And have you -- have you provided lectures, written books or articles?

A.   Yes.

Q.   On topics of neurosurgery?

A.   Yes.

1  Q. And I've marked a copy of your Curriculum Vitae

2  as Exhibit 1; and I'd like to have a you take a look at

3  that and tell us whether it's a relatively up-to-date

4  CV, since I know that you update it fairly frequently?

5  A. Yeah, it's relatively up-to-date. This has

6  137 publications. I actually have over 150 now, but

7  it's -- you know, I don't know if that's significantly

8  different for the purposes of our gathering today.

9  Q. Very good. Thank you.

10  Will you agree with me that during this

11  deposition you will answer all of my questions based on

12  reasonable medical probability?

13  A. Unless I'm not sure, in which case I'll qualify

14  the answer.

15  Q. Very good. And I just want to make sure I

16  understand that these two binders you have here in front

17  of you are your file with regard to various depositions

18  and medical records that -- that you're free to, you

19  know, refer to any of the medical records or depositions

20  at any time should you wish to do so.

21  A. Sure. And this is what I -- this is my file,

22  yes.

23  Q. All right. Can you give the Court -- well, as

24  the Court probably knows, we contacted your office to --

25  to ask you to provide a review in this case. And can

1  you, basically, tell us a little bit of what did?

2      A.   Well, I saw Mr. Rivera on February 27th, 2018,

3  where I performed a full history and physical

4  examination.  I reviewed a whole series of diagnostic

5  imaging -- I mean a whole series of medical records here

6  and reports of diagnostic imaging studies and some other

7  legal and other documents that were provided, which are

8  contained in these binders (witness pointing).

9          And, then, after all of that, I, you know,

10  considered all of the facts of the case and what I saw.

11  And based on my knowledge, Training, and experience, I

12  generated a report, which summarized my assessment of

13  Mr. Rivera, what I thought was wrong, and made some

14  other diagnoses and recommendations and things like

15  that.

16      Q.   All right.  And let me hand you what we've

17  marked as Baskin Exhibit 2 and ask you if that is a copy

18  of the report that you generated?

19      A.   Yes.

20      Q.   And that is -- and is that, in fact, the report

21  that you prepared?

22      A.   Yes.

23      Q.   All right.  And does that report -- does that

24  Exhibit 2 contain your opinions with regard to the

25  injuries he claims and your observations with regard to

1    the IME that you performed?

2        A.  Yes.

3        Q.  And are the opinions in this report based on

4    reasonable medical probability?

5        A.  Yes.

6        Q.  Based on your education, training, years of

7    practice, and your review of Mr. Rivera's medical

8    records and your examination of him, can you confidently

9    provide us with testimony today regarding his condition

10   and his prognosis?

11       A.  Yes.

12       Q.  Your review -- your report that you have in

13   front of you, does it outline or address, you know,

14   generally the records that you reviewed in connection

15   with this matter?

16       A.  Yes.

17       Q.  And can you tell the Court briefly the type of

18   records that you reviewed in connection with this case?

19       A.  Well, they're in Paragraph 2 and 3; but, I

20   mean, basically, they're from records from imaging

21   centers, Corpus Christi Medical Center, New Stride

22   Physical Therapy, Orthopedic Associates of Corpus

23   Christi, Medical Center of Corpus Christi, Radiology and

24   Imaging Center of South Texas, South Texas Bone & Joint,

25   Island Chiropractic, and then some records from the

1  Aransas-Corpus Christi Pilots, the Corpus Christi

2  Surgery Center, Masters Mates and Pilots Plan, and his

3  Original Complaint, and also some other legal things,

4  United States Coast Guard Marine Safety Advisory,

5  Navigation Inpsection Circular, and other -- other

6  relating -- other things relating to medical and

7  Physical Evaluation Guidelines for Merchant Mariners.

8      Q.  And have you, also, had the chance more

9  recently to review the depositions of some of the other

10  treating physicians that --

11     A.  Yes.

12     Q.  -- that Mr. Rivera has seen --

13     A.  Yes.  I'm sorry if I --

14     Q.  -- including Drs. Moloney, Grosser, and Evans?

15     A.  Correct.  I forgot to mention that.  And, also,

16  reviewed just today, which you provided to me some

17  additional records from Institute -- Institute of

18  Precision Pain Medicine, again more records from

19  Orthopedic Associates, more records from Radiology

20  Imaging of South Texas, some more records from

21  Dr. Grosser.

22     Q.  All right.  Now, as to your position as a

23  reviewing doctor versus being a treating physician, does

24  that provide an advantage or a disadvantage to you as

25  opposed to -- in terms of reviewing of a file and

1   evaluation of a patient such as Mr. Rivera?

2       A.   Neither, really.  I think that for purposes of

3   evaluating and making a diagnosis, I'm probably in a --

4   I think I'm in an equal position.  I may actually be in

5   a better position in the sense that when you're a

6   treating doctor, you rarely have the opportunity to have

7   all of the previous records.  I mean I treat -- I've

8   treated thousands of patients and I don't generally have

9   every record or mostly every record.  But, I mean to be

10  fair, I think it's about equal.

11      Q.   Okay.  I'd like to ask you a little bit about

12  your examination of Mr. Rivera.  When you first saw him,

13  did you take a history from him?

14      A.   Yes.

15      Q.   All right.  And can you tell the Court briefly

16  what a history is?

17      A.   Well, a history is to ask the patient to tell

18  them -- tell you the story and have you tell -- have you

19  tell -- they tell what's wrong with them in their own

20  words.  Obviously, if you're an experienced physician,

21  you ask questions to try to focus the conversation.

22      Q.   What history did Mr. Rivera give to you?

23      A.   Well, he told me that he worked as a harbor

24  pilot and he guided ships into ports.  And, then, he was

25  boarding a ship about six miles offshore, which was a

1  tug and barge unit; and he said he was climbing through

2  a watertight door and stepping down onto a deck on the

3  other side of the door.  And in front that was a hatch,

4  which was sticking up somewhat, and he stepped on the

5  hatch in an uneven way which made his left leg slip.  He

6  landed on his side and on the toes of his left leg and,

7  then, fell backwards and struck his buttocks.  He had a

8  backpack on fortunately, which shielded his fall, so he

9  didn't strike his head.

10      Q.  All right.  And, you know, as a physician, is

11  it important to you that the history provided by the

12  patients are accurate?

13      A.  Yes.

14      Q.  And the reason why it's accurate is why -- I

15  mean the reason why accuracy is important to you is why?

16      A.  Well, you're using the history to sort of

17  figure out what the injury was and what -- I mean the

18  history is everything in terms of medical diagnosis and

19  recommendations for treatment and recommendations and

20  assessments of injury.  So if what they're telling you

21  isn't true, then, obviously, your conclusions are going

22  to be false --

23      Q.  Right.

24      A.  -- or could be false.

25      Q.  Right.  So when you met with Mr. Rivera, did he

1  tell you as part of the history that you took from him
2  that he was feeling good enough in late January 2017 or
3  early February of 2017 to return to work?
4      A.  I don't know if he told me that, but I knew
5  that.  It was -- it was in the records.  He might have.
6  I don't recall whether he specifically told me that or
7  not.
8      Q.  All right.  So as part of your review of this
9  file, are you aware of the fact that, you know, in
10  January or February of 2017 he returned to work as a
11  harbor pilot, and we're talking after the accident
12  happened, that he worked as a harbor pilot for the next
13  seven months, boarded over 90 ships, and, then, he
14  eventually passes U.S. Coast Guard physical back in late
15  2017?
16      A.  Yes, I'm aware of that.
17      Q.  All right.  Did you, also, perform a physical
18  examination of Mr. Rivera's foot?
19      A.  Yes.
20      Q.  And what did that reveal?
21      A.  Okay.  Well, let me refresh my memory here.
22  Hang on a second.  Well, there was an obvious difference
23  in temperature in the left foot compared to the right.
24  The left foot was cooler.  The left foot is the foot of
25  interest.

1         There was absolutely no motor weakness.

2  There was a little bit of numbness in the one toe -- or

3  one part of the toe in the outside of the foot.  There

4  was no allodynia, which is hypersensitivity to touch,

5  which is important when we're considering this

6  diagnosis.  The skin was a little bit darker and there

7  were a few areas of mottling of the skin color, but not

8  very extensive, just a little bit.

9        Q.  And you mentioned the motor weakness.  What is

10  the significance of no motor weakness?

11       A.  Well, it means the nerve that control the

12  movement of the foot are intact.

13          (Dr. Baskin's cellphone sounds.)

14          THE WITNESS:  Sorry, hang on one second.

15          MR. SIAHATGAR:  All right.

16          THE WITNESS:  Sorry, I apologize.  I

17  obviously am still on call and -- okay.  That's fine.

18  That's nothing.  Let me put this on vibrate.  I'm really

19  sorry.  Okay.

20       Q.  (BY MR. SIAHATGAR)  Now, what was your

21  understanding as to Mr. Rivera's complaint at the time,

22  whether it was neurologic or physical or bone

23  limitation?  How would you describe what his complaint

24  was at the time that you saw him?

25       A.  Well, he just simply complained of a certain

1  number of symptoms.  They all, in my opinion, relate to
2  neurological function, not physical damage.
3      Q.  All right.  And the issue in this case -- and
4  we'll talk about this some more today as well -- is
5  either reflex sympathetic dystrophy and/or CRPS, the
6  chronic --
7      A.  -- complex regional pain syndrome.
8      Q.  Right, yeah, chronic regional pain syndrome.
9  And in terms of that, can you explain to the Court why
10  the finding of no allodynia was significant?
11      A.  Well, in order to make a diagnosis of complex
12  regional pain syndrome or reflex sympathetic
13  dystrophy -- it's the same thing, just reclassified in
14  terms of terminology -- allodynia or this
15  hypersensitivity where lightly touching the skin is
16  painful or -- and in most cases when that's present, the
17  patient can't even wear anything or let anything touch
18  the skin.  It is a pretty significant prominent portion
19  of the syndrome.  So when it's not there, it's very
20  important.
21      Q.  Could the lack of allodynia that you found
22  during your examination of Mr. Rivera have been caused
23  by his taking of any medication at the time?
24      A.  Not in my opinion, no.
25      Q.  And --

A. And people take huge amounts of narcotics and it doesn't affect the allodynia.

Q. And does the lack of allodynia impact your evaluation of Mr. Rivera, his condition at the time, and your opinions concerning his then current condition?

A. Yes, in that it's a very important thing that he doesn't have it and it makes me -- it's part of what made me reach my reaction conclusion that this was not a full-blown syndrome of -- for complex regional pain syndrome. In fact, I don't think he meets the criteria for complex regional pain syndrome.

Q. And can you -- can you explain to the Court why you question whether his diagnosis is truly reflex sympathetic dystrophy and/or CRPS?

A. Well, any time you injure any area in your body to any extent, there's basically almost no area where there's -- wait. Hang on. Every area of the body has nerves going to it. So if you ding an area of your body with any force, you're going to ding a nerve. I mean it happens just about 100 percent of the time.

So, people can have funny sensations, weird tingles, weird burns. I mean think about it, you put your elbow down the wrong way and you can get tingling running down your arm. That's the ulnar nerve. So, it's not uncommon for people to have all sorts of

1  neurologic nerve-like symptoms and that can stay

2  uncomfortable for a long time.  That's one thing.

3        Complex regional pain syndrome or reflex

4  sympathetic dystrophy is a much more severe thing and

5  one's one and one's the other; and I don't think he met

6  the criteria for that.

7     Q.  Were there certain observations that you made

8  when he came and visited you that supported and/or

9  highlighted your belief that he either doesn't have

10  that condition, the reflex sympathetic dystrophy and/or

11  CRPS?

12     A.  Right.  So, he didn't have that allodynia or

13  what we call hyperalgesia or just severe sensitivity,

14  big -- big point.  He didn't have any swelling or edema.

15  That's one of the criteria that Dr. Evans mentioned the

16  Budapest criteria, which was certainly not the "be all

17  and end all," but one of their criteria.  He didn't have

18  that.

19        He didn't have may any motortrophic changes

20  or loss of motor function.  He, basically, had this

21  temperature difference in one foot and the other and a

22  little bit of skin change.  So, he had a little bit of a

23  dysfunctional nerve.  It's not normal to have that, but

24  he didn't meet that criteria, which is fortunate for him

25  because it's not such a severe thing as the CRPS

1  syndrome.

2      Q.  Was the way that he appeared and/or dressed,

3  also, indicative to you or helpful to you in your

4  evaluation of whether he had that diagnosis or not?

5      A.  Yes.

6      Q.  And can you explain to the Court why that is?

7      A.  So I have not seen a patient with CRPS or

8  reflex sympathetic dystrophy -- you know, we can use the

9  RSD or CRPS, you know -- who can wear a shoe normally,

10 put a shoe and sock on and walk in and walk out and not

11 have some sort of adaptation to that.  Because it's so

12 uncomfortable and painful that people have cutaway

13 shoes.

14      They have cut -- some people sometimes

15 wear -- you know, cut the bottom part of their trousers

16 off. I've really never seen anybody with a full-blown

17 syndrome who just didn't have any of that at all.  So, I

18 mean, you don't make this conclusion based on one thing;

19 but that was immediately striking to me.  I looked at

20 the records and realized that was a question in the case

21 and, you know, he just walked in and took off his shoes

22 and socks.  And as he took off his shoes and socks, it

23 wasn't even painful.  I mean people are, you know, sort

24 of very careful with how they take it off.  None of that

25 happened.  So that was important, yes.

Q. Was the fact that he was able to walk relatively normally and/or was able to bear weight on his foot, also, indicative or supportive of your opinions?

A. Yes.

Q. And why is that?

A. Same sort of thing. If you've got this hypersensitivity surreally painful extremity, putting weight on it, putting weight bearing on it is usually extremely painful and it wasn't.

Q. So -- so what is your belief with regard, you know, what he actually has, whether it is CRPS, and if he does, whether it's a partial or full syndrome?

A. Well, I don't think he meets the criteria for CRPS, so I don't think he has that.

MR. PAXTON: Object. It's outside the scope of his original report.

Q. (BY MR. SIAHATGAR) Go ahead.

A. Okay. I think I said that on my report.

Q. Yeah -- no, I think you do. So, my questions is whether you believe that he has -- whether he has CRPS or something else and whether it's a full or a partial syndrome?

A. So I don't think he has CRPS. I don't think he meets those criteria. I think he has what we call

1  deafferentation, pain or deafferentation syndrome, which

2  means the nerves not conducting sensation quite right.

3  So there's a little bit of difference in temperature

4  regulation of the skin. There's a little bit of funny

5  feeling in the skin. And a lot of people can have that

6  without having CRPS.

7      Q. All right. Now, we took the deposition of

8  Dr. Evans. And as I appreciate what his comment was, he

9  seemed to think that you either do have CRPS or you

10  don't have CRPS and that there's no continuum; and he

11  didn't understand your reference to a partial syndrome?

12      And, so, what I'd like you to do is just to

13  kind of explain to the Court when you reference a

14  partial syndrome of CRPS, what does that mean and why do

15  you believe there is a quote, unquote a "partial"

16  syndrome?

17      A. Well, it's semantics. So if you read what I

18  wrote in my report, I said he has an element of

19  deafferentation pain and complex regional pain syndrome

20  because that's one of the elements of it as -- because

21  of the diminished temperature sensation that I found and

22  because of his history of tingling and discomfort. He

23  does not have the full-blown syndrome. You could, also,

24  say he doesn't meet the full criteria.

25      So I think he has something. I found him

1  to be personable, pleasant, cooperative. I didn't see

2  him -- I didn't find any symptoms when I examined him

3  that he was, you know, somehow not representing himself

4  well. He did. And I think he had -- his one hand --

5  one foot is cooler than the other. So he has something,

6  but I don't think he meets the criteria.

7  So I guess you could -- I could revise that

8  when I say full-blown syndrome, full-blown syndrome

9  meaning he meets the criteria. All of this is

10  semantics. Somebody comes and writes, you know, a set

11  of things on the board, "This is what you have to have

12  to have the syndrome." Well, what if you have half of

13  it or a quarter of it? So you can say "You don't have

14  it" or you can say "Well, you know, you have elements.

15  of it, but you don't completely make the diagnosis.

16  It's -- either way it's the same thing -- or either way

17  is my opinion.

18  Q. All right. Now, did you also have a chance to

19  review reports of MRI's, CT scans, bone scans, X-rays of

20  the foot that were performed after this incident

21  happened?

22  A. Yes.

23  Q. And was there anything in these studies that

24  either supported or undermined your opinions in this

25  case?

1    A.   No.

2    Q.   Well, I guess the question is:  Is there

3  anything in the reports specifically that support your

4  opinion that he either does or does not have CRPS or a

5  mild version?  Maybe I should ask it that way.

6    A.   Right.  Well, I mean he had a bone scan; and

7  the triple-phase bone scan, generally, is one test that

8  people have used to confirm that there's CRPS, and the

9  findings on that did not confirm CRPS.  In fact,

10  Dr. Grosser many times didn't think it was CRPS.  So,

11  there were no objective tests that confirmed it that are

12  available in these records.

13    Q.   All right.  And, now, you mentioned this bone

14  scan that was performed in late 2017.  Can you explain

15  to the Court a little bit what it is about the bone scan

16  that I think you mentioned that even Dr. Grosser

17  referenced in one of her reports.  How is that -- how is

18  the bone scan somehow linked to or used for purposes of

19  a CRPS diagnosis?

20    A.   Well, it's a confirmatory test.  It doesn't

21  make the diagnosis.  But without going into the details,

22  there's a triple phase, so there's three different times

23  that you're studying.  And in CRPS, there's a particular

24  pattern that you see and that pattern wasn't seen.  So

25  it doesn't prove it, but it also is -- you know, if

1  there was CRPS, you would expect that to be positive.

2      Q.  On the flip side, are there any of the other

3  radiology reports that were performed, you know, after

4  the incident that you could look at and say "Well, this

5  objectively shows that he has CRPS"?

6      A.  None, nothing.

7      Q.  Now, as you know from the history that

8  Mr. Rivera gave you, he was off work for about six

9  months following the accident and, then, went back to

10  work for seven months before undergoing surgery of his

11  foot and, then, was able to work for some period of

12  time.

13      During that time frame, given the fact that

14  he was able to go back to work, is that indicative or

15  supportive of your opinion with regard to whether he has

16  CRPS or not?

17      A.  It's supportive because, again, people with

18  CRPS, they can't go back to work.  And, certainly, what

19  he does is pretty strenuous, so it's supportive.

20      Q.  All right.

21      A.  It's exactly what I think he -- what I've said.

22  It's just -- I think has something, but it's not the

23  full-blown syndrome; and, fortunately, it's something

24  that will likely get better over time.

25      Q.  All right.  And, again, I mentioned to you a

1  little while ago about Dr. Evans, who I believe is

2  Mr. Rivera's treating neurologist.  And my understanding

3  is that Dr. Evans has seen Mr. Rivera on two occasions.

4  Do you have -- do you have a -- have you been able to

5  have an opportunity to review Dr. Evans' reports?

6       A.  Yes.

7       Q.  And I believe Dr.- -- Dr. Evans having seen

8  Mr. Rivera twice is just one more time than you saw him?

9       A.  That's correct.  Two minus one is one.

10      Q.  All right.  Now, Dr. Evans, in his reports and

11 I believe also his testimony, has expressed some views

12 concerning the permanency and/or the future inability of

13 Mr. Rivera's CRPS to resolve.  I mean, do you agree or

14 disagree with what his views are?

15      A.  I disagree.  I think with this degree of mild

16 symptomatology relating to what I would just call a

17 deafferentation pain or nerve-type pain, which I don't

18 think is CRPS.  I think it's more likely than not in

19 reasonable probability this will recover or get --

20 continue to get better over time.

21      Q.  Are you familiar with studies concerning the

22 permanency of CRPS particularly in cases where a person

23 has a milder version like, I believe, you think

24 Mr. Rivera has?

25      A.  A milder version?  Oh, I see, okay.

Q. Yeah.

A. Well, again, I've qualified what that means. I don't think he has it. I think it's semantics. I've seen studies, yes.

Q. And what are the studies reflective of in terms of the future prognosis of a patient, such as Mr. Rivera, in terms of the nerve pain that he has in his foot and the -- the future prognosis?

A. Well, in the patients that don't meet all of the criteria, the prognosis is much better. And, in fact, I'm a patient who had exactly that.

Q. And can you explain what that you mean that?

A. Sure. Last December, I was involved in a really bad car accident. I had a broken neck and six broken ribs. I had a collapsed lung and I had two broken bones in my wrist. And, so, I was pretty sick.

And as the fractures started to heal, I got -- I had this horrible burning pain in my wrist. My hand was a little cooler and I said "Oh, no. You know, here I am who treated all these people with it, I'm getting it." I didn't have the full-blown syndrome. I didn't have any skin mottling. I didn't have any hair or nail loss. I didn't have any motor weakness.

But, I mean, I could not -- you know, I had to walk around with my white coat like this. I could

1    not let it touch my wrist.  And I put on a bunch of, you

2    have, anti-inflammatory creams and did very, very

3    extensive physical therapy.  And a year later, it's

4    basically almost gone.  I have a little area where if

5    you touch it, it's just slightly uncomfortable.  But I'm

6    operating and working.  You know, 10 hours a day is a

7    short day for me.

8         Q.  Yeah.

9         A.  So, I mean, you know, when you have -- and, so,

10   I'm kind of an example.  I had some of those symptoms.

11   I was like "Oh, no, maybe I'm going to progress," but I

12   didn't.  So, it's certainly possible to just get better.

13        Q.  What is your experience and your opinion

14   concerning the future improvement opportunities for

15   Mr. Rivera or other patients with conditions such as he

16   has, whether it's a mild case of CRPS or the other --

17   other conditions that you may think he has?

18        A.  I think they're opportunities.  I think

19   extensive additional physical therapy can really help,

20   specifically certain movements and certain actions of

21   the limb to really continue to stretch the ligaments and

22   tendons; and that's exactly what I did.

23             There's spinal cord stimulation.  Dr. Evans

24   didn't seem to be very familiar with the results, but

25   the results are remarkably good.  And particularly in

1   people where you don't really have the exact syndrome.

2   You have just some elements of it. Our success rate is

3   quite high. It's 70, 80 percent.

4          There's a newer technique that is even --

5   which is dorsal root ganglion stimulation, which is a

6   stimulation of a part of those spinal cord and nerve.

7   And the results there are extremely encouraging and

8   supposed to be even higher and better. Although, it's

9   relatively new. So I think there are other

10   opportunities for him to pursue.

11      Q. You know, and some of the other issues that I

12   believe you even reference in your report are the fact

13   that there could be spontaneous improvement of

14   conditions such as he has and/or the use of nerve

15   blocks?

16      A. Yes.

17      Q. And -- but you mentioned a spinal cord

18   stimulator and I'd like to ask you some questions about

19   that.

20      A. Sure.

21      Q. Can you describe for the Court, generally, what

22   that device looks like?

23      A. Well, they're little wires and the wires have

24   little electrode contact points on them. So they're --

25   they're put in just through a -- like you prep the back

1  and you just slide these wires in.  It's done like under

2  local anesthesia as an outpatient.  And they're

3  positioned using X-ray so you make sure you have the --

4  and they're positioned right on top of the lining of the

5  spinal cord.

6       And, simply stated, they basically send

7  impulses down that cancel the pain impulses coming up.

8  It's a lot more complicated than that.  They actually

9  send impulses up to the brain as well, but you can think

10  of it as a kind of a cancellation-type situation.  And

11  they're highly effective.  And what we do when we place

12  them is we position them so you can get the tingling in

13  the distribution of the pain.  So, you know, again, just

14  simply stated, it kind of the canceling -- two waves

15  canceling each other out.

16       And, I mean, it's an outpatient procedure.

17  The electrodes are placed and, then, a little tiny rod

18  is made and you tunnel it over and you put a little

19  receiver in the chest.  It's sort of like having a

20  pacemaker.  People who have a pacemaker is outpatient.

21  It's very similar.

22       Q.  You know -- and, again, I believe you commented

23  that this was an outpatient operation?

24       A.  (Witness nods head.)

25       Q.  It's -- would you consider it major surgery,

1  the implantation of it?

2      A.  No.  I mean, it's still surgery in a sense; but

3  it's -- it's relatively minor.

4      Q.  All right.  And if Mr. Rivera pursued a spinal

5  cord stimulation activity, such as this, what would be

6  the effect on his pain and/or his need to take either

7  narcotic and/or pain medication?

8      A.  I think it's more likely than not that it would

9  help it tremendously, maybe even alleviate it

10  completely.

11      Q.  From the review of the records in this file

12  that you've seen, do you know whether somebody other

13  than yourself, one of his treating physicians, has

14  actually recommended that he pursue a spinal cord

15  stimulator?

16      A.  Yes, I believe one of the pain management

17  doctors recently recommended it.  And he, apparently,

18  refused it, at least that's what the doctor said.  I

19  didn't talk to Mr. Rivera about it.  I don't remember

20  who it was.  It was in one of the more recent records.

21      Q.  Now, Mr. Rivera has actually tried two nerve

22  blocks that, I believe, were performed by Dr. Liu and/or

23  his office in Corpus Christi.  And I expect that

24  Mr. Rivera is going to testify and/or refer to the

25  records that they either have been ineffective or have

1  only provided temporary or partial relief.

2         Does the success rate of the nerve blocks

3  impact your opinion on whether a future nerve block or

4  spinal cord stimulator could be effective to provide

5  significant relief for Mr. Rivera?

6     A.  Well, there are two questions there.  So the

7  first -- the first part of the question is "Does it have

8  anything to do with the spinal cord stimulator" -- "No."

9  In fact, whether or not you respond to a nerve block

10  doesn't mean you won't respond to a spinal cord

11  stimulator.

12         The second thing is:  If he had partial

13  responses, if he's only had two nerve blocks, that's not

14  very aggressive treatment.  In patients with this

15  condition, we often do six, eight, ten nerve blocks if

16  and usually in fairly rapid succession.  So I don't know

17  whether he's had response or not, but two nerve blocks

18  probably isn't enough.

19     Q.  All right.  Is it your view in terms of -- from

20  a pain management standpoint, given what you've seen and

21  what you know about Mr. Rivera, that there are other

22  options or certainly a lot of other options out there

23  for him that he should pursue in order to try to control

24  whatever the pain situations that he has?

25     A.  Yes.

Q.  Now, in your report, you make a comment concerning the qualifications of the pain management doctor who had performed the nerve blocks and/or the spinal cord stimulation implantation.  Why do you make that comment?

A.  Well, there are a lot of pain management doctors out there; and if you're not experienced with this condition, just in my own practice, I've seen people who are board certified pain doctors do things that are really not the right course of events to pursue in patients with this condition.

I wasn't implying that that hadn't been done here; but, you know, in my report here, you know, I'm saying "Oh, I -- I examined this fellow.  I found something.  I don't think it's the full-blown syndrome." A pain management doc who knows what he's doing could really help him.  So that's kind of why I put that there.

Q.  All right.  Dr. Liu, or whoever the physicians in Corpus Christi, do you know anything about him or his experience?

A.  No.

Q.  Mr. Rivera, I expect is going to testify or have the opinion that because these two nerve blocks he had were unsuccessful that he, therefore, is going to be

1  relegated to a life in pain.  Do you agree with that
2  assessment?
3      A.  No.
4      Q.  And can you explain why not?
5      A.  Well, first of all, what kind of nerve blocks,
6  were they truly sympathetic blocks, were they done
7  correctly, were they dorsal root ganglion blocks.  So, I
8  mean there's blocks and blocks and blocks.  And, again,
9  we don't know what he's going to testify.  If he had
10  partial relief, then, it should have been done more
11  frequently or more often or certainly more should be
12  done.  And whether or not he had relief from the nerve
13  blocks doesn't have anything to do with whether or not a
14  spinal cord stimulator would work.
15      Q.  And let's assume that Mr. Rivera actually
16  pursued these other options, these other modalities, you
17  know, whether it's other nerve blocks or multiple nerve
18  blocks and/or spinal cord stimulator, would these permit
19  to return to work without pain medication?
20          MR. PAXTON:  Objection, lack of foundation.
21      A.  Well, I think it's more likely than not that
22  they would.
23      Q.  (BY MR. SIAHATGAR)  And do you have any
24  experience with patients who have returned to work even
25  in the capacity as dangerous as Mr. Rivera's does

1  offshore at sea after having installed a spinal cord

2  stimulator?

3          MR. PAXTON:  Objection, lack of foundation.

4      A.  Yes.

5      Q.  (BY MR. SIAHATGAR)  And can you explain to the

6  Court your background and experience to be able to make

7  those opinions with regard to the use of spinal cord

8  stimulators and its impact on or ability of persons to

9  testify offshore -- I mean to work offshore?

10     A.  Well, in my knowl- -- in my knowledge,

11 training, and experience as a neurosurgeon, I've treated

12 many patients with this condition.  I've put in a number

13 of spinal cord stimulators and I've personally observed

14 people improve to a point where they can do very -- very

15 significant physical work, including work that might be

16 dangerous.

17     Q.  And from the standpoint of the implantation of

18 a spinal cord stimulator and/or the use of nerve blocks,

19 how is it that something like that would not cause

20 either a lack of or a decrease in mental ability or

21 physical ability to be able to perform a job?

22     A.  Well, that's an interesting question from a

23 neuroscience perspective.  In point of fact, they don't.

24 I mean they don't release morphine-like compounds.  They

25 don't stimulate an area of the brain that inhibits your

1    ability to think clearly; and there's absolutely no
2    evidence that support that it does any of that. And in
3    just, again, 35 years of experience, I have never seen
4    that problem.
5         Q.  All right.  Do you have an opinion with regard
6    to the necessity of any future medical treatment for
7    Mr. Rivera based on your review of the file and your
8    examination of him?
9         A.  Yes.
10        Q.  All right.  And what -- what is that opinion?
11        A.  Well, I think it would be very reasonable to
12   continue to provide medical treatment for him, including
13   extensive physical therapy focused on really joint
14   mobilization and tendon stretching and the kinds of
15   things we know works for deafferentation pain.
16             I think it would be reasonable to pursue
17   additional blocks, making sure they're done correctly
18   and making sure different types of block are done.  And
19   I think it would be very reasonable to consider a spinal
20   cord stimulator, plus we can do a trial stimulation
21   where they put in test electrodes and also a permanent
22   stimulator.
23        Q.  In your opinion, is there anything about Jay
24   Rivera's foot condition, based on your review of the
25   records and your examination of him, that would indicate

the need for future surgery?

    A.  No, I don't believe there's any indication for future surgery on the foot directly.  I don't think any of the doctors are proposing that, either.

    Q.  Now, do you have an opinion whether Mr. Rivera's foot condition will improve over time, particularly if he pursues further treatment options?

    A.  Yes.

    Q.  And what is your opinion?

    A.  It's more likely than not it will.

    Q.  All right.  And, again, these options that you recommend that he pursue are what?

    A.  Aggressive physical therapy, very specific types, specific types of different kinds of nerve blocks, and spinal cord stimulation.

    Q.  Other than neurological issues, does Mr. Rivera currently have any physical disabilities that either now or in the future will restrict him from returning to any type of gainful employment?

    A.  No, other than the neurological issue, no.

    Q.  And when I'm talking about future employment, I'm talking about whether as a harbor pilot or otherwise?

    A.  Correct and "no."

    Q.  Does Mr. Rivera have any neurologic issues that

1  you believe currently restrict him from returning to

2  work as a harbor pilot currently?

3         MR. PAXTON:  Objection, lack of foundation,

4  calls for a legal conclusion, and a regulatory

5  interpretation of the Texas Transportation Code.  Go

6  ahead.

7      A.  Okay.  Ask me the question again, maybe.

8      Q.  (BY MR. SIAHATGAR)  Right.  Does Mr. Rivera

9  currently have any neurologic issues that you believe

10  restrict him from returning to work as a harbor pilot?

11         MR. PAXTON:  Objection, calls for a legal

12  conclusion, and an interpretation of the Texas

13  Transportation Code, and also federal law regarding

14  pilotage.

15      A.  I don't think that his neurological condition

16  prevents him from returning to work.  Now, part of his

17  neurological condition is his subjective experience of

18  pain.  So I wouldn't want to push him to return to work

19  right now if he says "I'm in too much pain to return to

20  work."  I mean that just wouldn't be smart.

21         But I don't think that his condition is

22  such that he won't be able to return to work.  I would

23  push him to pursue these other treatments.

24      Q.  (BY MR. SIAHATGAR)  And that really is what the

25  direction of my questions:  So if his -- if with further

1  treatment his condition improves to a point where he no
2  longer needs to take any narcotic medication, where the
3  pain is reduced to a point where it no longer prevents
4  him from, you know, walking normally, being able to
5  step, climb ladders and stuff like that, do you believe
6  that that is a point where he can get to with some of
7  the further treatment that you've recommended?
8      A.  Yes.  I mean just like me, I mean, I have this
9  little -- you know, I mean I do -- I would suggest that
10  doing brain surgery is probably as dangerous -- or
11  potentially dangerous as being a harbor pilot and I --
12  you know, I recovered; and I recovered just with
13  extensive therapy.
14          I'm not saying he 100 percent will, but I
15  think it's more likely than not he will; because he
16  really doesn't have the whole deal here.  He has just a
17  little bit of a nerve dysfunction.
18      Q.  Do you believe that it is more likely than not
19  that he could return to his former work in the future,
20  assuming he pursues some of these other treatments that
21  we've discussed today?
22          MR. PAXTON:  Objection and calls for a
23  legal conclusion and interpretation of the Texas
24  Transportation Code and the method by which one can
25  regain their commission of being a harbor pilot.  And

1  it's just independent and totally outside the scope of

2  Dr. Baskin's expertise.

3      A.  I believe he could return to work more likely

4  than not.

5      Q.  (BY MR. SIAHATGAR)  Right.  And can you explain

6  why?

7      A.  Because I think these things are going to help

8  and get him to a point where he'll be able to be able to

9  return to work.

10     Q.  All right.  Do you have an opinion whether

11  Mr. Rivera is physically permanently restricted from

12  returning to gainful employment in the future?

13     A.  Yes.

14     Q.  And what is your opinion?

15     A.  No.

16     Q.  And can you explain -- again, I think it's

17  probably a reiteration of all the things that you've

18  already testified to a couple of times, but just why you

19  believe that it is -- that Mr. Rivera's not physically

20  going to be restricted from returning to gainful

21  employment in the future?

22     A.  Well, he doesn't have any physical limitation,

23  other than the neurological condition.  And the

24  neurological condition we've discussed is mild, not

25  quote "full blown," as I've said or doesn't really meet

1  the criteria for CRPS. And I think it'll continue to
2  get better with some additional treatment.
3      Q. If he pursues a spinal cord stimulator, is that
4  something that you believe would be helpful for him to
5  be able to pursue future employment, whether it be
6  offshore or onshore?
7      A. Yes.
8      Q. Are all the options -- the opinions that you're
9  giving here today consistent with the opinions you've
10  provided in your original report, simply amplifying on
11  them a little bit?
12      A. Yes.
13      Q. I'd like to bring up just -- really just two
14  more items and I'll be done. I asked Dr. Evans about
15  this a little bit in his deposition, but are you
16  familiar with the term "secondary gain" syndrome?
17      A. Yes.
18      Q. All right. Can you explain to the Court what
19  that means?
20      A. Well, secondary gain syndrome refers to
21  something we call symptom magnification. In other
22  words, a person may have a condition or not have a
23  condition; but they report or they experience symptoms
24  and problems that are out of proportion than what you
25  would expect to see.

1          So, symptom magnification can be in

2    different categories.  It can be faking, somebody's just

3    making it up, but they really aren't experiencing it; or

4    it can be a psychological thing, where, you know, the

5    person really feels like things are worse, but actually

6    physically they're not.  So, there's different

7    categories.

8          Q.  Is secondary gain either conscious or

9    unconscious or can it be both?

10          A.  It can be either one or both.

11          Q.  Do you have an opinion with regard to

12    Mr. Rivera whether there's any elements of secondary

13    gain in connection with CRPS and his condition?

14          A.  Well, I don't think he has CRPS.  I did not see

15    any conscious evidence -- well, I didn't see any

16    evidence of him consciously trying to magnify his

17    symptoms.  And there are a number of things you can look

18    for and I -- you know, I thought he was -- what he was

19    telling me was probably more likely than not what he --

20    what he was experiencing.

21          Now, if you have this kind of discomfort

22    and you sit around all day and you don't go to work, we

23    all can sort of obsess about it a little bit.  So that's

24    possible.  I'm not saying that's more likely than not,

25    but I mean it's just sort of part of the normal human

1  condition, that if you're sitting around all day with a

2  problem and you're not doing other things, you're just

3  sort of -- you can focus on it more.

4         I'm -- but, again, I'm not trying to impugn

5  his character or anything about him.  I found him to be

6  a nice guy, reasonable.  So it's possible that's going

7  on, but it's not -- it's just possible.

8      Q.  Are you familiar with any studies that relate,

9  you know, specifically CRPS and I understand that you

10  don't believe that he has that condition with secondary

11  gain --

12      A.  Oh, yes.

13      Q.  -- in the literature?

14      A.  Oh, yes.  Yeah, there's quite a few that relate

15  it to.

16      Q.  The last thing is:  Doctor, we started your

17  deposition at your offices here at 5:30 this evening.

18  What would you be doing tonight if you weren't in

19  deposition?

20      A.  Well, what time is it now?  I would be working

21  and doing surgery usually until about 6:00 or 6:30.  But

22  because I had this deposition, I only did one surgery

23  today, instead of two.  Most of my surgeries take four

24  or five hours.

25      Q.  And since I'm taking the deposition, am I

1  compensating you for the time that we're taking you away
2  from your practice so that you can give the deposition
3  today as well as the time that you spent in reviewing
4  the records in this matter?
5       A.  Yes.
6       Q.  Has that, the fact that I'm paying you in any
7  way affected the opinions that you've given here today?
8       A.  No.  I mean, frankly, I don't think that my
9  opinions is entirely helpful to you.  I -- you know, I
10 think this fellow does have something.  He does have
11 some problems; but, no, it hasn't affected my opinion.
12      Q.  Right.  And just because I've hired you, I
13 understand that you're hired by lawyers on both sides on
14 a routine regular basis.  I'm not sure how often it
15 happens, Dr. Baskin; but, I assume, there's situations
16 where a lawyer or a law firm will hire you and ask you
17 for your opinion and in some instances you'll agree with
18 what the defense or plaintiff's strategy is and other
19 times you do not?
20      A.  That's correct.
21      Q.  All right.  And you know -- and, I assume, is
22 the testimony you provide -- I'm the lawyer representing
23 the Defendant in this case.  I'm not sure you knew that
24 or not.  But are there instances where you are
25 representing or been retained by lawyers for the

1    Plaintiff?

2        A.   Yes.

3        Q.   And can you give the Court a couple examples of

4    some matters where you're representing --

5        A.   Well, I have --

6        Q.   -- or been retained by the plaintiff?

7        A.   -- three cases now with a fairly prominent law

8    firm in town, Arnold & Itkin, where I'm representing the

9    Plaintiff; and I've testified for them before in the

10   past as well as several other plaintiff attorneys,

11   including Michael Gallagher, John O'Quinn, other

12   plaintiff attorneys.

13            MR. SIAHATGAR:  Dr. Baskin, I appreciate

14   your time.  I think that's all the questions I have for

15   you at this time.

16            THE WITNESS:  All right.

17            MR. SIAHATGAR:  Thank you.

18            THE WITNESS:  Thank you.

19            (The time is 6:12 p.m.)

20               E X A M I N A T I O N

21   BY MR. PAXTON:

22       Q.   Doctor, thank you.  I'm -- I'm just a simple

23   country person.  It's hard for me to understand some of

24   these semantics that doctors talk about, just like I'm

25   sure some of the semantics that lawyers play around with

1    are sometimes difficult to understand as well.  I -- I

2    understood from your testimony that you do believe that

3    Captain Rivera had some sort of debilitating condition;

4    is that correct?

5         A.   I don't know about debilitating.  I believe he

6    had a nerve-like injury or partial injury, yes.

7         Q.   Okay.  And one of the things that you said in

8    your report, which is on Page 7; and it's the third

9    paragraph from the bottom:  "At the present time, I

10   would agree that it is not safe for him to return to

11   work"?

12        A.   Correct.

13        Q.   Okay.  Now, as we sit here today, have you seen

14   anything differently in all of the records that have

15   been provided to you, including all the ones that you

16   reviewed just today that would indicate that it is safe

17   for Captain Rivera to return to work right now?

18        A.   I haven't seen anything to be fair.  I have

19   just very scant records.  But, no, and I haven't seen

20   him again so I don't really know what his condition is

21   right now.

22        Q.   Fair enough.  So, that opinion remains the same

23   as we sit here today?

24        A.   Lacking any other evidence that to the

25   contrary, yes, it would have to.  I mean if I saw him

1    again I might think differently depending on how he's
2    doing.
3        Q.   Sure.
4        A.   But, I mean, I have to go by the evidence I
5    have, which are these few reports, which, you know, are
6    not that extensive about how well or poorly he's doing
7    and the fact I have not seen him again.
8        Q.   One thing Mr. Siahatgar, Bijan, didn't ask you
9    about is how much you're charging him on an hourly basis
10   to provide your opinion in this case.  Do you know?
11       A.   Yeah, $1,500 an hour for the deposition.
12       Q.   Okay.  How much for document review?
13       A.   A thousand dollars an hour.
14       Q.   And how many hours have you spent in total in
15   preparing for and drafting your reports and, then,
16   after -- we'll know what the time is on the testimony --
17   but how many hours have you expended thus far on this
18   case?
19       A.   Probably at least 12 or 13 hours.
20       Q.   Okay.
21       A.   I would say that's a reasonable estimate, plus
22   then preparing for this, so maybe 15, 16 hours.
23       Q.   Okay.  So, insofar as the records that you are
24   able to review, someone was paying you for that time to
25   review those documents and for you to synthesize them

1    and to render them into opinion, correct?

2         A.   Sure.

3         Q.   So for a treater, like Dr. Evans in this case,

4    he wasn't being financially incentivized to comb through

5    all of the records that may or may not have been within

6    his purview at that time.  So, would you have had an

7    advantage or a disadvantage financially in having the

8    ability to review these documents on an hourly

9    compensated basis?

10        A.   Well, I don't know how to answer that question.

11   It's apples and oranges.  He's not asked to review the

12   records.  I don't know what he was asked to do, by the

13   way.  I don't know how to answer that question.

14        Q.   Well, let me ask you this:  From a treater's

15   perspective, did Dr. Evans have any sort of financial

16   incentive, one way or another, in diagnosing Mr. Rivera

17   with CRPS?

18        A.   I don't know the answer to that.  I don't know

19   who referred him -- Mr. Rivera to Dr. Evans and -- I

20   don't know the answer to that.

21        Q.   I'm asking you if he's a treating physician and

22   he was a treating physician, not an expert witness, do

23   you -- do you think there's any financial incentive for

24   Dr. Evans to have diagnosed Jay Rivera with CRPS?

25        A.   I don't know the answer to that question.  It'd

1    depend on who referred him.   If he was referred by a

2    law, it could have been.   I don't know.

3          Q.   Okay.   Have you seen anything in his

4    deposition.   Did you look Mr. Rivera's deposition in

5    this case?

6          A.   I don't have Mr. Rivera's deposition, no.

7          Q.   Would that have been something important for to

8    you look at in terms of determining and evaluating what

9    sort of objective pain symptoms he might have been

10   experiencing?

11         A.   Not really.   I mean I saw and talked to him

12   personally.   I think that's better than a deposition.

13         Q.   That's fair enough.   I have a question about

14   your -- your injury.

15         A.   Yeah.

16         Q.   When your -- when your hand -- when you were

17   experiencing the pain symptoms that you were

18   experiencing --

19         A.   Right.

20         Q.   -- were you performing surgeries at that time?

21         A.   No.

22         Q.   Okay.   When did you make the decision that it

23   was going to be safe again for you to return to

24   performing surgeries?

25         A.   I was -- let me see, November, December --

```
 1   probably about two or three months when the -- when the
 2   symptoms abated.
 3       Q.  Did you --
 4       A.  I mean, you know, I -- when I could -- when it
 5   was no longer unpainful to do this (witness motioning)
 6   and when I -- yeah, it had to get better be obviously.
 7       Q.  Did you make that decision on your own or did
 8   you have another doctor clear you?
 9       A.  No, I had another doctor -- I had a hand
10   surgeon who treated me make that decision for me,
11   because I knew I would be biased and want to go back to
12   work too quickly.  And, so, she wouldn't let me go back
13   and she said it has to be, you know, pretty good and
14   she'll make that decision and, then, she made that
15   decision.  And, obviously, the hospital was very closely
16   watching that and made sure that it wasn't me who was
17   deciding that.
18       Q.  Sure.  The hospital has an interest in making
19   sure that --
20       A.  It was safe.
21       Q.  -- it was safe, right?
22       A.  Correct.
23       Q.  Do you understand in your time of talking to
24   Rivera -- Captain Rivera that he was under a timetable
25   that he had to show improvements or he risked imperiling
```

1    the occupation as a harbor pilot that he had?  Did he

2    communicate that to you?

3        A.  I'm not -- I'm not sure I understand what

4    you're referring to.  You mean that he had a certain

5    period of time that he had to go back to work or lose

6    his license or --

7        Q.  Yes.  Do you understand anything along those

8    lines?

9        A.  You know, I have a vague recollection of

10   something like that; but I wouldn't want to tell you

11   exactly what those requirements were.  I -- I don't know

12   whether it's him or other somebody else who's -- I've

13   seen other harbor pilots in the past.  I've treated

14   other harbor pilots.

15              So I -- the honest answer is:  I don't

16   remember, but I know there is some sort of rule in the

17   regulations like that where they have so long and, then,

18   I think they have to re-qualify or something like that;

19   but I'm guessing.

20       Q.  Sure.  But you -- right.  You don't know what

21   those rules and regulations are --

22       A.  No --

23       Q.  -- regarding that?

24       A.  No.

25       Q.  I'm going to ask you a hypothetical with regard

1   to this hospital.  You're probably the most preeminent

2   neurosurgeon in the city and I'm not saying that to

3   flatter you.  I think that it's pretty widely

4   understood.

5                    Had there been a time limit in this

6   hospital that you had to regain the use of your right

7   hand before you could return to doing surgeries or you

8   lost your entire career as a neurosurgeon, do you know

9   of any kind of regulatory --

10       A.  Yeah, that's a good -- that's a good question.

11  I don't know that there's a set regulatory issue.

12  However, my return was also assessed by our chair and

13  other people.  And I would say to be fair and to be fair

14  to Mr. Rivera, if I were out for six or nine months, I

15  think there would be pretty close scrutiny as to whether

16  or not I could return to work.  I think that's fair and

17  I think that's what you're getting at, sure.

18                    I mean -- and, obviously, I don't have any

19  problem with that.  You know, the regulatory bodies have

20  to be sure somebody's safe.

21       Q.  And I think what I'm getting at is that there's

22  apples and oranges between what Bijan was asking you

23  about earlier about your opinion on whether he could

24  return to work in the future if he improved.  And you

25  may recall that that drew an objection from me based on

1  some regulations in the Texas Transportation Code.  Do

2  you remember that?

3      A.  Yes.

4      Q.  Okay.  So, what my question to you now is:

5  You're not familiar with the Texas Transportation Code

6  and have not been asked to render an opinion on it, have

7  you?

8      A.  Well, I'm vaguely familiar with it; but I'm not

9  rendering an opinion on it, nor is my comment about him

10 being able to return to work based on some intense,

11 immense knowledge of what those regulations are.

12     Q.  Okay.  So, I'm going to ask you the question in

13 this framework:  If Captain Rivera was required to pass

14 and maintain his U.S. Coast Guard physical and he had to

15 do so by July of this year and he was unable to pass

16 that physical because of reports like Dr. Evans, yours,

17 other peoples, and he lost his license and his

18 commission and he can no longer return to work where he

19 was making between 6- and $800,000 a year, what

20 difference does it make if future -- if he will recover

21 in the full if he's already lost that commission?

22          MR. SIAHATGAR:  Object to the form.

23     A.  Well, that's a complicated question.  Well,

24 the -- I think that question's not uncomplicated.  The

25 answer is.

1          It makes a huge difference if he's going to

2   recover or not for him and his life.  I don't know

3   whether -- I don't know the regulations, but I would

4   think -- and it's not more likely than not in medical

5   probability.  It just kind of makes sense to me.

6          If something like this happens to somebody

7   and they get better, maybe, they would have to go

8   through the testing again; but I'm not sure that they

9   would be completely excluded from ever having that job

10  again.  I think they'd just have to go back through the

11  rigmarole.

12          Just like your question about me, if I was

13  out six months or a year and I don't -- I think this is

14  much more vaguely regulated than the medical profession,

15  but I would bet this hospital would make me re-apply for

16  privileges, probably have me being mentored by another

17  surgeon for six, eight, ten cases.  So it would be

18  extremely inconvenient, but I don't think the hospital

19  or the -- is it the Coast Guard who regulates this

20  you're saying -- whoever regulates this would say "You

21  can't ever come back under any circumstances."  They

22  might make him jump through a whole lot more hoops.

23  That's my guess.  I don't know the rules.

24     Q.   (BY MR. PAXTON)  I appreciate that guess, and

25  what I'm getting at with my question is:  You're --

1    you're not really qualified, one way or another, to

2    render an opinion on whether he will be able to jump

3    through those hurdles down the road and regain that

4    position and whether it's even allowed?

5        A.   Well, I'm not qual-

6            MR. SIAHATGAR:  Object to form.

7            THE WITNESS:  I'm sorry?

8            MR. SIAHATGAR:  I'm just objecting to form.

9        A.   Okay.  I'm not qualified to tell you whether

10   it's really allowed or not.  I don't know the rules.  I

11   think if he got better and there was a path for him to

12   jump through the hurdles, I think he could jump through

13   the hurdles.  But I don't know what those hurdles are,

14   so this is all very speculative.

15       Q.   (BY MR. PAXTON)  It's -- yeah, it's speculative

16   and, again, it's based on something that you profess

17   you're not familiar with, fair?

18       A.   It's speculative and, yeah, I'm not familiar

19   with the regulations, so that's true.

20       Q.   And -- and what I took from your answer was:

21   You think just common sense with someone as well

22   established as yourself or Captain Rivera that, perhaps,

23   allowances would be made to re-insert them into the

24   field?  Is that what your answer was?

25       A.   Yeah, well, I mean, as far as I'm concerned,

1  you know, it wasn't -- I was fortunate and it wasn't
2  that long.  And, so, it's probably not the same thing.
3  It's just that I had those same types of symptoms, so I
4  know what they are.
5            Yeah, I -- my -- let me put it:  My opinion
6  is I would think there would be some path for him to get
7  his license back if he improves to the point where it
8  was safe for him to work.  I don't know what that path
9  would be.  I don't know what it is.  I have no knowledge
10  of it.
11       Q.  And you don't have any reason to differ with
12  someone else in this case who might be qualified in that
13  area of regaining his commission who testifies
14  differently?
15            MR. SIAHATGAR:  Object to form.
16       A.  Ooh -- I don't know.  It would depend on what
17  that person exactly said.
18       Q.  (BY MR. PAXTON)  And -- okay.  And I'm going to
19  ask you if it comes down to an interpretation of
20  regulatory board governance and what the process
21  consists of and what an organization's articles of
22  agreement involve, what benefit would you, as a
23  neurosurgeon, bring to that conversation, Dr. Baskin?
24       A.  None unless I had an opportunity to see those
25  regulations and opine on them.

1　　　　　　　THE WITNESS:　Can we go off the record for

2　a second?　Someone's calling me.

3　　　　　　　MR. PAXTON:　Sure.

4　　　　　　　THE VIDEOGRAPHER:　The time is 6:21 p.m.

5　We're off the record.

6　　　　　　　(Whereupon, a recess was taken

7　　　　　　　　from 6:21 p.m. to 6:28 p.m.)

8　　　　　　　THE VIDEOGRAPHER:　The time is 6:28 p.m.

9　and we are back on record.

10　　　　Q.　(BY MR. PAXTON)　Okay.　Dr. Baskin, I notice in

11　front of you you've got very large two sets of binders

12　in front of you?

13　　　　A.　Yes.

14　　　　Q.　And this -- these two binders represent your

15　entire file in this case; is that correct?

16　　　　A.　Yes.

17　　　　Q.　Okay.　And do these, also, include copies of

18　any medical literature or journal documents that you may

19　have referred to in rendering your opinion?

20　　　　A.　No.

21　　　　Q.　Did -- one of your opinions is that there is

22　such a thing as partial CRPS or partial RSD or maybe an

23　individual might not have all of the symptoms in order

24　to be become "full blown"?

25　　　　A.　Well, I think -- I thought I clarified

1  semantically.  Yeah, I did say that, but I think another

2  way of saying it is they don't meet the diagnosis, but

3  they have elements of the diagnosis --

4      Q.  Okay.

5      A.  -- which is what I think is the case here.

6      Q.  Okay.  And, so, are there any studies or

7  medical literature or journals that you referred to in

8  reaching that opinion?

9      A.  No, it's based on my knowledge, training, and

10  experience with my own patients.

11      Q.  How many -- you're primarily a neurosurgeon who

12  specializes on the neck and up; is that correct?

13      A.  Well, recently, but for many years -- I still

14  do lumbar spine surgery.  I mean more of my practice is

15  intracranially, about 60/40 cranial spine.

16      Q.  How -- throughout your 40 years of practice,

17  how many cases of -- or how many patients with RSD or

18  CRPS have you treated?

19      A.  Oh, well -- close to 100.

20      Q.  Okay.  And those of 100, how many have you

21  followed?

22      A.  Well, all of them have been followed for a

23  period of time.  I can't give you statistics on how long

24  each one's been followed.  I don't know.

25      Q.  Of those 100, how many of those cases resolved,

1   if you know?

2       A.  It's -- I don't know the answer to that.  It

3   depends on how severe they were and a lot -- I can't

4   answer that with accuracy today.

5       Q.  Okay.  And insofar as your opinion on whether

6   or not Captain Rivera will improve over time, did you go

7   back and look at those 100 CPRS cases and evaluate what

8   percentage of those patients recovered and were able to

9   go back to work in some capacity in reaching your

10  opinion, then, at sometime in the future Captain Rivera

11  will be able to do so?

12      A.  I didn't specifically go back over the 100

13  patients or so.  I don't know that I even have that data

14  or nobody does.  I did, though, refer to my knowledge

15  and experience with patients who have elements of the

16  syndrome, but not full blown; and the majority of those

17  do go back to work and function.

18      Q.  How many of the 100 patients you referred to

19  had elements of CRPS, but not full-blown CRPS?

20      A.  Or didn't have CRPS, depending on the

21  semantics.  I would say about 30 -- again, an estimate,

22  around 30 or 40 percent.

23      Q.  Okay.  And, so, of those 30, 40 percent, you do

24  or do not have records on what happened to those

25  patients throughout the course of your treatment?

1     A.   There are records, but I don't have them

2  accessible to me at this point.  I mean, we've been

3  through different kinds of medical record systems and it

4  would be next to impossible just to pull all that up.

5  But I have that in my head and that's what all doctors

6  do.  That's why we talk about doctors having experience

7  over time.  And my experience in those patients is more

8  likely than not they're going to significantly improve.

9     Q.  And I think my -- I appreciate that.  And my

10  question was along the lines of in terms of preparing

11  your report and your opinion testimony today, you did

12  not go back and look at those medical records and

13  determine what the outcome of those 30 to 40 percent of

14  patients with partial CRPS symptoms, what their recovery

15  model looked like?

16     A.  No, I used my recollection.

17     Q.  Okay.  Is it, also, your experience that

18  you're relying on in making the statement that

19  Gabapentin has -- plays no effect in the allodynia

20  response?

21     A.  "Gabapentin has no effect in the allodynia

22  response?"  Where -- where was that stated?

23     Q.  Let me see if I can refresh your memory.  One

24  of the things that you testified to when you were going

25  back and forth with Mr. Siahatgar was that when Captain

1  Rivera presented for his IME, he demonstrated that no

2  allodynia and you were asked whether or not if he was

3  under the influence of Gabapentin that that would block

4  the allodynia response?

5      A.  Well, I don't recall that testimony about

6  Gabapentin, no.

7      Q.  Do you know whether or not Captain Rivera was

8  under the influence or taking Gabapentin on the day that

9  you performed your IME?

10     A.  Yes, as far as I know, he was.  He told me he

11 was taking 600 milligrams of Gabapentin twice a day.

12     Q.  And can you tell the Judge in this case what

13 Gabapentin is and what it's used for?

14     A.  It's a medicine for neuropathic pain.  It

15 reduces transmission in nerves and the helps the pain --

16     Q.  Okay.  So --

17     A.  -- sometimes.

18     Q.  And, so, if Captain Rivera reported to his --

19 all of the doctors who examined him in this case that he

20 had a favorable, you know, response to Gabapentin, but

21 it made him drowsy, could his use of Gabapentin on the

22 day that he underwent his IME have explained why he

23 didn't have a respon-- the allodynia response?

24     A.  I suppose it's possible.  It's not that much

25 Gabapentin.  The full dose is 3,600 milligrams a day.

1  That's 1,200 milligrams, but I suppose it could have

2  improved it and made it better.  I don't know that it

3  would -- that dose would completely take it away.  I

4  suppose it's possible.

5      Q.  So, I'm going to ask you under the scenario

6  that if Captain Rivera was taking Gabapentin at the time

7  that he appeared for your IME and the Gabapentin was the

8  only thing that made him able to wear socks and shoes

9  and otherwise it was unbearable, which I think he has

10  related to other people in this case at one time or

11  another, could that have explained why you didn't have

12  an allodynia response when you examined him?

13      A.  It's possible.

14      Q.  Okay.  Have you ruled that out?

15      A.  There would be no way for me to rule that out

16  without seeing him additionally and taking him off the

17  Gabapentin and seeing what he's like on the Gabapentin

18  and off the Gabapentin.  And it wouldn't make sense to

19  take him off the Gabapentin if it was helping him

20  because that's part of the treatment.

21      Q.  All right.  And, so, if the Gabapentin is

22  working as far as the pain management, but the

23  Gabapentin is what prevents him from performing his

24  duties as a pilot, what is the out- -- what is the

25  approach that he should have taken in order to maintain

```
 1   his U.S. Coast Guard license and his commission?
 2        A.   Well, I don't know if that question is --
 3             MR. SIAHATGAR:   Okay.   Let me object to the
 4   form.
 5        A.   -- assumes things that are correct.   I mean, I
 6   don't know that his Gabapentin prevents him from
 7   performing at his job.   That's a low dose and even if it
 8   makes you drowsy initially, an overwhelming majority of
 9   people take 1,200 milligrams of Gabapentin a day are not
10   drowsy and can function well.   So I don't know how to
11   answer that question.
12             (Exhibit No. 3 marked.)
13        Q.   (BY MR. PAXTON)   Okay.   What I'm going to do is
14   I'm going to show you what has been Bates-labeled Rivera
15   959.
16             MR. PAXTON:   I think is this Exhibit 3 or
17   2?
18             THE REPORTER:   3.
19        Q.   (BY MR. PAXTON)   I've highlighted a section of
20   this.
21             MR. PAXTON:   There you go.
22             MR. SIAHATGAR:   (Receives Exhibit 3.)
23        Q.   (BY MR. PAXTON)   Dr. Baskin, what I'm going to
24   represent to you is this is a letter from Dr. Laura
25   Torres-Reyes, who's the Medical Director of the National
```

1    Maritime Center to Jay Rivera.  Have you seen this
2    letter before?
3         A.   I don't think so.  It was certainly written
4    after the time I saw Mr. Rivera, so I don't recall
5    seeing it, no.
6         Q.   Okay.  And, as far as you know, has
7    Mr. Siahatgar or someone from his office, have they sent
8    this to you and is it in your file, if you know?
9         A.   Not as far as I know.
10         Q.   Okay.  What I'd like to draw your attention to
11    and I'll just read the first paragraph.  It says "The
12    medical information you submitted in support of your
13    merchant mariner medical certification has been received
14    and evaluated at the National Maritime Center.
15              Careful consideration and review of all
16    available medical information reveals you have a history
17    of chronic regional pain syndrome with documented
18    inability to perform your duties due to chronic pain and
19    medication side effects.  We have determined, therefore
20    that you are medically unfit for your merchant mariner
21    certification -- medical certification under Title 46,
22    Code of Federal Regulations (46 CFR) Part 10, Subpart C.
23    Based on the medical information provided, you pose a
24    compelling and substantial risk of imminent harm to
25    maritime safety if you continue to operate under the

1   authority of your merchant mariner credential (MMC).

2   For this reason, you should not operate under the

3   authority of your MMC."

4              Okay.  Are you familiar with the method in

5   which mariners like Captain Rivera are required to

6   submit medical documentation to maintain their U.S.

7   Coast Guard credentials and licenses?

8      A.  Not specifically.

9      Q.  Okay.  Are -- I know that one thing you

10   reviewed in this case, because you referred to it in

11   your opinion, was this Navigation, and Vessel Inspection

12   Circular No. 04-08, Chapter 1.

13      A.  Okay.

14      Q.  Have you seen that document before?

15      A.  Probably, yeah.

16      Q.  Okay.  I'm sure it's in your file.  But do you

17   understand what NAVIC 04-08, as I'll refer to it, is

18   used for?

19      A.  Not -- not entirely, no.

20      Q.  Okay.

21      A.  Or I don't recall that.  I mean, I looked at

22   it, but it was in February.

23      Q.  I'm not -- I'm not going to try to put words in

24   your mouth, but it's a Coast Guard document that is

25   instructions for physicians who conduct physical

1  examinations on mariners to determine whether they're
2  fit or unfit.  So that -- those represent the guidelines
3  for whether a mariner can maintain his credential.
4  So -- and was that one of the documents that you
5  reviewed in preparing your report in this case?
6      A.  Yes.
7      Q.  Okay.  So, what I'd like to ask you about next
8  is going back to your report.
9      A.  Okay.  Let me do this.  I guess I'll give this
10  to you, huh (pointing to exhibits).
11      Q.  I asked you previously whether you remembered
12  Captain Rivera asking if there was anything that you
13  could do to help him pass his Coast Guard physical that
14  he had to take that was upcoming.  Do you -- do you
15  recall having a conversation with him about that?
16      A.  Not specifically.  He may have asked me that.
17  I don't recall.
18      Q.  Okay.  Now, one of the important things in this
19  case that I'm going to represent to you is that Captain
20  Rivera's loss of his license -- and this is a dispute
21  between us, but I'm trying to give you a little bit of
22  the flavor -- caused him to ultimately lose his State
23  Commission that was granted by the Governor of the State
24  of Texas to conduct pilotage, which allowed him to make
25  between -- again, this is for the dispute.  I'm not

1   trying to give evidence --

2       A.  Right.

3       Q.  -- between 6- and 800,000 or more dollars a

4   year.  And now he has lost that commission.  It's gone.

5   And I know we had a little conversation earlier about

6   whether he could get it again.  So, I'm only -- I'm only

7   going through that to try to go back and ask you about

8   your opinion.  If --

9       A.  Can we go off the record one second.  I've just

10  gotten another call.  Would that be okay?  I'll make

11  it --

12      Q.  Can we finish --

13      A.  Okay.  Finish the question.

14      Q.  Oh, that's fine.

15      A.  Finish the question.  That's fine.

16      Q.  And, so, I want just to finish the question

17  and, then, I don't have a problem going off the record.

18      A.  Sure.

19      Q.  If at the time, you performed your independent

20  medical examination, did you know of a pain management

21  specialist that could -- that you could have referred

22  Captain Rivera to that you think would have given him a

23  different outcome than what he received with Dr. Liu and

24  the Institute of Precision Pain Management?

25      A.  Possibly, but my role as an independent medical

1  examiner is not to make the referrals.  In fact, I think
2  the rules are pretty specific that I'm not supposed to
3  do that; because, then, I would be assuming the role of
4  a treating doctor.
5           So, yeah, there's -- there are people that
6  I work with who are very familiar with complex regional
7  pain syndrome.  But, you know, my -- my understanding of
8  the rules of engagement of this -- and you probably know
9  them better than me -- is that I'm not supposed to make
10  referrals to anybody because I'm not a treating
11  physician.
12           If he wanted to come and see me as a
13  treating physician, I'd be happy to do that -- well, I
14  don't know if I can do that; but if I could do that
15  legally, then, I would, you know, take that approach.
16           THE WITNESS:  Can I go off the record now?
17           MR. PAXTON:  Yeah, now.
18           THE WITNESS:  I just want to answer this
19  call.
20           MR. PAXTON:  -- that's fine.  I just wanted
21  to make sure you were finished.
22           THE WITNESS:  Okay.
23           MR. PAXTON:  I'll pick it up.
24           THE VIDEOGRAPHER:  The time is 6:42.  We're
25  off the record.

```
1              (Whereupon, a recess was taken
2          from 6:42 p.m. to 6:46 p.m.)
3              THE VIDEOGRAPHER:  The time is 6:46 p.m.
4    and we are back on record.
5              (Exhibit No. 4 marked.)
6         Q.  (BY MR. PAXTON)  Dr. Baskin, I'm going to show
7    you what's been marked as Exhibit No. 4 and I -- it's
8    marked --- don't pay attention to the cover page.  What
9    I'd like to ask have you do is turn to the second page.
10   The first page is just a cover letter for transmittal
11   purposes to the United States Coast Guard.
12        A.  Okay.
13        Q.  What I'm going to represent to you -- and,
14   obviously, opposing Counsel is free to disagree with me
15   on what this is -- is what's called a U.S. Coast Guard
16   719K.  It's a government document that physicians use to
17   complete what's called an annual physical for pilots,
18   like Captain Rivera.
19        A.  Okay.
20        Q.  Have you looked at any of -- have you reviewed
21   any 719K's in this case referring -- regarding Captain
22   Rivera?
23        A.  I'm not sure.  I don't think so.  It's
24   possible, but I don't think so.
25        Q.  I think you may have, but I don't know if you
```

1    reviewed this one and that's why I wanted to --

2        A.   Yeah, I don't -- let's put it this way:  I

3    don't have an independent recollection of it.

4        Q.   Okay.  And, so, Dr. Baskin, what I'm going to

5    represent to you is that these forms are used by the

6    National Maritime Center, Dr. Laura Torres that we

7    talked about earlier with her letter, in evaluating

8    whether a mariner is safe physically.  They're

9    physically competent to go out and do the job, whether

10   it's for medication purposes or for physical

11   impairments.

12                  So what I'd like to draw your attention to

13   is turn to page -- if you've got another call, go ahead.

14       A.   No, no, I'm going to look something up here --

15       Q.   Sure.

16       A.   -- relating to what you're doing, but go ahead.

17       Q.   Okay.

18       A.   I'm just looking the medicine up.

19       Q.   It's been -- it's Page 4 of 9 at the top and

20   then it's Rivera --

21       A.   Yeah, I know you were going to go there.  Let

22   me just -- hang on one second.  I want to look up --

23   there's one medicine here that I think I know, maybe, by

24   another name.  All I'm doing is looking at a drug

25   database to make sure I know what that medicine is;

1    because I think you're going to ask me about medicines.

2    Okay.  Very good.  That's what I thought.  All right.

3         Q.  What I'd -- what I'd like to draw your

4    attention to is on the right-hand column, starting with

5    45 down to 88.

6         A.  Right.

7         Q.  There's "yes" and "no" boxes.  And, so, there's

8    a number of boxes that are checked "yes" and, then,

9    there's explanations for those conditions and a comment

10   at the bottom.  And, so, what -- what I'd like to do is

11   ask you item by item if you disagree that any of these

12   items --

13        A.  Okay.

14        Q.  -- existed or manifested in Captain Rivera when

15   you examined him.  So 49 is "Fractures requiring

16   surgery."  At the time you examined Captain Rivera, he

17   had had a fixation of his -- the fifth left metatarsal;

18   is that correct?

19        A.  Yeah, he had a -- he had a fracture requiring

20   surgery.

21        Q.  Okay.

22        A.  He doesn't have a fracture now requiring

23   surgery, but -- so I -- I mean it depends on the

24   semantics, but that's my opinion about that.

25        Q.  Fair enough.  And, so, there's a lot of

1    different interpretations of whether you should check

2    "yes" or "no" there, right?

3       A.  Well, yeah, I mean, does it mean in the past or

4    now or what.  I don't know.

5       Q.  Well, if you look at the top, it says "Identify

6    the Condition" and it says "List Any Limitations, Is the

7    Condition Controlled, Approximate Date of Diagnosis,

8    Prognosis, and Additional Information"?

9       A.  Right.

10       Q.  Okay.  So, then, at the bottom, you have to

11   fill in some additional information with the physician's

12   help.  So "fracture requiring surgery," I think we can

13   all agree in this case that that fracture has been

14   resolved, correct?

15       A.  Correct.

16       Q.  Okay.  "Limitation of any major joint," would

17   you agree that Captain Rivera, at least when you

18   examined him, had a limitation in his left foot lower

19   extremity in the -- in the joint?

20       A.  In the joint, no.

21       Q.  Okay.  Would it be fair for a layperson, like

22   Captain Rivera, to err on the side of caution and check

23   "yes" there?

24       A.  Possibly.

25       Q.  Okay.  "Bone or joint surgery - 51," again,

1  that's been resolved in this case; is that fair?

2       A.  He had bone and joint surgery.  So if that's

3  what it means, yes.

4       Q.  So "54 - Swollen or painful joint," in the area

5  of his left foot that was swollen and sometimes painful,

6  that would be fair enough for him to check "yes"?

7       A.  I don't think the joint was swollen or painful.

8  I saw no evidence of that.  He had some pain in the

9  foot.  I don't know that I've ever seen -- I've never

10  seen any swelling.  Maybe he does or maybe he thinks

11  it's there.  All right.  I mean, he's checking these

12  conditions.

13            So I -- you know, I partially agree that

14  he has pain -- I think he has in his foot.  I don't know

15  if -- I don't think it's in the joint.  When I examined

16  him, it wasn't in the joint and I didn't see any

17  swelling and that's about all I can say about it.

18       Q.  Did -- did he difficulty walking or climbing?

19  I'm skipping down to 59.

20       A.  He didn't have difficulty walking when I saw

21  him.  He might perceive that he would have difficulty

22  walking or climbing on a boat.

23       Q.  Okay.  Have you ever seen a video or do you

24  understand how these individuals, like Captain Rivera,

25  board and disembark from vessels at sea?

1      A.   My understanding is that there's this sort of

2  crane and a basket and they kind of get loaded into a

3  basket and the basket -- they swing the crane over and

4  lower basket onto the deck of the boat.

5      Q.   Okay.  I'm -- I'm going to, just for your own

6  information, tell you that that's a completely different

7  type of method that some offshore individuals use.  Have

8  you ever heard what is called a Jacob's ladder?

9      A.   A rope ladder?

10      Q.   It's a rope ladder.

11      A.   Yeah, uh-huh.

12      Q.   And there are about -- they're anywhere from

13  about 25 to 30 meters in length and they're hung from

14  the side of the ship's rail over the side of the ship.

15  And, so, the small pilot boat will pull up alongside the

16  tanker or the ocean-going ship and the pilot will grab

17  onto both of the rope -- both sides of the rope and with

18  rungs that are about this long and they're statutorily

19  required -- I'm just going to try to give you a picture

20  of what this is leading up to my question.

21            They have to climb up at least 20 meters in

22  some cases on these rope ladders and, then, when they

23  descend and get off the vessels at sea, they have to get

24  off and then step or jump from the ladder onto the pilot

25  boat.  Okay.

1      A.   They have to jump?  I mean how -- doesn't the

2  rope go down to the boat?

3      Q.   Okay.  Sometimes, you know, at sea, vessels --

4  they have waves, right?  And sometimes some waves are

5  rougher than others.  And, so, if you've got a vessel

6  that is moving alongside a vessel and it falls away from

7  the larger ship, you can understand a situation where an

8  individual may fall some distance from the --

9      A.   Yeah, I know.  But I think that if I had a

10  rope --

11              MR. SIAHATGAR:  Object to the form.

12      A.   -- ladder, I would make sure it was long enough

13  the he wouldn't -- the person wouldn't be hanging in the

14  air if the ship went down, but okay.  I mean, I don't

15  know.  It just makes sense to me to have a short rope

16  ladder.

17      Q.   (BY MR. PAXTON)  Sure.

18      A.   Okay.  I get it.  Okay.  It's a rope ladder.  I

19  get that, yeah.

20      Q.   Fair enough.  I'm not trying to argue with you

21  about what happens.

22      A.   Yeah.

23      Q.   I just -- I wanted to get a basis for your

24  understanding of what it was that he did as a pilot --

25      A.   Okay.

1    Q.  -- in terms of boarding and disembarking.

2    A.  Okay.

3    Q.  So as you -- now understanding that that's how

4 he boards and disembarks vessels offshore, it would be

5 fair for him to say "difficulty walking or climbing" and

6 check that?

7              MR. SIAHATGAR:  Object to form.

8    A.  I think it would be fair for him to perceive

9 that he would have that difficulty, yes.

10    Q.  (BY MR. PAXTON)  Okay.  Is it accurate for him

11 to check "Sciatica or nerve pain" for 60?

12    A.  Nerve pain, yes and -- so "yes."

13    Q.  Okay.  And 61 - "Other bone/joint disorder,"

14 again --

15    A.  Not really, but I don't know that he would know

16 that -- I don't -- I think he wouldn't know how to fill

17 that out.  I'm not sure I would know how to fill that

18 out exactly, you know.  In other words, "Is elements of

19 the deafferentation pain syndrome part of a bone or

20 joint disorder?"  "No, it's a nerve disorder," but --

21 so, I guess, strictly speaking, he doesn't have that.  I

22 wouldn't fault him for putting that on there.

23    Q.  Okay.  "Impaired balance, or balance disorder

24 or difficulty"?

25    A.  I didn't see any evidence of impaired balance.

1    Q.  Did Captain Rivera report to you that while he

2    was taking Gabapentin that he often experienced

3    dizziness?

4    A.  No, I don't recall that.

5    Q.  Do you know if that's a side effect of

6    Gabapentin?

7    A.  It's a potential side effect.

8    Q.  Okay.  And "Vertigo or dizziness," same

9    question, could Gabapentin cause that if that's what

10    you're using?

11    A.  It could.

12    Q.  And, then, "Numbness or paralysis," as far as

13    what he relayed to you during your independent medical

14    examin- --

15    A.  He has a little bit of numbness.  He doesn't

16    have any paralysis.

17    Q.  Fair enough.  I'm not suggesting that he does.

18    And, then, the next one that he checked was "Other brain

19    or nerve disease."  Does he have a nerve disease?

20    A.  He has a nerve dysfunction, so I think it's

21    reasonable that he checked that.

22    Q.  Okay.  And, so, as far as reporting this, in

23    the regulatory framework in order to maintain his

24    license, would this be a report that is erring on the

25    side of caution and reporting symptoms that he

1  manifested or something that is exaggerating symptoms

2  that he possessed at the time he underwent this

3  physical?

4          MR. SIAHATGAR: Objection to form.

5      A.  Those two things are not mutually exclusive.  I

6  mean exaggeration of symptoms could lead him to report

7  something that's erring on the side of caution, so I

8  don't know how to answer that question.

9          I think that if you asked me is he erring

10 on the side of caution, "yes," maybe.  But I don't find

11 what he said here to be unreasonable from his point of

12 view.

13     Q.  (BY MR. PAXTON)  Okay.  And that's fair enough.

14 And the "Condition" and "Comment" section at the bottom,

15 he goes on and explains some of these.

16     A.  Is that his writing or the doctor's writing

17 or --

18     Q.  I'm not sure if it is or not, but I'm just --

19 for purposes of this report, I'm asking for what's your

20 opinion of this report is --

21     A.  Okay.

22     Q.  -- and whether it's accurate or not.  He has

23 49, 50, and 51.  He explains "Left foot 5th metatarsal

24 fracture & fixation, right knee ACL reconstruction"?

25     A.  I don't recall the right knee ACL

1    reconstruction.   Is that part of what was done?

2        Q.   I'm going to just represent to you it was a

3    prior injury well in the past.

4        A.   Okay.   Okay.

5        Q.   Condition No. 54, he says "Left foot CRPS"?

6        A.   Well, he's been told that, so that's why.

7        Q.   Okay.   So 54 --

8        A.   I don't agree that he has that, but he's been

9    told that.

10       Q.   Okay.   And let me go -- let me backtrack a

11   little bit to something that happened before we had one

12   of the brief interruptions.

13            If the Gabapentin use masked the allodynia,

14   does that change your opinion on whether or not he has

15   CRPS?

16       A.   No, because it doesn't meet some of the other

17   criteria, either.

18       Q.   So, he had the coolness touch, right?

19       A.   Correct.

20       Q.   Okay.   He had -- did he have hair loss?

21       A.   I didn't see any hair loss.

22       Q.   Okay.   But others have reported that he's had

23   hair loss.   But if you didn't observe it, that's --

24       A.   I didn't see it.

25       Q.   Okay.   And so -- but I think that you testified

1  that really what the hallmark is, is the allodynia, the

2  hypersensitivity?

3  　　　A.　Well, I don't recall saying it was the

4  hallmark.　I said it was an important symptom, but I

5  talked about four symptoms, which is the allodynia, the

6  edema or swelling, the skin color changes, the

7  temperature changes, and the decrease range of motion or

8  weakness or tremor or hair or nail or skin loss.

9  　　　　　　So I didn't see what's called motortrophic.

10  I did see the pseudomotor, the temperature change, and

11  the skin color change.　I didn't see the edema and I

12  didn't see the allodynia.

13  　　　Q.　And, so, in terms of your original opinion, you

14  opine that he has some symptoms of CRPS, but not all of

15  them; and I think you were kind of comparing it on a

16  scale more likely than not he doesn't have CRPS.

17  　　　　　　And, so, what I'm asking about now -- and I

18  think you've answered it, but I want to make sure I'm

19  clear -- is that if the Gabapentin masked the allodynia

20  and he does have a hypersensitive response when he is

21  not taking Gabapentin, does that shift your opinion back

22  towards he may have CRPS?

23  　　　A.　No, but it would give you another -- another

24  criteria that he met.　He still hasn't met enough

25  criteria even by the Budapest criteria for CRPS, but it

1    would be another element that he would have.

2        Q.   Okay.  So, then, under -- the next 63, 64, 65,

3    "dizziness, disorientation, drowsiness due to meds for

4    CRPS"?

5        A.   Okay.

6        Q.   Okay.  And that -- if he's experiencing those,

7    it would be fair for him to report that and honest for

8    him to report that to the examining physician?

9        A.   Sure.  One of the meds he takes is a pain med,

10   so it could be due to that, the Tramadol.  It's a

11   narcotic, so -- but, yeah, I think it would be fair for

12   him to report it as a whole.  I don't think he would

13   necessarily know which one was causing it.

14       Q.   Okay.  So, on the next page, which is Page 4 of

15   9 -- and I don't know why it says "4 of 9" on both of

16   these.

17       A.   It says "4 of 9" on both pages, but I --

18       Q.   Yeah.

19       A.   -- I assume we're on the same page which says

20   "Medications" at the top.

21       Q.   That's -- yeah, it's Bates-numbered 969 at the

22   bottom.

23       A.   Yeah, okay, I got it.

24       Q.   It lists the medications that he's using.

25       A.   Right.

1    Q.   And, so, when you -- the Gralise, that's a --

2  that's a narcotic as well, isn't it?

3    A.   No.   Gralise is Gabapentin.   It's just a

4  different form of it, which I was not sure what it was.

5  So, it's the Tramadol that's the narcotic.

6    Q.   Sure.   I knew that that was a narcotic, but I

7  wanted to make sure.   What effect does the Cymbalta have

8  on --

9    A.   Well, Cymbalta -- let me make sure I remember

10  what that is.   I know these drugs by their generic name,

11  not their trade name.   You see, it's duloxetine.   It's a

12  -- I believe.   Let me make sure that I'm not testifying

13  correctly.   Yeah, it's a serotonin and norepinephrine

14  re-uptake inhibitor.   So what does that mean?   It means

15  there are certain neurochemicals that are taken back up

16  into a nerve so the nerve can continue to fire and it

17  reduces that uptake.   So it reduces the firing in the

18  nerve.

19          It can be used as an antidepressant,

20  because serotonin, one of those chemicals is involved in

21  depression, but it can also be useful in this kind of

22  nerve pain syndrome.   So it's not a narcotic.   It does

23  have sedating effects -- it can have sedating effects.

24  It's one of the side effects.   So I suppose it could be

25  the Cymbalta as well.

1      Q. In your 100 patients that you treated for CRPS

2 in the past, did you monitor or follow the incident rate

3 for depression in those patients after they became

4 diagnosed with CRPS?

5      A. Well, I don't know if I monitored it. I

6 certainly noted it; and to be fair, a fair number of

7 them get depressed because it's a difficult situation to

8 deal with.

9      Q. And is it -- is it an accurate statement that

10 for someone that is experiencing CRPS that it's a very

11 debilitating condition that is difficult for many

12 patients to cope with?

13      A. Well, depending on how severe the CRPS, it can

14 be debilitating. If it's debilitating, it can certainly

15 be difficult to cope with.

16      Q. Okay. In your experience treating patients

17 with CRPS, what was the percentage of patients that

18 responded to Neurontin or Gabapentin or some other sort

19 of medicated treatment?

20      A. Depending on the severity, the severe cases

21 generally don't respond. The more mild cases more

22 likely than not will have some response, ranging from,

23 excuse me, a little bit better to a lot better.

24      Q. Okay. And, so, along those lines, will that

25 also fall in line with your opinion that if Captain

1    Rivera had it, he had a mild version of it?

2         A.  Well, I don't think he had it; but I think he

3    had deafferentation pain, nerve-based pain for which

4    these medications can, also, be effective.  You don't

5    have to have CRPS to have these medicines help.

6         Q.  Doctor, let's take the label off it.  Whatever

7    it was that Captain Rivera had, it was significant

8    enough that it affected his ability to maintain his

9    Coast Guard license.  Would you agree with that?

10              MR. SIAHATGAR:  Object to the form.

11        A.  Well, yeah, ultimately I would agree with that.

12   In other words, he went on a bunch of medications --

13   and, again, I'm assuming this because you seem like an

14   honorable guy -- assuming the fact he was on all these

15   medicines and that's why the doctors said he couldn't

16   have his license -- so, you know, he had the fracture

17   which led to some agree of this nerve problem, whatever

18   you want to call it, which led him to be on medicines

19   which led them to say he couldn't have his license, yes,

20   assuming all those connections.

21        Q.  (BY MR. PAXTON)  Okay.  And, then, the -- it's

22   Bates-labeled 971.  It says "Page 7 of 9" at the bottom.

23        A.  Hang on a second here.  Okay.

24        Q.  Again, this -- I'm not sure who entered this,

25   but it says "Please make numbered comments on abnormal

1  systems/organs."

2      A.  Yeah, I would think this was a medical

3  professional just by some of the words, you know, dorsum

4  of the foot.  Nobody talks about -- maybe.  I don't

5  know.  It's a guess.

6      Q.  So --

7      A.  "Antalgic gait," I don't think people know what

8  that is.

9      Q.  You probably have a better ability to review

10  and parse this out than I do, so what I'd like for you

11  to do is if you could read that aloud and, then, explain

12  to us what this -- these comments mean.

13      A.  Well, I think we can skip the first line.  It

14  has to do with his knee in the past.

15      Q.  Fair enough.

16      A.  A fracture of the left metatarsal, it's a foot

17  bone for nonunion sur- -- well, I assume that means non

18  U surgeon -- surgery.  I think that means he's had a

19  nonunion surgery.

20          ORIF left 5th metatarsal fracture, so

21  that's an open reduction and internal fixation, which is

22  the surgery he initially had.

23          Diagnosed as having chronic regional pain

24  syndrome, left foot.  I don't really know what that is,

25  but it's referring to whatever it is he has, as you put

1  it, at one time.

2          Currently under care of neurologist and

3  pain management specialist -- pretty obvious.

4          Current meds Gabapentin 300 milligrams

5  twice a day (causing drowsiness) so that whoever wrote

6  this thought that's what it was.  Cymbalta, milligrams

7  twice a day.  Tramadol, 50 milligrams at bedtime, takes

8  over-the-counter vitamin D and calcium, has had

9  sympathetic nerve block -- or wait a minute.  So he

10  says -- he states Tramadol causes disorientation.  So

11  that's the pain medicine causing the disorientation.  So

12  that's kind of interesting.  I don't know how you would

13  know which one caused which, but at least whoever wrote

14  this thought the pain medicine was, at least, causing

15  disorientation.

16          Then it says has had two sympathetic nerve

17  blocks without improvement, complains of pain in left

18  foot, aggravated by weight bearing, altered sensation.

19  I think that's left, "L" -- it's kind of hard to see --

20  it's cut off -- foot, exam left -- I guess that's foot.

21  Coolness of left foot, good pedal pulses.  That's the

22  artery pulses.  Loss of hairs in the dorsum of the foot.

23  Tenderness in the dorsum of the foot.  Unilateral one

24  side.  Pain to light touch of the dorsum of the foot.

25  And antalgic, which means an abnormal gait due to pain.

1       So I don't know who wrote that, but I don't

2  think Mr. Rivera wrote that.  Maybe he did.

3       Q.  Okay.  So if the -- these would appear to you,

4  at least, in your review of the record that this is

5  something that a medical practitioner would write down?

6       A.  I think so.  I mean he could have been a nurse;

7  but just some of the words, antalgic gait, dorsum of

8  foot -- I mean Mr. Rivera is a pretty sophisticated and

9  educated guy, maybe he wrote it, but I doubt it.

10       Q.  I'm not asking you to guess on who wrote it.

11  I'm asking -- what I want to ask you about is these

12  symptoms on his exam of the left foot.  So he notes

13  coolness, right?

14       A.  Right.

15       Q.  It says "left foot good pedal pulses."  Does

16  that have any impact on whether or not someone has CRPS?

17       A.  No.

18       Q.  Okay.  Let's --

19       A.  Well, it can, but in very end stage disease,

20  the arterial pulses can be reduced, but not generally.

21       Q.  Loss of hair, dorsum of foot, is that a

22  symptom?

23       A.  That can be a finding, yes.

24       Q.  Tenderness, dorsum of foot, pain to light

25  touch, I can't -- I don't know what that "unilateral

1    aspect" means or "unlateral"?

2        A.   Yeah, I don't know what that means, either.

3    So, we're together on that.

4        Q.   But that's a -- pain to light touch is

5    something that is -- can be allodynia?

6        A.   Right, can be.

7        Q.   Can be.   And antal- -- I don't know that is.

8        A.   Antalgic gait.

9        Q.   Antalgic gait?

10       A.   It means an abnormal walking.   That's generally

11   due to -- antalgia usually refers to you're not walking

12   normally because it hurts.

13       Q.   Okay.

14       A.   It can refer to other things, but that's the

15   most common use of it.

16       Q.   Okay.   So at least in terms of the Budapest

17   criteria -- and, again, I think for purposes of whatever

18   this document is, it doesn't matter what condition he's

19   labeled with, he has conditions that are impairing him.

20   Is that fair?

21              MR. SIAHATGAR:   Object to form.

22       A.   He has problems that -- assuming these are --

23   were all there, which I don't -- you know, I don't know

24   who's filling it out -- that these would produce some

25   degree of impairment, sure.   He had findings here that I

1    didn't see when I examined him.  This is a different

2    date of the exam.  I don't really know when it was.  I

3    guess it is in June or something.

4         Q.  (BY MR. PAXTON)  If you look on Page 9 of 9,

5    Rivera 973, at the bottom, it's got -- it says

6    "Verifying Medical Practitioner - Recommendation" and it

7    says 6-20-2018?

8         A.  Right.  So, it was after I saw him --

9         Q.  Yeah.

10        A.  -- a number of months after I saw him.

11        Q.  Okay.  And, so, what Dr. Moloney has checked

12   here at the top is it says "Not Recommended Competent

13   (explain in comments)?

14        A.  Go ahead.

15        Q.  And, so, Dr. Moloney states "Due to chronic

16   left foot problems and medication side effects, it is my

17   opinion that the applicant is unable to perform the

18   tasks required for ordinary and emergency shipboard

19   function at this time."

20             Do you have any reason to disagree with

21   what Dr. Moloney found in this June 20, 2018 physical

22   examination?

23             MR. SIAHATGAR:  Object to the form.

24        A.  Well, I don't have any reason to agree or

25   disagree.  I have no way of independently verifying what

1    Mr. Rivera's condition was on that date; so with that
2    caveat, no.
3        Q.  (BY MR. PAXTON)  Okay.  And -- all right.
4    Let's see.  When was the -- when was the last time --
5        A.  One second.  I'm sorry.  Is this an exhibit?
6    Do I need to give it to this young lady?
7            MR. PAXTON:  It is.  I think that's Exhibit
8    4.
9            THE WITNESS:  Okay.
10            MR. PAXTON:  Is that right?
11            THE WITNESS:  Here you go.  That way we
12    won't -- or we'll lose them later.  Okay.
13        Q.  (BY MR. PAXTON)  How many of your 100 patients
14    that you've treated that you've diagnosed with CRPS, how
15    many of them have undergone a spinal cord stimulator
16    implantation?
17        A.  Well, probably between 30 to 40 percent.
18        Q.  Okay.  Do you know what the recovery window is
19    for spinal cord implantation surgery?
20        A.  It's really short.  I mean people go home often
21    the same day or the next day.  It's three or four weeks
22    most -- at most.
23        Q.  Okay.  Did -- do you know of any -- what's the
24    success rate of spinal cord stimulators, if you know,
25    and if you're qualified to say?

1    A.   They're greater than 50 percent.   The

2  literature is quite variable about it, but for focal

3  CRPS or focal deafferentation pain, which means just in

4  one spot, not diffusely through the body, the success

5  rate is around 60, 70 percent.

6         Now, when it's more diffuse and spreads to

7  the whole -- both legs and all that, then, it's not very

8  successful.

9    Q.   Did you -- I'm just curious about this because

10 it seems like it was something that was in the air about

11 it, but did you watch the 60 Minutes episode, either

12 last weekend or the weekend before, about spinal cord

13 stimulator implantation --

14   A.   No.

15   Q.   -- and the success rates?

16   A.   No, I didn't.

17        MR. SIAHATGAR:   I didn't, either.

18   Q.   (BY MR. PAXTON)   Do you know if there are any

19 negative side effects associated with spinal cord

20 implantation and the risks?

21   A.   Sure.

22   Q.   Can you tell us what those are?

23   A.   Infection.   A good surgeon's infection rate is

24 less than 5 percent.   There is a small risk, but a real

25 risk of a hemorrhage since the wire is inserted, you

1  know, in a way blindly.  In other words, you see where

2  it is on X-ray, but you don't see the vessels.  You can

3  hit a vessel and there can be bleeding.  And, rarely,

4  I've seen three -- two or three cases of people being

5  transiently paralyzed from the blood clot pressing on

6  the spinal cord.

7          Fortunately, on all the cases I've seen,

8  two of them were not cases that were done here.  They

9  were done elsewhere.  If you operate promptly and remove

10 the blood clot, it goes away; but that's a risk.

11     Q.  And when you consult -- or when you performed

12 your independent medical examination with Captain

13 Rivera, did you express to him that he should -- that he

14 should seek out and undergo a spinal cord stimulator?

15     A.  Again, I don't think so.  I might have

16 mentioned it; but I would not emphasize it because,

17 again, I'm not a treating doctor.  I'm not really

18 supposed to make recommendations for treatment.  If

19 people -- I don't have an independent recollection.

20          If people ask me, I'll say I'm going to put

21 my opinion in the report and you can talk to your

22 lawyers about it and see what you think, but I don't

23 remember.  I don't think so, possibly.

24     Q.  Is it your opinion -- or is it your opinion

25 that had he undergone spinal cord stimulation

1  implantation that he would still have his U.S. Coast

2  Guard License and State Commission today?

3      A.  Well, I don't know the answer to that because,

4  as you pointed out, I'm not aware of all of the

5  regulatory issues involved in getting it.  It's my

6  opinion and it's more likely than not he would have

7  significant improvement in his symptoms to a point where

8  he might be able to regain the license.  But I -- you

9  know, I'm taking you at your word about all these other

10  regulatory things.  I -- and, therefore, I'm not

11  qualified to talk about that.

12      Q.  Sure.  And I think it would be fair in just the

13  same way for someone to come in and second-guess your

14  ability to return to work as a surgeon under the regular

15  statutes --

16      A.  Correct.  I mean it would be up to the hospital

17  and what their policies are and somebody from the

18  outside really wouldn't know that, you know.  So, yeah,

19  sure.  I guess that's true.

20              MR. PAXTON:  Okay.  Thank you, Dr. Baskin.

21  Pass the witness.

22              MR. SIAHATGAR:  I just have one quick

23  question, Dr. Baskin.

24              THE VIDEOGRAPHER:  Your mike.

25              MR. SIAHATGAR:  Microphone?

1    THE VIDEOGRAPHER:  Yes, sir.

2    MR. SIAHATGAR:  You don't think my voice

3  carries enough?

4    (The time is 7:16 p.m.)

5    F U R T H E R   E X A M I N A T I O N

6  BY MR. SIAHATGAR:

7    Q.  Dr. Baskin, the questions I was asking you

8  today with regard Mr. Rivera's condition, options that

9  he has in the future, your view and all the testimony

10  you've provided is with regard to his physical condition

11  and the improvements of his physical condition that he

12  may have in the future should he pursue these different

13  options?

14    A.  Correct.

15    Q.  All right.  In other words, the testimony

16  you're giving you weren't saying whether or not from a

17  regulatory standpoint if he would re-qualify for, you

18  know, any kind of profession or pass any kind of Coast

19  Guard exam.  What we're talking about is from a physical

20  standpoint whether or not his physical condition would

21  improve to a point where the pain in his foot goes away

22  and/or he could stop taking whatever medication he was

23  taking, as we just viewed on Exhibit 4?

24    A.  That's correct.

25    Q.  All right.  Now, from the standpoint of a

1  spinal cord stimulator -- and I think -- I think

2  Mr. Paxton just asked you that question -- if Mr. Rivera

3  had pursued a spinal cord stimulator, say, in January of

4  2018, so 10 months ago or 11 months ago, how long would

5  the recovery from period from a spinal cord stimulator

6  have been after that?

7      A.  Three to four weeks, you know, if somebody was

8  going to go back to an active physical sort of job,

9  usually like to say three months because you don't want

10  the wires to move and, so, you like some scar tissue to

11  form around the wires, but I mean three to four weeks he

12  could be doing most things.  To go back to a big deal

13  job like his, assuming -- assuming he got better -- we

14  don't know that 100 percent -- three months.

15      Q.  All right.  And I think you already testified

16  that you believe it was more likely than that not, if he

17  had in the past or would in future have a spinal cord

18  stimulator implantation that his conditions would

19  improve?

20      A.  Yes, that's correct.  I mean no one knows

21  100 percent, all except the good Lord, but I believe

22  that in his case for a lot of reasons we've already

23  discussed, he has a pretty good chance of getting some

24  real improvement, more than -- more likely than not.

25      Q.  All right.  And if these improvements took

1  place, what effect would that have on either A) the pain
2  that he has in his foot and/or B), the medication that
3  he's taking as outlined in the Exhibit 4 that we just
4  looked at?
5      A.  Well, it would be likely -- I mean if it
6  worked, the pain would be less and, therefore, he might
7  require less or no medication.
8      Q.  From the standpoint of your experience with
9  spinal cord stimulation with CRPS and/or whatever
10 condition it is that Mr. Rivera has, what is your
11 opinion as to Mr.- -- the likelihood that Mr. Rivera's
12 prognosis, condition will improve, or could improve
13 provided he pursue some of these other modalities we've
14 talked about in this deposition today?
15     A.  It's more like likely than not that it would.
16     Q.  And if he improves, his physical condition
17 improves, whether or not he will regain his Coast Guard
18 license, you know, what the whole regulatory framework
19 is, is beyond your expertise; however, from a physical
20 standpoint, from a physical ability standpoint as well
21 as a pharmacological standpoint, would there be anything
22 in your mind that would restrict him from pursuing any
23 type of profession?
24     A.  Well, again, it depends on how much improvement
25 he gets.  Improvement can really be striking.  So

1  assuming he gets the significant improvement that I

2  think is more likely than not to happen, no.

3  Q.  He would be able to do whatever he wanted to

4  do --

5  A.  Yeah.

6  Q.  -- from a physical --

7  A.  Well, you know, I wouldn't want him to be a

8  Green Beret or do something crazy like that.  But I

9  think he would be able to go back to most jobs,

10  including his job from a physical standpoint.  I mean

11  this gentleman, your colleague to the right, points out

12  I don't know all the "ins and outs" of the maritime law,

13  and nor do I profess to.

14           MR. SIAHATGAR:  That's all I have.  Thank

15  you very much, sir.

16              (The time is 7:20 p.m.)

17         F U R T H E R   E X A M I N A T I O N

18  BY MR. PAXTON:

19  Q.  Just one real quick question about --

20  A.  Everybody says that, but it's not one question.

21  Go ahead.

22  Q.  This has to do with the timeline of Captain

23  Rivera's diagnosis.  You understand Captain Rivera was

24  first diagnosed by Dr. Evans in December of 2017,

25  right --

1        A.    That may --

2        Q.    -- of CRPS?

3        A.    I don't know that to be correct.  I assume

4    that's correct.

5        Q.    Okay.  And, so, assuming that it's correct,

6    would a conservative method of treatment for his

7    condition, assuming he has it, be to first undergo the

8    sympathetic nerve blocks before going to straight spinal

9    cord stimulator?

10       A.    Yes.

11       Q.    Okay.  And, so, a conservative approach would

12   have been to first get a series of pain injections -- or

13   nerve blocks, determine what the outcome of those nerve

14   blocks is, and then to move on to spinal cord stimulator

15   implantation with the idea that a conservative recovery

16   period may be three to four months, fair?

17       A.    Well, I don't know exactly that.  The

18   appropriate treatment would be to try medication first,

19   which I think was done, and, then, to try a series of

20   blocks.  I don't know that you'd wait three or four

21   months.  I'd probably wait three or four weeks before I

22   would do the blocks, and I would do a lot more blocks

23   than were done; but I don't really know what kind of

24   blocks were done so that's a little hard.

25             But I'm not critical of the fact that he

1  didn't jump into getting a spinal cord stimulator,

2  which, I think is what you're getting at.

3      Q.  That's right.

4      A.  I'm not critical of that, no.  I think now,

5  though, again, I -- if he were my patient, I would want

6  to review what kind of blocks he had, who did the

7  blocks, how qualified were they to do the blocks.  And

8  if I was concerned about that, I'd schedule him for a

9  series of three blocks, one week apart, to really see

10 whether hammering it a little more -- it looks like in

11 somewhere it refers that the blocks were done a month

12 apart -- whether hammering it with blocks would make a

13 difference.  And, then, if not, I would advise him to

14 undergo a trial spinal cord stimulator.

15          MR. PAXTON:  Okay.  Thank you, Doctor.

16 That is my one question.

17          THE WITNESS:  All right.

18          MR. SIAHATGAR:  No further questions.

19 Thank you, Doctor.

20          THE WITNESS:  All right.

21          THE VIDEOGRAPHER:  The time is 7:21 p.m.

22 We are off the record.

23          (Deposition concluded at 7:21 p.m.)

24

25 -- SIGNATURE REQUESTED TO BE WAIVED BY THE WITNESS --

1    UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    GALVESTON DIVISION

4  JAY RIVERA,                        §
                                      §
5      Plaintiff,                     §
                                      §
6  VS.                                §    C.A. NO. 3:17-00111
                                      §       9(H) Admiralty
7  KIRBY CORPORATION AND              §
   KIRBY OFFSHORE MARINE, LLC         §
8      In personam                    §
                                      §
9  M.V. TARPON                        §
       In Rem                         §

10

11

12    REPORTER'S CERTIFICATION OF THE VIDEOTAPED ORAL
          DEPOSITION OF DAVID S. BASKINS, M.D.
13                  DECEMBER 5, 2018

14

15        I, Lori A. Belvin, a Certified Shorthand

16  Reporter and Notary Public in and for the State of

17  Texas, hereby certify to the following:

18     That the witness, DAVID S. BASKINS, M.D., was duly

19  sworn by the officer and that the transcript of the oral

20  deposition is a true record of the testimony given by

21  the witness;

22        That the original deposition was delivered to

23  MR. BIJAN SIAHATGAR.

24        That a copy of this certificate was served on

25  all parties and/or the witness shown herein on

1    _____.

2          I further certify that I am neither counsel for,

3    related to, nor employed by any of the parties or

4    attorneys in the action in which this proceeding was

5    taken, and further that I am not financially or

6    otherwise interested in the outcome of the action.

7          Certified to by me on this, the 7th day of

8    December, 2018.

9

10

11

12

13

14

15

16    _____
      Lori A. Belvin, CSR No. 2572
17    Firm Registration No. 10699
      Expiration Date:  12-31-2019
      1225 North Loop West, Suite 327
18    Houston, Texas  77008
      Ph. No.: (713) 581-7785

19

20

21

22

23

24

25