UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JAY RIVERA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3:17-CV-111 |
| | § | |
| KIRBY CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried to the bench for seven days. The following are the Court's findings of fact and conclusions of law. *See* FED. R. CIV. P. 52. Any conclusion of law more properly characterized as a finding of fact is adopted as such, and any finding of fact more properly characterized as a conclusion of law is adopted as such.

### A. UNDERLYING FACT FINDINGS

1. Captain Jay Rivera ("Captain Rivera" or "Rivera") suffered a severe injury to his left foot on August 19, 2016 while on board the *M.V. Tarpon* ("the *Tarpon*"), a seagoing tugboat owned and operated by Kirby Offshore Marine, LLC ("Kirby"). At the time, Captain Rivera was 39 years old and was a state-commissioned harbor pilot working in Corpus Christi, Texas. Captain Rivera, who grew up watching his father work as a pilot in Puerto Rico, had received his commission from the Governor of Texas as a Branch Pilot for the Port Aransas Bar, Corpus Christi Bay and Tributaries in 2008. Captain Rivera's commission was renewed in 2011 and again in 2015.

2. While serving as a harbor pilot in Corpus Christi, Captain Rivera was a member of an association known as Aransas—Corpus Christi Pilots, which exists, according to its Articles of Agreement, "to establish and maintain a set of agreements, rules and procedures by which the licensed bar pilots individually practicing their profession on the Port Aransas Bar, Corpus Christi Bay and Tributaries may act together in order to improve and enhance the efficiency of such individuals." Aransas—Corpus Christi Pilots collects the pilotage fees earned by its members; places those fees in a common fund; and makes regular pro rata distributions, less expenses, to its members. Captain Rivera formed an S corporation, Riben Marine, Inc., that received his distributions from Aransas—Corpus Christi Pilots. Captain Rivera was the sole owner and sole officer of Riben Marine.

3. Captain Rivera was self-incorporated and acting as an independent contractor during his membership in Aransas—Corpus Christi Pilots. The Court finds that the record facts regarding Captain Rivera's employment status during his membership in Aransas—Corpus Christi Pilots are materially indistinguishable from the record facts regarding the employment status of the pilot in *Bach v. Trident Steamship Co., Inc.*, 920 F.2d 322, 327 & n. 5 (5th Cir. 1991) ("*Bach II*"), *reinstated after remand at* 947 F.2d 1290, 1291 (5th Cir. 1991), *cert. denied*, 504 U.S. 931 (1992); *see also Bach v. Trident Steamship Co., Inc.*, 708 F. Supp. 772, 773 (E.D. La. 1988) ("*Bach I*") (district court opinion describing

*Bach* pilot as self-incorporated, a member of a pilots' association, and an independent contractor).

4. On August 19, 2016, Captain Rivera boarded a pilot boat and traveled approximately three to four miles offshore to serve as a compulsory harbor pilot aboard the *Tarpon* and guide the *Tarpon* to a berth at Oil Dock #11 in the Corpus Christi Harbor. When Captain Rivera's boat met the *Tarpon*, the *Tarpon* was near the Port Aransas sea buoy. The *Tarpon* was attached to a barge as part of an articulated tug/barge unit, a configuration that required Captain Rivera to board the barge in order to board the *Tarpon*.

5. After Captain Rivera boarded the barge from the pilot boat, he made his way to the bow of the *Tarpon*, where he was met by an able-bodied seaman named David Hudgins ("Hudgins"), who was assigned to escort Captain Rivera to the *Tarpon*'s wheelhouse. Hudgins did not typically work on board the *Tarpon* and had only been working on board the *Tarpon* for two days. The master of the *Tarpon*, Captain Jay Crossman ("Captain Crossman" or "Crossman"), testified that he had not provided Hudgins with any formal training regarding how to escort pilots safely to and from the wheelhouse of the *Tarpon*. Moreover, there is no evidence in the record showing that Hudgins had undergone the new-vessel familiarization training that Kirby's internal policies require. Kirby's general manager and corporate representative, Captain Kevin Fogelsanger ("Fogelsanger" or "Captain Fogelsanger"), testified that he did not recall seeing

any notation indicating that Hudgins had undergone new-vessel familiarization training on the *Tarpon*.

6.  Hudgins briefly greeted Captain Rivera before turning around and walking down the port side of the *Tarpon* toward the stern, headed for the aft side of the *Tarpon*'s house. Captain Rivera trailed Hudgins, walking slowly to keep from slipping on sea spray that he saw on the *Tarpon*'s deck. When Captain Rivera reached the aft side of the *Tarpon*'s house, he had lost sight of Hudgins, who had already entered the house.

7.  Entering the *Tarpon*'s house from the aft side entailed entering through a watertight door by climbing over a two-foot-high bulkhead. A single raised step was attached to the bulkhead's outboard side, and another single raised step was attached to the bulkhead's inboard side. The two steps were roughly one foot high from the *Tarpon*'s deck. The watertight door led into a part of the *Tarpon*'s engine room in which engine pistons and other machine parts were stored.

8.  On the deck just inboard of the watertight door was a closed hatch cover. When open, that hatch cover allowed the crew of the *Tarpon* to raise large machinery items out of and lower large machinery items into the *Tarpon*'s lower engine room. But even when the hatch cover was closed, the hatch cover's edge was not flush with the *Tarpon*'s deck; rather, it sat one to one-and-a-half inches above the deck, creating a drop-off of one to one-and-a-half inches around the perimeter of the closed hatch cover. The hatch cover was very close to the bulkhead; the aft edge of the hatch cover lay approximately fifteen inches

forward from the forward edge of the one-foot-high step that was attached to the bulkhead's inboard side. The edges of the hatch cover were not marked and were not painted in a color contrasting the color of the deck. Captain Fogelsanger conceded that the placement of this access hatch—inboard of and underneath a watertight door in a primary walkway—was unusual and that no other vessel in Kirby's fleet contained an access hatch that was placed in such a location. Captain Fogelsanger, in fact, could not say that he had ever seen an access hatch placed in such a location on any vessel other than the *Tarpon*.

9. Captain Rivera entered the *Tarpon*'s house by climbing over the bulkhead using the raised steps. From the inside step, he stepped down toward the deck with his left foot. His left foot landed on the edge of the hatch cover. When Captain Rivera stepped on the edge of the hatch cover, his ankle rolled and he fell, fracturing the fifth metatarsal of his left foot. Hudgins was still out of sight and was not present when Captain Rivera fell.

10. Captain Rivera lay on the deck for a few minutes until Hudgins realized that he had left Captain Rivera behind and reentered the engine room to look for him. Hudgins helped Captain Rivera stand up; and Captain Rivera hopped on his right foot to the *Tarpon*'s galley, where he checked in, and from there to the *Tarpon*'s upper wheelhouse.

11. In the *Tarpon*'s wheelhouse, Captain Rivera reported his injury to Captain Crossman and requested ice and Ibuprofen, which Captain Crossman provided. Captain Rivera then guided the *Tarpon* to its intended berth.

12. Captain Fogelsanger conceded in his testimony that United States Coast Guard regulations required Kirby to submit a Coast Guard Form 2692 regarding the incident to the Coast Guard. No one submitted a Form 2692 to the Coast Guard regarding Captain Rivera's injury. Additionally, an internal audit conducted by Kirby five months before Captain Rivera's fall cited the *Tarpon*'s crew for numerous recordkeeping deficiencies, including failing to properly maintain the *Tarpon*'s vessel log; failing to correctly log pre-departure and pre-arrival inspections; failing to properly log VHF radio calls; failing to properly complete voyage plans; and failing to properly conduct and log job hazard analyses. This evidence of varied recordkeeping failures on the *Tarpon* leads the Court to explicitly reject as having no probative value the testimony offered by Captain Crossman and Captain Fogelsanger claiming that, prior to Captain Rivera's fall, Captain Crossman and Kirby had never been notified of an incident in which someone tripped, slipped, or fell on the hatch cover on which Captain Rivera broke his foot.

13. Captain Crossman and Captain Fogelsanger both testified that the area in which Captain Rivera fell was the primary avenue of ingress to and egress from the *Tarpon*'s house. Captain Rivera's marine safety expert, Captain Reginald McKamie ("Captain McKamie" or "McKamie"), credibly testified that the area in which Captain Rivera fell was not reasonably fit and safe for the purposes of ingress to and egress from the *Tarpon*'s house. Captain McKamie further credibly testified that, in order to make the area in which Captain Rivera fell

reasonably fit and safe for the purposes of ingress to and egress from the *Tarpon*'s house, Kirby and the *Tarpon*'s crew needed to either: (1) mark the difference in elevation around the perimeter of the closed hatch cover with, for example, reflective tape or yellow nonskid paint; or (2) put in an order for a shipyard repair to modify the hatch cover so that, when closed, it would lie flush with the *Tarpon*'s deck. Captain McKamie based his assessment on maritime industry customs and standards regarding the prevention of trip hazards in walkways. Captain McKamie testified that a written standard promulgated by ASTM International entitled "Standard Practice for Human Engineering Design for Marine Systems, Equipment, and Facilities" accurately encapsulates the general maritime industry customs and standards regarding trip hazards on which Captain McKamie relied in forming his opinion. The ASTM standard first prescribes that, to the extent possible, workplace walkways on maritime vessels should be constructed without elevation changes. If such a construction is not feasible, the ASTM standard prescribes that elevation changes in excess of three-eighths of an inch, if not clearly visible, should be marked to warn of a potential trip hazard.

14. The Court notes that some of Kirby's own training materials bolster Captain McKamie's description of the relevant industry customs and standards regarding the prevention of trip hazards in walkways. Indeed, Kirby's training materials alone could have adequately supported an expert opinion that the hatch cover on which Captain Rivera broke his foot should have been marked or repaired. One

such piece of training material is a video made by a company named Moxie Media. At one point, the Moxie Media video depicts a worker stepping on an unmarked abrupt elevation change in a walkway and rolling his ankle while a narrator discusses how "[u]neven surfaces, including curbs, steps, or step-up doorways, frequently cause trips." A few minutes later, the video depicts an oddly positioned single step that is properly marked with yellow paint while that same narrator admonishes the viewer to "[c]learly mark any known hazards, such as steps that are hard to see or step-up doorways." Dovetailing the Moxie Media video are two printed documents, one entitled "Lesson Plan for Slip, Trip and Fall Prevention" and the other entitled "Lesson Plan for Slip, Trip and Fall Prevention—Beyond the Basics" ("the lesson plans"). The lesson plans are safety-training scripts authored by the Safety Committee Chairman of the American Waterways Operators, a trade group of which Kirby is a member; and Captain Fogelsanger acknowledged that, as a member of the American Waterways Operators group, Kirby relies on documents like the lesson plans to improve its safety management system. The lesson plans state that "[a]s little as a 3/8-inch rise in a walkway can cause a person to 'stub' his toe, resulting in a trip and fall[,]" echoing the ASTM standard's warning that elevation changes in excess of three-eighths of an inch generally present trip hazards. Moreover, the lesson plans specifically mention hatches as potential trip hazards. In short, the walkway in which Captain Rivera broke his foot represented a confluence of several factors discussed in Kirby's own training materials in that the walkway

featured an abrupt change in elevation that was significantly larger than three-eighths of an inch and was created by an oddly positioned, hard-to-see hatch cover. In tandem, the Moxie Media video and the lesson plans provide ample support for Captain McKamie's opinion that Kirby and the *Tarpon*'s crew did not conform to industry customs and standards when they failed to mark or repair the hatch cover on which Captain Rivera broke his foot. Notably, in the eight years that he spent as master of the *Tarpon* before Captain Rivera's injury, Captain Crossman never identified or corrected a trip hazard anywhere on the *Tarpon*, a fact that surprised even Captain Fogelsanger.

15. Captain McKamie further testified that Kirby and the *Tarpon*'s crew did not conform to industry customs and standards regarding the provision of escorts to harbor pilots. According to Captain McKamie, industry customs and standards required Kirby and the *Tarpon*'s crew to provide an escort to Captain Rivera who was both properly trained and familiar with the *Tarpon*. Captain McKamie opined that industry customs and standards require an escort to make a harbor pilot aware of trip hazards and other unsafe conditions while the escort is taking the pilot to the bridge to meet the captain. The Court also found this opinion credible.

16. After Captain Rivera guided the *Tarpon* to its intended berth, he hopped on his right foot to the stern of the *Tarpon*, where line handlers helped him off of the *Tarpon* and into his vehicle.

17. Captain Rivera went from the *Tarpon* to Bay Area Hospital in Corpus Christi. Although the practitioners at Bay Area Hospital initially diagnosed him with a sprained ankle, Captain Rivera saw his primary care physician, Dr. Tom Dorrell ("Dr. Dorrell"), three days later and was diagnosed with a broken foot. Dr. Dorrell recommended that Captain Rivera see Dr. Dawn Grosser ("Dr. Grosser"), an orthopedic surgeon. Dr. Grosser diagnosed Captain Rivera with a fracture of the fifth metatarsal of his left foot, put him in an air cast, and gave a prognosis of a return to work in six to 12 weeks.

18. Approximately a month after his fall aboard the *Tarpon*, Captain Rivera was experiencing hyperintense pain and occasional shooting pains along the dorsum of his foot that radiated throughout the foot and were not limited to the fracture site. The foot was also cool, discolored, and extremely sensitive even to very light touch. Dr. Grosser recommended that Captain Rivera use a bone stimulator and referred him to a physical therapist. Captain Rivera made some progress, but he continued to suffer severe pain.

19. On January 31, 2017, Dr. Grosser released Captain Rivera to return to work and gave him an orthotic insert for his shoe. After his return to work, Captain Rivera continued to suffer severe pain in his left foot. At Dr. Grosser's recommendation, Captain Rivera climbed ladders—something that harbor pilots frequently do— by keeping his left foot parallel to the steps of the ladders and placing his entire left foot on each step (as opposed to stepping on the ladder with only half of his foot and with his foot perpendicular to the steps, as is common) in order to

distribute his weight evenly along the sole of his left foot. Captain Rivera also continued seeing the physical therapist.

20. In order to maintain his license to serve as a harbor pilot, Captain Rivera was required to undergo an annual physical examination. Even though Captain Rivera passed such an examination in July of 2017, he learned that same month in a follow-up appointment with Dr. Grosser that his lingering pain resulted from a nonunion, meaning a failure of his metatarsal to heal properly on its own—a complication sometimes attendant to fractures like the one suffered by Captain Rivera. Dr. Grosser recommended surgery to repair the bone.

21. In September of 2017, Dr. Grosser performed an open reduction internal fixation surgery on Captain Rivera's left fifth metatarsal using a bone graft from Captain Rivera's heel. The procedure did not alleviate Captain Rivera's pain, which in fact intensified post-surgery.

22. In December of 2017, Captain Rivera consulted with a neurologist, Dr. Randolph Evans ("Dr. Evans"), who diagnosed him with Complex Regional Pain Syndrome ("CRPS") of the left lower limb based on his medical history and a physical examination. Dr. Evans noted that Captain Rivera's left foot had less hair on the top than his right foot did and that Captain Rivera's left foot was cooler than his right foot was, indicating atrophic and vasomotor changes consistent with CRPS. Dr. Evans also noted findings of chronic pain and chronic cutaneous allodynia, which were also consistent with CRPS.

23. CRPS is a disorder characterized by debilitating burning pain. Though it is more aptly characterized as a neurological condition than as an orthopedic one, it can have an orthopedic trigger; and Dr. Evans opined that Captain Rivera's CRPS was caused by his fall aboard the *Tarpon*. In his testimony, Dr. Evans emphasized that he found no fault with either Dr. Grosser's decision to operate on Captain Rivera's foot or the manner in which she conducted the surgery. Dr. Evans testified that, even if performed properly, a surgery can cause or exacerbate CRPS. Dr. Evans also testified that, although research has found that a significant portion of CRPS cases originate with fractures, diagnosing CRPS immediately after a fracture can be very difficult because of the overlap between symptoms associated with CRPS and symptoms associated with fractures. Dr. Evans's testimony indicates that, in many cases, CRPS is only diagnosed after pain persists for longer than one would expect if the fracture alone were causing the pain.

24. Dr. Evans recommended that Captain Rivera continue physical therapy; augment the pain medication (Tramadol) that he was already taking by beginning Gabapentin, a neuropathic pain medication that treats CRPS effectively; and follow up with Dr. Grosser. Dr. Grosser referred Captain Rivera to Dr. Li Herng Liu ("Dr. Liu"), a pain specialist. In February of 2018, Dr. Liu, like Dr. Evans, diagnosed Captain Rivera with CRPS of the left lower limb. Dr. Liu administered two lumbar sympathetic nerve blocks to Captain Rivera, which failed to provide any pain relief.

25. In June of 2018, Captain Rivera consulted with Dr. Evans again. Dr. Evans performed another physical examination of Captain Rivera and confirmed his earlier diagnosis of CRPS. Because Captain Rivera was having trouble tolerating the Gabapentin that Dr. Evans had previously prescribed, Dr. Evans prescribed Cymbalta. In his notes, Dr. Evans opined that, more likely than not, Captain Rivera would "not be able to pass a Coast Guard physical and return to work as a mariner in the next . . . year."

26. Dr. Evans's opinion proved prescient when, less than a month later, Captain Rivera failed his annual physical examination. The occupational physician who administered the physical examination, Dr. Thomas Moloney ("Dr. Moloney"), had performed 12 prior physical examinations on Captain Rivera, all of which Captain Rivera had passed. When he examined Captain Rivera in June of 2018, however, Dr. Moloney concluded that Captain Rivera was medically unfit for his merchant mariner medical certification. Dr. Moloney attributed his conclusion to Captain Rivera's "chronic left foot problems and medication side effects[.]" As a result of Dr. Moloney's conclusions, the National Maritime Center formally found that Captain Rivera should not operate under the authority of his merchant mariner credential, citing Captain Rivera's "chronic regional pain syndrome with documented inability to perform [his] duties due to chronic pain and medication side effects."

27. Captain Rivera informed the Port of Corpus Christi pilot board and his colleagues in the Aransas—Corpus Christi Pilots organization that he had failed

his physical examination. On July 27, 2018, the Board of Pilot Commissioners for the Port of Corpus Christi voted unanimously to recommend to the Governor of Texas that Captain Rivera's state pilot commission be revoked. On July 31, 2018, Captain Rivera lost his membership in Aransas—Corpus Christi Pilots, as was mandated by the organization's bylaws.

28. At trial, Dr. Evans testified that, more likely than not, Captain Rivera will suffer from CRPS for the rest of his life. The Court credits this testimony and so finds.

## B. ULTIMATE FACT FINDINGS AND CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter under 28 U.S.C. § 1333(1).

2. Captain Rivera has brought an unseaworthiness action against the defendants based on the *Sieracki* doctrine, and he may recover under that claim. The defendants argue that Captain Rivera is covered by the Longshore and Harbor Workers' Compensation Act ("LHWCA") because he is not a Jones Act seaman and that, as a result, Captain Rivera's unseaworthiness action is barred as a matter of law. The Court disagrees: in *Bach II*, the Fifth Circuit examined the merits of a pilot's survivors' unseaworthiness claim under the *Sieracki* doctrine even though the district court had dismissed that unseaworthiness claim on the basis that the pilot was covered by the LHWCA because he was not a Jones Act seaman. *Bach II*, 920 F.2d at 327 & n. 5 (citing *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946) and *Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir. 1981)); *see also Bach I*, 708 F. Supp. at 775. The *Bach II* panel held that, while the pilot lacked the requisite vessel connection to qualify as a Jones Act seaman, "the

record before [the panel] d[id] not clearly reveal whether [the pilot] was an LHWCA-covered worker" because it was not clear "that [the pilot] was the employee of anyone." *Bach II*, 920 F.2d at 324–27 & n. 5. Since it was "unclear whether the LHWCA covered [the pilot,]" the *Bach II* Court explicitly "address[ed the pilot's survivors' unseaworthiness] claim on the merits." *Id.* at 327 & n. 5. Based on the evidence produced at this trial, the Court has found that the record facts regarding Captain Rivera's employment status during his membership in Aransas—Corpus Christi Pilots are materially indistinguishable from the record facts regarding the employment status of the pilot discussed in *Bach I* and *Bach II. See Bach I*, 708 F. Supp. at 773; *Bach II*, 920 F.2d at 327 & n. 5. The Court will therefore address the merits of Captain Rivera's unseaworthiness claim. *Bach II*, 920 F.2d at 327 & n. 5; *see also Blancq v. Hapag-Lloyd A.G.*, 986 F. Supp. 376, 381–83 (E.D. La. 1997).

3. Captain Rivera's unseaworthiness claim is meritorious. A shipowner has an absolute duty to provide a seaworthy vessel. *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988). "[T]he seaworthiness doctrine . . . is in essence that things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 213 (1963). To prevail on an unseaworthiness cause of action, then, the plaintiff must prove that the shipowner "has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the

purposes for which it is to be used." *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001). The plaintiff must also establish that the "unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson*, 845 F.2d at 1354. "[T]he shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability. . . . What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549–50 (1960). Trip hazards in walkways can render a vessel unseaworthy. *See, e.g., Sousa v. M/V Caribia*, 360 F. Supp. 971, 976 (D. Mass. 1973) (finding, in a case in which the plaintiff had tripped on a raised hatch cover lifting ring while carrying a carton of frozen fish, that the raised lifting ring had rendered the deck of the vessel's hold unfit for the purpose of discharging cargo); *Jussila v. M/T Louisiana Brimstone*, 691 F.2d 217, 218–20 (5th Cir. 1982) (holding, in a case in which the plaintiff had tripped on a metal rim protruding vertically from the deck of a vessel, that the plaintiff created a fact question as to unseaworthiness by presenting an expert who testified that the vessel owner had violated industry custom by not painting the metal rim with white or luminous paint). Captain Rivera has met his burden of proof. Kirby and the *Tarpon*'s crew violated industry customs and standards and created an unsafe condition when they failed to mark or repair the hatch cover on which Captain Rivera broke his foot. Kirby and the *Tarpon*'s crew also violated industry customs and standards

and created an unsafe condition when they failed to provide an escort to Captain Rivera who was both properly trained and familiar with the *Tarpon*. These unseaworthy conditions played a substantial part in causing Captain Rivera's injuries and the loss of his state harbor pilot commission, and Captain Rivera's injuries and the loss of his state harbor pilot commission were direct results and/or reasonably probable consequences of the *Tarpon*'s unseaworthiness.

4. Even if Captain Rivera were covered by the LHWCA, he would still prevail. In his live complaint, Captain Rivera has, as an alternative to his unseaworthiness action, asserted a negligence action against Kirby and the *Tarpon* under Section 905(b) of the LHWCA. *See* 33 U.S.C. § 905(b). A person who is covered by the LHWCA (such a person is often referred to as a "longshoreman," irrespective of actual job title) and who is injured by the negligence of a vessel may bring an action for damages against the vessel under Section 905(b). *Burchett v. Cargill, Inc.*, 48 F.3d 173, 178 (5th Cir. 1995). A maritime negligence action requires the plaintiff to prove: (1) that there was a duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) injury sustained by the plaintiff; and (4) a causal connection between the defendant's conduct and the plaintiff's injury. *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir. 1991). The harm resulting from the defendant's breach of duty must be reasonably foreseeable in order to be actionable. *Id.* Under Section 905(b), a vessel has a duty—commonly called the "active control" duty—to "exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the

active control of the vessel during the stevedoring operation." *Burchett*, 48 F.3d at 179 (quoting *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156, 167 (1981)) (quotation marks omitted). Put another way, a vessel may be held liable to a longshoreman "for injury caused by hazards under the control of the ship." *Burchett*, 48 F.3d at 178. The longshoreman may recover even if the injury-causing hazard was open and obvious, though contributory negligence can reduce the longshoreman's recovery. *Masinter v. Tenneco Oil Co.*, 867 F.2d 892, 897–98 (5th Cir. 1989), *modified on other grounds*, 929 F.2d 191 (5th Cir. 1991). During Captain Rivera's time on the *Tarpon*, Kirby and the *Tarpon* maintained active control over the walkway in which Captain Rivera broke his foot; therefore, by failing to mark or repair the hatch cover on which Captain Rivera broke his foot, and by failing to provide an adequate escort to Captain Rivera, Kirby and the *Tarpon* breached the LHWCA's active control duty. *Id.* at 897–98 (affirming the district court's finding of negligence when the defendant controlled the vessel and the defendant's crew placed a moveable stairway such that there was an uneven surface beneath the steps and an inordinate distance between the last step and the deck); *see also Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 535–36 (5th Cir. 1986) (affirming the district court's finding of negligence when the defendant's crew failed to clean drilling mud off of a keyway deck in an area controlled by the defendant). The hazard that caused Captain Rivera's injuries was not open and obvious, and Captain Rivera was not contributorily negligent. There was a causal connection between the defendants'

conduct and Captain Rivera's injuries and the loss of his state harbor pilot commission, and Captain Rivera's injuries and the loss of his state harbor pilot commission were reasonably foreseeable consequences of the defendants' breaches of the active control duty.

5.  With regard to the calculation of lost future earnings in this case, Captain Rivera has developed a sufficient evidentiary basis to support a deviation from the Bureau of Labor Statistics ("BLS") work-life expectancy average. A trial court may deviate from the BLS work-life expectancy average based on "evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average." *DePerrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 361 (5th Cir. 2016) (quotation marks omitted). In *DePerrodil*, the plaintiff successfully argued for a deviation by first establishing that he had set a specific goal (corroborated by an agreement with his wife) of working until age 75 and then establishing, using expert testimony from a vocational-rehabilitation counselor, that the age-75 goal was reasonable. *Id.* at 362.

6.  Like the plaintiff in *DePerrodil*, Captain Rivera has presented evidence establishing both a specific pre-injury retirement goal and the reasonableness of that goal. On the witness stand, Captain Rivera made very clear that, from a very young age, he wanted to emulate his father, who served as a pilot in Puerto Rico for 35 years and retired just before he turned 65. When Captain Rivera broke his foot on the *Tarpon*, he was well on his way to matching his father, having

received his Texas pilot commission at the age of 31. Captain Rivera testified that serving as a harbor pilot was his "dream job" and that, before suffering the injury from which this lawsuit arose, he had planned to work past the age at which his father retired. According to his testimony, Captain Rivera set his retirement goal at age 68 because that is the mandatory retirement age for pilots working in the Port of Houston. Indeed, 68 is the mandatory retirement age for pilots at three of the five port complexes (Houston, Brazoria County, and Jefferson and Orange County) addressed in the Texas Transportation Code; the other two complexes (Corpus Christi, where Captain Rivera served as a pilot, and Galveston County) have no mandatory retirement age for pilots. *See* Tex. Transp. Code §§ 66.040 (Houston); 67.040 (Galveston County); 68.040 (Brazoria County); 69.040 (Jefferson and Orange County); 70.040 (Corpus Christi). Captain Rivera's testimony was clear enough to establish that he had set a specific retirement goal of working until at least age 68. Additionally, Captain Rivera presented expert testimony to establish that, prior to his fall on the *Tarpon*, his goal of working until at least age 68 was reasonable. Dr. Moloney testified that he has performed Coast Guard physical examinations to determine mariners' physical competency since 1991 and that, during that time, he has performed 13 physical examinations on Captain Rivera. After the last such examination, Dr. Moloney deemed Captain Rivera medically unfit to hold a merchant mariner credential because Captain Rivera had been diagnosed with CRPS and placed on medication that could cause drowsiness and disorientation.

However, Dr. Moloney testified that, prior to Captain Rivera's fall on the *Tarpon*, he saw nothing in Captain Rivera's physical examinations or medical history indicating that Captain Rivera would be unable to meet his goal of maintaining his merchant mariner credential and working as a pilot until age 68.

7. That Captain Rivera lost a substantial income stream when he lost his pilot commission is undeniable. Captain Rivera's economist, Dan Cliffe ("Cliffe"), calculated Captain Rivera's lost future earnings appropriately; and the Court found his testimony credible. This Court must calculate Captain Rivera's lost future earnings by: (1) estimating the loss of work life resulting from Captain Rivera's injury; (2) calculating the lost income stream; (3) computing the total damage; and (4) discounting that amount to its present value. *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir. 1983) (en banc). Fifth Circuit precedent requires this Court to use the "below-market-discount method" to account for the effect of inflation. *Id.* at 117–18. When using this method, the trier of fact estimates the wage increases the plaintiff would have received each year as a result of all factors other than inflation, then discounts the resulting income stream by a below-market discount rate that represents the estimated market interest rate adjusted for the effect of any income taxes and offset by the estimated rate of general future price inflation. *Id.* at 118. Calculation of the lost income stream begins with the injured party's gross earnings at the time of the injury. *Id.* at 117. When earnings data is inconsistent, as it is in Captain Rivera's case, it is appropriate to analyze and average earnings from past years, which is

what Cliffe did. *See, e.g., In re Parker Drilling Offshore USA LLC*, 323 Fed. App'x 330, 335 (5th Cir. 2009) (citing cases) (approving the district court's use of a five-year period to estimate gross earnings because of fluctuations in earnings). Captain Rivera was not paid a set salary as a pilot; the amount of vessel traffic through the Port of Corpus Christi determined the amount that he earned. As a result, in the five-year period extending from 2013 to 2017, Captain Rivera's earnings from pilotage varied from a low of $613,349 in 2013 to a high of $722,868 in 2015. Captain Rivera's average annual earnings from pilotage for that five-year period were $667,211. Cliffe subtracted $20,000 from that average to account for non-reimbursable expenses, resulting in a wage-base figure of $647,211. When extrapolating from that wage-base figure, Cliffe testified that, more likely than not, Captain Rivera's earnings would have risen at a rate of approximately one percent above inflation during his work life. After calculating lost future earnings using a one-percent growth rate net of inflation, Cliffe applied a range of below-market discount rates to discount the lost-earnings figure to its present value. Use of a range of discount rates was appropriate because Captain Rivera was only 39 when he suffered his injury and thus had many years of work life left. The below-market discount rates represent returns on reasonably safe investments, primarily United States Treasury debt obligations; and Cliffe utilized rates ranging from .87 percent to 1.58 percent net of inflation. According to Cliffe's calculations, if Captain Rivera worked until his retirement goal of age 68, and if his wages grew at a rate of one percent net

of inflation, his lost future earnings, discounted to present value, would be $10,868,197. The Court "must remember that the ultimate total damage figure awarded is the sum of a series of predictions, none of which involves mathematical certainty, and that it is the reasonableness of the ultimate figure that is really in issue[.]" *Culver*, 722 F.2d at 121 (quotation marks omitted). Having considered Cliffe's testimony and reports, the Court concludes that the calculations and figures provided by Cliffe are reasonable.

8. However, the $10,868,197 in lost future earnings must be reduced to account for Captain Rivera's residual earning capacity. At trial, Cliffe noted that his initial calculations assumed a residual earning capacity of $95,000 per year based on Captain Rivera's work as a consultant and expert witness. Cliffe then conceded that he needed to adjust his calculations downward to account for the testimony of Captain Rivera's vocational rehabilitation expert, Wallace Stanfill ("Stanfill"), that Captain Rivera could earn as much as $150,000 a year post-injury. In order to make that adjustment, Cliffe took the $55,000-per-year difference between $95,000 and $150,000; reduced that $55,000 to account for taxes; calculated an income stream using the assumption that Captain Rivera would do his consulting work until age 62; and then discounted that amount at a rate of 1.02 percent. The resulting reduction was $800,000. After the subtraction of that $800,000, Captain Rivera's lost future earnings total $10,068,197.00.

9. When he lost his membership in Aransas—Corpus Christi Pilots, Captain Rivera also lost the opportunity to accrue credit in the Aransas—Corpus Christi Pilots

defined-benefit pension plan. Captain Rivera accrued 11 years of credit in the pension plan. The maximum number of years of participation in the pension plan is 30. In order to ascertain the amount that Captain Rivera lost when he lost the opportunity to accrue the remaining 19 years of credit in the pension plan, Cliffe subtracted what Captain Rivera will be entitled to under the pension plan from what he should have been entitled to under the pension plan. Cliffe averaged Captain Rivera's three highest consecutive years of compensation; applied the four-percent multiplier provided in the pension plan to the three-year compensation average; and multiplied by 30 years for an annual pension value of $240,605—i.e. what Captain Rivera should have been entitled to. Using the same formula, Cliffe calculated, and the pension plan's actuaries confirmed, that Captain Rivera's 11 years of participation will provide an annual pension value of $104,846—i.e. what Captain Rivera will be entitled to. Subtracting the latter from the former leaves a difference of $135,759 annually. Captain Rivera will turn 62 and begin receiving his pension in 2039, and his statistical life expectancy extends to 2055. Cliffe took that 16-year period, multiplied it by $135,759, and discounted the result to present value using the interest rate at the time of trial. The total was $1,469,129.00.

10. Captain Rivera is also entitled to past lost wages from August 1, 2018—which is the day after Captain Rivera lost his membership in Aransas—Corpus Christi Pilots—until the beginning of trial. Cliffe calculated that past wage loss, after taxes, to be $157,810.00.

11. The Court concludes that Cliffe's calculations and methodology are reasonable, appropriate, and compliant with the governing law. In accordance with that conclusion, the Court awards Captain Rivera damages in the amount of $11,695,136.00.

## C. **CONCLUSION**

The Court renders judgment for the plaintiff in the amount of $11,695,136.00. Any pending motions are denied as moot.

**It is so ORDERED.**

SIGNED at Galveston, Texas, on _____, 2019.

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE